Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

**IN THE CIRCUIT COURT OF ST. LOUIS CITY**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| ERB LEGAL INVESTMENTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Cause No. 2022-CC09383 |
| QUINTESSA MARKETING, LLC, | ) | |
| | ) | Division No. |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**<u>AMENDED PETITION</u>**

**COMES NOW** Plaintiff, ERB Legal Investments, LLC, by and through the undersigned attorneys, and for the cause of action against Defendant, Quintessa Marketing, LLC states as follows to the Court:

1.      Plaintiff ERB Legal Investments LLC is a Missouri Corporation that operates as a law firm within the States of Missouri and Illinois.

2.      Defendant Quintessa Marketing, LLC is an Oklahoma Corporation that provides "bulk marketing" services for law firms throughout the United State, including Missouri, and touts itself as a "full service platform" in marketing for, screening, qualifying and signing "plaintiffs" involved in motor vehicle collisions for representation.

3.      Plaintiff and Defendant entered into a Contract attached as **Exhibit 1** wherein Defendant would provide its "bulk marketing" services for Plaintiff and provide its "full service platform" in marketing for, screening, qualifying and signing "plaintiffs" involved in motor

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

vehicle collisions for representation. Plaintiff incorporates all terms and conditions thereof as if fully set forth herein.

4.      Exhibit 1 was drafted by Defendant Quintessa.

5.      Plaintiff executed **Exhibit 1** on April 21, 2020, emailed it to Defendant on that same day and pre-funded the marketing account with $50,000.00.

6.      Defendant requested a copy of Plaintiff's retainer contract so that "Plaintiffs" could be retained on Plaintiff's retainer.

7.      Plaintiff provided a copy of its retainer contract to Defendant.

8.      Plaintiff gave Defendant limited authority to use said contingency fee contract to sign "plaintiffs" if and only if they met the minimum criteria called for in the contract.

9.      Plaintiff at all times herein was required to pre-fund its marketing account with Defendant.

10.     Indeed, Plaintiff's account was at all times pre-funded, meaning that Defendant had possession of unearned funds at all times.

11.     Defendant began tracking all individuals it made contact with on behalf of Plaintiff in a Google Document. The Google Document set up by Defendant was a real-time document wherein Quintesssa would communicate to Plaintiff the name of the "plaintiff" along with other basic information. While some of the information was straightforward, some was not. For instance, the document would change font color of some "plaintiffs" from black to red without any reference at to status. Some would be in yellow highlighting.

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

12.     Plaintiff was only granted "read" access to said Google Document except for 2 functions: 1) a "disengage" button and 2) a note field.

13.     Shortly thereafter, Defendant began engaging "plaintiffs" by having them execute Plaintiff's contingency fee contract.

14.     One of the Defendant's duties under the contract was to prequalify all "plaintiffs" pursuant to the terms and conditions of **Exhibit 1**.

15.     It became immediately apparent that Defendant was not fulfilling its duties in ensuring that "plaintiffs" met minimum criteria before signing them to Plaintiff's contingency fee contract.

16.     In particular, Defendant would sign "plaintiffs" to Plaintiff's contingency fee contract that did not meet minimum criteria in one or more respects. Thus, they were not being pre-qualified by Defendant.

17.     Plaintiff, by and through its owner, brought the fact leads were not being properly pre-qualified to the attention of Lauren Mingee and Leo Mingee, the owners of Defendant.

18.     On May 14, 2020, Plaintiff's owner, Lauren Mingee and Leo Mingee had a telephone conversation wherein an audio recorded conversation took place wherein the parties discussed the fact Defendant was signing unqualified "plaintiffs" who did not meet minimum criteria as called for in **Exhibit 1**. In particular, Defendant was signing "plaintiffs" without verification of insurance. During that call, it was agreed that Plaintiff would help qualify for insurance, but that usually this takes far longer than 144 hours. Defendants stated that "extensions" for insurance would be granted and that it would not be a problem. At no time did Defendant state

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

that Plaintiff was required to "disengage" a case first in order to obtain an extension to qualify the case for insurance or take any specific actions in this regard.

19.     Immediately thereafter and in reliance upon this conversation, on May 14, 2020, Plaintiff emailed Defendant a new retainer contract to use in signing up "plaintiffs," which made clear that our representation of that plaintiff was conditioned upon and it was specifically amended to state: "You understand we are accepting your personal injury case on a contingency fee contract, subject to the terms and conditions below, based upon the understanding that a) you were not at fault in causing the crash, b) there is automobile insurance coverage (liability or uninsured motorist), c) that there is at minimum $1500 in property damage and d) that you have physical injuries for which you sought medical treatment within 14 days and are continuing to need medical treatment as a result of these injuries. We reserve the right to reject your case if any one of these factors is not applicable to your case and we will not charge you any fee."

20.     Despite Plaintiff sending the new contract to Defendant, Defendant continued to a) sign up "plaintiffs" that were not properly qualified on the old contract, b) emailing the case to Plaintiff and c) deducting monetary funds from Plaintiff's account. Defendant also continued to email unengaged "plaintiffs" and deducting monetary funds from Plaintiff's account.

21.     In some instances, Defendant would not sign a "plaintiff" on the retainer contract and instead simply email over unengaged individuals for Plaintiff's consideration. On those, Defendant never indicated if, how or when Plaintiff would or would not be charged for "plaintiffs" who were unengaged, but simply emailed for consideration. Moreover, the only button on the Google Document was to "disengage" a "plaintiff." From Plaintiff's perspective, since these

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

people were never engaged, there was nothing to disengage. Most importantly, Defendant never communicated that unengaged "plaintiffs" needed to be disengaged.

22.     Over the course of the next two months, Defendant continued to sign up both qualified and unqualified "plaintiffs" on the old retainer contract instead of the new one. The unqualified plaintiffs were sometimes a) in geographical areas that were not agreed to, or b) signed without any good faith belief there was insurance, or c) signed without any good faith belief they were not at fault, or d) signed without any good faith belief that property damage exceeded $1500.

23.     During this time, Plaintiff knew engaged plaintiffs needed to be disengaged within the Google Document within 144 hours for criteria ***unrelated*** to insurance. Plaintiff complied with this.

24.     In reliance upon the May 14, 2020 phone call, Plaintiff continued to accept dozens of engaged plaintiffs when there initially appeared to be no insurance available.

25.     In reliance upon the May 14, 2020 phone call, Plaintiff continued to work diligently on engaged plaintiffs to qualify them for insurance, which took more than 144 hours to properly vet, as was repeatedly explained to Defendant.

26.     During this time, Defendant never disclosed to Plaintiff it was taking money out of Plaintiff's pre-funded account for any engaged "plaintiffs" when insurance was still unverified after 144 hours.

27.     During this time, Defendant never disclosed to Plaintiff it required Plaintiff to first ask permission on a case-by-case basis to obtain its permission to qualify a case beyond the 144 hour mark.

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

28.     During this time, Defendant lead Plaintiff to believe that Plaintiff was doing a service to both itself and Defendant by conducting a thorough and complete investigation for insurance, even if it took longer than 144 hours, by not disclosing that it was charging Plaintiff for those "plaintiffs" when the 144 hour mark hit.

29.     On June 3, 2020, Plaintiff's owner, Ryan Bradley emailed Lauren Mingee, the owner of Quintessa asking for clarification as to how disengagements were being handled on the Google Document. That email stated:

*Hi Lauren…. Can you LMK what the color coding on the excel sheet means?*

*RED I guess means disengaged.*

*How can we tell if these is one that we turned down, but it is still chargeable versus one that we TD that you agreed is not chargeable?*

*Thanks,*

*Ryan*

30.     Lauren Mingee nor anyone at Defendant Quintessa ever responded to the email referenced in paragraph 28.

31.     Defendant knew Plaintiff did not understand the disengagement policy, requested it clarify the policy, and despite this Defendant knowingly refused to clarify the policy.

32.     At no time whatsoever did Defendant explain it apparently wanted Plaintiff to use the Google Document to request extensions to verify insurance coverage.

33.     The Google Document did not even have functionality available to Plaintiff for any such extension request as there was no "extension" button.

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

34.     At no time whatsoever did Defendant explain Plaintiff needed to "disengage" plaintiffs who were never "engaged" in the first place.

35.     On June 4, 2020, Plaintiff again emailed Quintessa about using the new contract that incorporated the minimum criteria to become a "plaintiff" and stated in that email: "*Can you guys check to make sure that you received the amended contract that I sent over three or four weeks ago? The old one is still being used and I would like to use the updated one. If you need me to send it again, I will. Thank you, ryan*"

36.      In response, Lauren Mcneil stated "Can you resend we can confirm we have it."

37.     On June 10, 2020, Plaintiff emailed Quintessa the new contract for the <u>third time</u>, stating: "Here are the 2 contracts I sent over …. Please use this."

38.     The new contracts were never used by Quintessa. Instead, Quintessa continued to use the old retainer contract to sign unqualified leads against Plaintiff's express directive not to do so, which did not contain the minimum case criteria agreed upon by Plaintiff and Defendant.

39.     Notably, Quintessa had the new contract with the agreed-upon minimum criteria but never expressed to Plaintiff that it disagreed with it.

40.     During the next month to 45 days, Quintessa continued to sign unqualified "plaintiffs" to Plaintiff's old contingency fee contract and refusing to clarify how it was handling disengagements and/or refunds for cases that turned out to be unqualified.

41.     Within the Google Document  Plaintiff was only granted limited functionality. Plaintiff could only click on a button to "disengage" a "plaintiff" if the case did not meet one or

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

more of the minimum criteria. However, after 144 hours, the button would not be functional. The only other functionality usable by Plaintiff was a "note" field.

42.     During this time, Plaintiff worked in good faith in an attempt to qualify engaged and unengaged plaintiffs, especially as to the exitance of insurance.

43.     During this time, Plaintiff was under no impression that it would be charged for any engaged or unengaged plaintiffs if it was determined there was no insurance more than 144 hours from the time the lead was sent to Plaintiff.

44.     During this time, Plaintiff believed it was helping both itself and Defendant by thoroughly vetting the case for insurance, which always took longer than 144 hours. In doing so, it created a "win-win" for both parties. Plaintiff got a qualified "plaintiff" and Defendant was able to charge Plaintiff.

45.     After Plaintiff conducted a thorough and exhaustive search for insurance, approximately 22 cases were determined by Plaintiff not to be qualified due to insurance reasons.

46.     Plaintiff requested "disengagement" from these 22 cases on various dates from Defendant by entering a "note" on the Google Document.

47.     Defendant did not respond to the notes entered by Plaintiff. Instead, In fact, the "notes" that were entered by Plaitniff requesting disengagement were often deleted by Defendant without explanation. Plaintiff would re-enter the note once again only to find the note would disappear without explanation by the Defendant.

48.     In addition to submitting disengagements through the portal, since Plaintiff was not getting responses from Quintessa about those disengagements, at times Plaintiff emailed

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

Defendant about disengagements from "plaintiffs" that did not meet minimum criterial, in particular for insurance or fault reasons beyond the 144 hour deadline after Plaintiff's due diligence was completed.

49.     Those emails were once again ignored by Defendant.

50.     During this time, Defendant Quintessa would not advise Plaintiff if it was or was not issuing disengagement credits through the Google Document nor the reasons for any of its decisions to reject a disengagement as required by the contract.

51.     During this time, Defendant kept signing, emailing and deducting from Plaintiff's pre-funded account money for "plaintiff" cases that it was not qualifying.

52.     Finally, after spending approximately $250,000 with Defendant over the course of 2-3 months, Plaintiff's owner emailed Defendant about the fact "plaintiffs" who were properly disengaged after the 144 hour deadline were not being credited back into Plaintiff's pre-funded account.

53.     On July 12, 2020, Plaintiff conducted an audit and determined that Plaintiff only had 82 engaged "plaintiffs" from Defendant yet was billed for 111 "plaintiffs." Plaintiff emailed Defendant about this discrepancy.

54.     Lauren Mingee replied on that same date "Looping in our Operations, he will be the one to go over disengagements."

55.     Prior to this time, Plaintiff was never advised of an "Operations" department nor that "Mike" apparently was in charge of "disengagements."

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

56.     Plaintiff had a phone call with Mike shortly thereafter wherein it was apparent Lauren Mcneill had already given Mike a directive that no disengagements would be credited.

57.     Lauren Mcneill nor anyone from Quintessa would discuss the merits of the disengagement credits referenced in Plaintiff's July 12, 2020 email despite phone calls, texts and emails from Plaintiff.

58.     "Mike" never communicated with Plaintiff any resolution to the fact Plaintiff had been requesting disengagement credits for months and that those credits were not being refunded by Defendant.

59.     On July 17, 2020, Plaintiff emailed Defendant advising it was in material breach of the contract and gave it until July 24, 2020 to cure its breach. That email stated:

That makes no sense at all and is NOT what we agreed upon. We had a conversation wherein I SPECIFICALLY stated it was IMPOSSIBLE for us to confirm insurance coverage that fast.

At this point, I am telling you that Quintessa is in underlined material breach of contract and we will exercise all rights accordingly. I am giving you an opportunity to cure this material breach by engaging in a phone call with me (a nice one) and reviewing each case (which I have asked for numerous times).

I remain available to discuss this for **one week**. After that, I am not willing to further discuss and will take all actions necessary to recover the funds that were improperly taken by Quintessa.

60.     During this time, Plaintiff remained open and available to discuss the merits of each of the 22 cases in issue.

61.     During that time, Defendant refused to have any conversation on any of the 29 cases.

62.     Instead, Defendant hired a lawyer in Oklahoma and Plaintiff worked through him and once again asked to have a discussion about each one of the 29 cases.

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

63.     Defendant, through its lawyer, refused to have any discussion on any of the 29 cases. Instead, Defendant's lawyer inquired of approximately 3 cases wherein Defendant now claimed Plaintiff retained plaintiffs but they were "disengaged" in the Google Document portal.

64.     Plaintiff emailed Defendant's lawyer information on all 3 of those cases during the phone call wherein this issue was raised proving in all but one that Plaintiff had turned down the case.

65.     Plaintiff demonstrated it was acting in good faith by immediately responding to Defendant's concern about these three plaintiffs and provided documentation to Defendant's counsel  on each.

66.     Despite Plaintiff's good faith, Defendant continued to act in bad faith by refusing to address any of the 29 plaintiffs in dispute.

67.     On July 23, 2020 at 4:26pm CST, Defendant's lawyer for the first time, communicates an intention to file a lawsuit against Plaintiff for breach of contract and fraud in 34 minutes. Here is that email:

*Ryan,*

*I'm not quite sure how you can listen to this conversation and contend that Leo and Lauren gave you a blanket extension on all cases while you're trying to verify insurance coverage. This has been your position since we started discussing this matter.*

*Leo and Lauren literally say at the 8:00-9:30 minute mark that while they have no problem granting extensions, its "not a blanket extension of like 14 days on top of the 7." Rather, if you have "potentially a great case and want it to work" and you explain what's going on, they will consider that, and usually granting the extension won't be an issue. This is completely in line with what Lauren and Leo have been saying: it is completely against their business model to grant blanket time extensions on all cases, but they do grant them on a case-by-case basis.*

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

*At this point, Quintessa demands payment for every lead they have sent to The Bradley Law Firm for which it has not provided a proper disengagement reason (including email-only leads).*

*Quintessa is tired of the lawsuit threats and has elected to file suit itself for breach of contract and fraud. Suit will be filed by 5:00pm unless The Bradley Law Firm agrees to pay for every lead sent to it where there is not a valid/timely disengagement reason.*

*Ben M.*

68.     Neither Defendant nor its counsel ever identified the grounds upon which 33 cases it referred to or the basis for its newfound request for compensation.

69.     Defendant cancelled Plaintiff's account on July 17, 2020.

70.     Defendant revoked Plaintiff's access to the Google Document shortly thereafter.

71.     Plaintiff demanded all unearned funds be returned to Plaintiff.

72.     As of the filing of this lawsuit, none of the unearned funds in Plaintiff's account have been returned.

## COUNT I – BREACH OF CONTRACT

73.     Plaintiff fully incorporates paragraphs 1-72 as if fully set forth herein.

74.     Plaintiff at all times fully performed all conditions and obligations under the contract and as modified by the parties agreements.

75.     Defendant was and still remains in material breach of contract for failure to timely provide disengagement credits for unqualified "plaintiffs."

76.     Defendant was afforded an opportunity to cure its material breach of contract.

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

77.     Plaintiff has incurred damages as a result of Defendant's breach of contract and believes that amount to be approximately $50,000.00, but is subject to change once Plaintiff regains access to the Google Document. In no event do the total damages in this case exceed $75,000.00.

**WHEREFORE,** Plaintiff requests damages against Defendant in the amount of $50,000.00 and for any such other relief and further relief this courts seems appropriate.

### COUNT II- FRAUD

78.     Plaintiff fully incorporates paragraphs 1-77 as if fully set forth herein.

79.     Defendant made representations and engaged in a course of conduct that that lead Plaintiff to believe and understand it would have more than 144 hours to verify the existence of insurance for any engaged or unengaged "plaintiff" without any pre-condition to obtain approval and in fact gave Plaintiff no reasonable method through the portal to request an extension.

80.     Defendant knew it would have a financial windfall by engaging objectively unqualified cases on behalf of Plaintiff, send to Plaintiff despite them not being qualified or having any reasonable chance of being qualified, tasking Plaintiff with the burden of qualifying them, and hoping Plaintiff would not do so within 144 hours.

81.     Defendant knew this because it also knew that Plaintiff operated under the reasonable belief that it had more than 144 hours to disengage any case if there was in fact no insurance.

82.     Defendant's refusal to utilize Plaintiff's new retainer contract despite giving it to Defenant on three separate occasions is indicative of Defendant's scheme. Defendant knew if engaged "plaintiffs" read the very first paragraph that clearly set forth the agreed-upon minimum criteria that use of the new retainer contract would likely thwart and expose Defendant's fraud.

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

83.     Plaintiff began requesting disengagement beyond the 144 hours for lack of insurance in the infancy of the contractual relationship.

84.     Instead of clarifying Defendant's position on disengagement, as expressly requested by Plaintiff, Defendant knew it was financially better off to not clarify this and instead lead Plaintiff down the proverbial primrose path.

85.     Defendant clearly was advised on numerous occasions of disengagement requests beyond the 144 hour mark for lack of insurance.

86.     During this time, Defendant knew there was an obvious disagreement upon how disengagements would be granted.

87.     During this time, Defendant knew Plaintiff was ignorant of Defendant's deceptive conduct in this regard yet kept requesting $50,000 payments from Plaintiff, which it paid, to the tune of $250,000.00.

88.     Beyond the insurance scheme stated above, upon information and belief, Defendant engaged "plaintiffs" it expressly knew were unqualified and without any reasonable believe they could or would be qualified and in some instances fabricated evidence to make the "plaintiff" appear to be qualified when in fact they were not.

89.     On multiple occasions, the material information regarding minimum requirements that was obtained directly by Plaintiff from the engaged "plaintiff" was at odds with that placed within the intake by Defendant, which resulted in the lead becoming disqualified.

90.     Defendant maintains audio recordings of all phone calls with "plaintiffs" it qualifies.

91.     Plaintiff previously requested access to those phone calls when it became suspicious that the information provided by "plaintiffs" expressly contradicted that which

EXHIBIT B

Electronically Filed - City of St. Louis - August 03, 2020 - 10:29 AM

Defendant put in the intake form to qualify and charge Plaintiff. Defendant rejected Plaintiff's request for access to those phone call recordings.

92.     Defendant's representations as stated above were false.

93.     Defendant' representations as stated above were material.

94.     Defendant and its owners Lauren Mingee and Leo Mingee had knowledge of their representations falsity.

95.     Defendant Lauren Mingee and Leo Mingee had the intent that their representation be acted on by the hearer in the manner reasonably contemplated.

96.     Plaintiff was ignorant of the falsity of the representation.

97.     Plaintiff relied upon Defendant's representations being true.

98.     Plaintiff had a right to rely on the representations.

99.     Plaintiff was consequently and proximately caused damage as a result thereof.

100.    Upon information and belief, Defendants have engaged in this type of fraudulent conduct in the past with other firms, which plaintiff specifically requests discovery upon so that it may amend its Petition in the future to state additional claims for relief, including but not limited to punitive damages.

**WHEREFORE,** Plaintiff requests damages against Defendant in the amount of $50,000.00 and for any such other relief and further relief this courts seems appropriate.

Respectfully submitted,
By: /s/E. Ryan Bradley

**E. Ryan Bradley, #53777**
Attorney for Plaintiff
The Bradley Law Firm
1424 Washington Avenue, Ste 300
St. Louis, MO 63103
(314) 721-9111 (phone)
Ryan@thebradleylawfirm.com

EXHIBIT B