UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


ERB LEGAL INVESTMENTS,      )
LLC,                        )
                            )
     Plaintiff,             )
                            )
     v.                     )No. 4:20-CV-01255 DDN
                            )
QUINTESSA MARKETING, LLC,   )
                            )
     Defendant.             )


MOTION HEARING

BEFORE THE HONORABLE DAVID D. NOCE
UNITED STATES MAGISTRATE JUDGE


FEBRUARY 28, 2022


APPEARANCES:

For Plaintiff:       Edward Ryan Bradley, Esq.
                     THE BRADLEY LAW FIRM
                     1424 Washington Ave., Suite 300
                     St. Louis, MO  63103

For Defendant:       James R. Wyrsch, Esq.
                     KHAZAELI AND WYRSCH, LLC
                     911 Washington Ave., Suite 211
                     St. Louis, MO  63101

TRANSCRIBED BY:      ANGELA K. DALEY, CSR, RMR, FCRR, CRR
                     Official Court Reporter
                     United States District Court
                     111 South Tenth Street, Third Floor
                     St. Louis, MO  63102
                     (314) 244-7978


PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

2

**(PROCEEDINGS STARTED AT 11:45 A.M.)**

**(THE FOLLOWING PROCEEDINGS WERE HELD VIA THE ZOOM PLATFORM)**

THE COURT:  4:20-CV-1255, consolidated case number 4:21-CV-19, the matter is before the Court this morning for a hearing on the plaintiff's motion for sanctions, document 90, and the defendant's motion for a protective order, document 92.

Let's see, representing the plaintiff, Mr. Bradley -- where is Mr. Bradley?  Edward Bradley?

MR. BRADLEY:  Yes, Your Honor.

THE COURT:  Oh, all right.  It says Ryan on there.

MR. BRADLEY:  I go by my middle name.  It's the curse my parents gave me when they authored the birth certificate I guess.

THE COURT:  All right.  Thank you very much.  Is Anna Lammert with you this morning?

MR. BRADLEY:  She is not, Your Honor.

THE COURT:  Okay.  And then representing the defendant is Attorney James Wyrsch.  I take it Mr. McCaslin is not with you, Mr. Wyrsch; is that correct?

MR. WYRSCH:  Correct, Your Honor.  Good morning.

THE COURT:  Good morning.  And then we have John Korb.  Mr. Korb, would you state --

THE CLERK:  Judge, that's your intern.

THE COURT:  Oh, I'm sorry.  I should have recognized

3

his name.  I apologize.  All right.  Thank you very much.

All right.  There seems to be some confusion, but at least not in the Court's mind a whole lot of confusion, about the status of discovery.  Let me ask, Mr. Bradley, with respect to the motion for sanctions, your motion is related -- let's see here -- to the defendant's failure to produce a list of clients.  Is that a fair statement?

MR. BRADLEY:  That is partially accurate.  It is not wholly accurate, but yes, that is part of it.  The sanctions specifically address failure to follow the Court's order of August 16 and supplement interrogatories 15, 19, and RFPs, requests to produce, 924 and 925 which does include the client list.

THE COURT:  Okay.  Yes, I do see that.  All right. And let's see, Mr. Wyrsch, I know that there are some arguments made by the defendant with respect to what it believes its obligation is under the Court's order and with respect to the discussion of a proposed questionnaire.

Let us go to the interrogatories then that were propounded to the defendant, Interrogatories 15 and 19, and let's see -- let me ask you first before we do that, I'm wanting to make the record clear about certain relevant parameters, parameters for relevancy.  Let me ask, Mr. Bradley, for the dates of the business dealings between the plaintiff and the defendant.

4

MR. BRADLEY:  The date of dealing would go to --

THE COURT:  Well, there is -- you know, there is a request for clients dating back to January 1, 2001 I believe, but my -- I'm wanting to define in the Court's mind certain factors regarding relevancy, so tell me when -- from what date did the business relationship between the plaintiff and the defendant begin and then certainly it's my understanding I think from what I have read that they are not in business together and when did that business relationship end?

MR. BRADLEY:  Yes, Your Honor.  So the business relationship began on April 21, 2020, and the date that we declared them in breach would have been I believe in July 2020.  It was very short lived.

THE COURT:  July of 2020?

MR. BRADLEY:  Yes.  If you want the day, I think -- I gave a notice of --

THE COURT:  Okay.  That's close enough.  Let me ask Mr. Wyrsch.  Putting aside the events that may be defining that business relationship, is that generally the period of time that the plaintiff and the defendant did business together?

MR. WYRSCH:  Yes, Your Honor.

THE COURT:  All right.  Let's see, and the other question I have is, Mr. Bradley, state for me succinctly -- you know, you can use more than one sentence, of course, but

5

tell me the relevance of the defendant's client list as it either existed before, during, or after that period of time.

MR. BRADLEY:  Well, I think that the client list is indicative of, you know, that we've got an allegation that they engaged in fraudulent conduct which included representing that disengagement credits would be given based upon certain criteria and then actually not giving them, and since the money was paid in advance by plaintiff to defendant, then they held on to the money and refused to give it back when the disengagement procedure was followed.  So other clients that have experienced that particular scenario in the past that were actually not clients at the time of the business relationship between plaintiff and defendant would be relevant to show that this had been an issue that had arisen that had created problems before for other people.  They knew about it and yet continued to engage in this type of conduct.

And then beyond that, Judge, it would be relevant to find out if there were other things that this particular defendant and/or its agents did within the scope of providing services under Federal Rule of Evidence 608 that goes to reputation or opinion evidence as to the truthfulness of this company and its actors, and specifically on subsection B, specific instances of conduct that show character for truthfulness.  So that is why this is relevant.

THE COURT:  All right.  Now the interrogatory -- or

the -- the interrogatory number 15 requests identification of such entities from January 1, 2001 to the present.  How can a list of clients going back to 2001 be likely to be indicative of what you've stated?

MR. BRADLEY:  Well, I mean, I think that certainly it is a long time, it's 20 years, but if we find that there are other law firms out there that have experienced this for the last 20 years -- and actually I don't even think that this has actually been in existence that long, but at the time we drafted this interrogatory, I don't think we knew exactly that information.  So, you know, if we're just looking at the temporal thing and you were having a problem with 20 years, you know, we can address that, but certainly I don't know how many other instances of this like pattern of conduct that will be discovered or not.  Certainly it is possible that there are a myriad of other law firms that have experienced this and whether that be 1, 2, 5 or ten years ago, I just don't know at this point, but yet I would still say that it is relevant.

THE COURT:  All right.  Mr. Wyrsch, do you have any comments to make about what Mr. Bradley has just said about the relevance of clients going back that far?

MR. WYRSCH:  Well, I would say that the company has only been, as Mr. Bradley said, in existence since 2019, so we went ahead and produced everything dating back to that up until the end of last year and then we filed the protective

7

order regarding a handful of people who were operating under a different contract.  I think it's less than ten.  We provided names of 69 clients which was my understanding is the bulk of the clients in the time period that they had been open, so preceding the contract and after.

THE COURT:  And when was that production made?

MR. WYRSCH:  We made a partial production on January 7th I believe -- or was it the 10th -- on the 10th, and then we supplemented that on February -- I should have that all at hand, I apologize.  We supplemented with a full list in early February, I don't have the exact date right now, then there was -- that was on February 9th, and then Mr. Bradley -- we were trying to get the list out to them and then Mr. Bradley noted that, you know, this supplemental -- that the interrogatory had a little bit more information that it requested and we went ahead and supplemented the interrogatory answer and provided a more detailed client list last week on the -- what day was that.  Was that Thursday morning?

THE COURT:  All right.  And that was in -- that activity was in response to the Court's order on October -- issued on October 18, 2021?

MR. WYRSCH:  Correct.

THE COURT:  Mr. Bradley, tell me why that production -- putting aside the timing of it, why is the

8

plaintiff entitled to more production of the client's identification?

MR. BRADLEY:  Well, Your Honor, I'll tell you that the production back on January 10th we were able to download and it was sent via some secure link.  We didn't have a problem with that, and it simply consisted of names of law firms.  It did not have any of the information that the Court specifically sustained when we already argued this motion to compel and required a response to interrogatories 15, 19, and the RFPs that I previously mentioned.  Subsequent to that, you know, months and months and months goes by and then Mr. Wyrsch indicated that he sent a link on 2/9 that I told him I could not get to download and I asked him to send it regular e-mail. He offered to drop it by my office, that was never done, but I was still trying to get this to work, and just as of today, I still don't have this information, so I don't know what was produced.  I don't know if it's just simply more like an address and phone number of the various firms that would be on the client list.

But needless to say, this motion for sanctions is not just listed -- not just for names of clients.  It is specifically addressing the interrogatories 15 and 19 and the RFPs that I have listed in the motion for sanctions that I do not have a formalized answer to that I deserve and is required under the Rules of Civil Procedure.  So here I am arguing

9

this, and I still don't have the information because Mr. Wyrsch refuses to transmit it in a fashion that I can actually look at.  That is the current problem.

THE COURT:  Mr. Wyrsch, what happened with respect to the providing of information and the response to those interrogatories 15 and 19?

MR. WYRSCH:  Respectfully, Your Honor, what Mr. Bradley just said is a complete mischaracterization of what happened.  As far as interrogatory 19, we had supplemented that before.  I had not heard any dispute or concern about that particular interrogatory, so my understanding is that our answers -- our supplemental answers satisfied them.  That was supplemented last year.  I have not heard anything about our supplemental answer to that.

With regard to 15, we did file supplemental responses that we sent over last week.  He pointed out an e-mail that we sent with a client list on the 9th.  I did not hear anything about a problem with downloading that at all, so that's incorrect, and there was no followup or anything like that.  Last week when we sent over the supplemental interrogatory response with the full response plus the updated client list, which has a little more detail than what was provided before, I was just trying to get him the names of the clients because he was insistent on getting them, so we sent that over.  I received an e-mail last week on Friday saying that I can't

10

open this, please send it as a regular attachment, and I explained that I sent it over encrypted because it contains -- or it's an attorneys eyes only e-mail that contains my client's full list of customers. We fought over a protective order to get this information, so I sent it in an encrypted format which I've never had anyone ever tell me they were unable to open an encrypted e-mail. I responded to him quickly, I said -- I tried to explain how to open it and then I offered to give a printed copy. He never said I want a printed copy. He just responded saying what password, what do I have to do, and then I didn't hear anything else about that. Then this morning around 10:22, I got another e-mail saying I can't open the document, and I again offered to bring it down to him. I think his office is just a few blocks down. We would print one out and do it. He never said he wanted it. He just kept insisting that I send it in an unsecured fashion. I said if you have other secured methods by which you would like me to do that, I'm all ears, but he is doing this an hour before the hearing.

So I have made every effort to get him the information he wants. This idea that I sat on this since the 9th is absurd and wrong. You know, if he had responded to me on Friday and said please drop it off at my office, I would have dropped it off at his office. Instead, he just started e-mailing me about passwords and what not. I sent it. If he

11

has another method he would like me to send it, if he wants me to drop it off in person, I am happy to do that, but this idea that I've been sitting on this for weeks is just wrong.

THE COURT:  Okay.  But you're talking about having offered to drop off, you are talking about a flash drive?

MR. WYRSCH:  I can do a flash drive.  I was going to do a paper copy, but whatever he wants, I mean, you know, as long as it is a secured method to produce it.  I just don't feel comfortable sending it over regular e-mail.  I even sent him directions from Microsoft's website on how to open up an encrypted e-mail.  I don't know what more I can do than get on a Zoom with him and have him figure out how to do it.  This is the first person who has ever had a problem with it, and we sent this through the same method before and we didn't have an issue with it and the first I heard about it was on Friday.

MR. BRADLEY:  Judge, may I respond quickly?

THE COURT:  Sure.

MR. BRADLEY:  The bottom like here is Rule 5 dictates how --

THE COURT:  No, just tell me -- I want you to respond to what Mr. Wyrsch has said about having been offered either a paper copy or flash drive.

MR. BRADLEY:  Sure.  He said he would drop off a copy, but I said I wanted it electronically, and I asked him to try to facilitate that, and we kind of didn't request

12

him -- I didn't want to put him out to walk down some papers,

and that was last week, and then today before the hearing, I

reiterated to him I've done everything I can to try to

download this link and work through the instructions that he

gave me and it still is not working.  So, you know, I still

don't have it, so that would be directly addressing what he

just stated.

Beyond that, Judge, I would simply say Rule 5

dictates how papers are served, and Section B, subpart (b)(E)

specifically, talks about sending electronic means, but when a

party learns that -- the serving party learns that it did not

reach the person to be served, then it's ineffective, and

that's what I told him last week.

THE COURT:  Okay.  I require more in the way of

cooperation between counsel than the argument you have just

made, Mr. Bradley.  I believe that you should have taken up --

taken Mr. Wyrsch up on the offer of either a paper copy or a

flash drive.  We'll just put it at that.

MR. BRADLEY:  Understood.

THE COURT:  All right.  So with respect to -- so that

exchange, you know, covers in effect both interrogatory 19 and

interrogatory 15.  I mean, is that a fair statement?

MR. BRADLEY:  Judge, at this point in time, I can't

tell you if he's complied with the terms of this Court's prior

order directing him to respond to 15 or not because I have not

13

seen the production.  All I know is I don't have anything, so, therefore, I'm coming to this Court asking for an order that at minimum would make him formally respond to the interrogatories that are in the request for production of documents since I don't have them.

THE COURT:  Well, you have a list of clients; correct?

MR. BRADLEY:  I have a list of current clients that they previously gave me that did not conform to the interrogatory nor any of the subsections.

THE COURT:  Well now wait a second.  Wait a second. Even defining the list of clients going back to January 1, 2001 to the present, do you have any dispute with Mr. Wyrsch's statement that the defendant was not in existence -- let's see.

MR. BRADLEY:  2019 I think he said.

THE COURT:  I think that's right.  Yeah, came into existence in 2019, and it was apparently shortly after that even, you know, just the next year in April when plaintiff and defendant developed a business relationship which perhaps ended in July of 2020.  So it would seem to me that going back previous to 2019, there wouldn't be any clients.

MR. BRADLEY:  Which is why this issue was brought up to the Court and in our pleadings we had alleged, you know, that she had opened and closed various companies that are

14

different iterations of this and sought discovery as to that. The Court shut that down.  That addresses that portion of it. So subject to that, I would agree, Judge, but I cannot tell you whether or not what he has previously indicated that he sent over, since I don't have it, complies with and answers all of the subsections in interrogatory 15, which asks for very specific things that the Court already looked at and sustained and said Mr. Wyrsch, your client needs to answer this stuff.  I don't know if he did that or not.

THE COURT:  Okay.  Now, you have the identities of 69 clients?

MR. BRADLEY:  No, I do not.  I have the original partial, which Mr. Wyrsch described it as, production from January 10th.  That's the only thing I have, and it only has like, for instance, The Smith Law Firm.  That is it.  No location, no contract between them, nothing that is asked for in interrogatory 15 to identify it that the Court already sustained.  So that's what I was given.

THE COURT:  All right.  Mr. Wyrsch, what about that?

MR. WYRSCH:  So like I said, we were trying to get the information to him.  This all came back up in early January.  We were trying to get -- you know, the focus had been on the questionnaire, and then he kept saying we want the list, we want the list, so we gave him a partial list.  As I mentioned in my motion, my client had a couple questions about

15

the scope of the list, so I held that back.  We resolved it. I sent over a further list, and then when we supplemented the response, we went through each of the subparts in 15 and provided answers to all the subparts in 15 on an exhibit that contains the list.  It has the name of the entity, the name of the primary contact, the date you first provided services, the date you last provided services, and then E through J requested some specific information about disputes over the contract terms.  We answered those things in full.

So again, it has been provided to him.  I understand that he is not able to access that, and I again will deliver in any format that he wants other than unsecured e-mail, hand-deliver it over there today after this hearing and we can have that further discussion.  But all the information that is requested in subparts A through J has been provided.

THE COURT:  All right.  Now you mentioned there was an exception for ten clients.  What was that?

MR. WYRSCH:  So in our motion for protective order, it's less than ten.  I don't have an exact number.  I tried to get an exact number, but I understand it's less than ten.  But at the beginning of the year -- all of this is based on I think what Mr. Bradley described as my client had contracts with various firms and -- like Mr. Bradley's contract says that the leads that they provide have to have certain -- have to meet certain criteria regarding insurance, amount of

16

damage, being at fault or not, and they send over -- my client will send the lead to the attorney. The attorney will then do some diligence work to figure out what's going on with the case, and if they discover that one of the factors have not been met, they are permitted within a certain period of time to disengage the lead and they would not be charged for that lead.

As of the 1st, my client changed its model completely and doesn't have -- just sends leads over and doesn't have all these criteria or a disengagement model, and their sort of question to the Court is do we have to provide those names given that the contract has nothing to do with the same sort of setup that is going on in this case. And so they just asked for that particular subset of clients to be protected. We provided 69 names, which I understand is the entire client list from when they started in 2019 up until December 31st of 2021, and it includes current clients as long as they were operating under that previous model. So it only is a small subset of clients who only operated under this new model that doesn't involve the disengagement and all that thing.

And if the Court orders them to do it, they will produce it, but this seems not relevant to the claims at issue because they are not operating under that issue. It's only a matter of a couple months and they would just request the Court to give them some deference on that and not require them

17

to produce that.  But we have produced everything else is my understanding.

THE COURT:  All right.  Mr. Bradley, what's your thought about the relevance of clients -- I don't want to use the term "engaged", but clients of the defendant after the business model changed?

MR. BRADLEY:  I still think it's relevant because it goes specifically to Rule 608 about their witness's character for truthfulness or untruthfulness in Sections A and B.  So, you know, despite the fact that the model changed could lead to the discovery of admissible evidence under Rule 608 as to whether or not this company does fraudulent things.  It doesn't have to be the same fraudulent things or does dishonest things, and so, therefore, it is relevant.

THE COURT:  Okay.  I'm going to make a determination that I'm not persuaded that the new model clients information at this point is relevant to the operation of the defendant with respect to the engagement model clients that the plaintiff is also seeking, so I will sustain the defendant's position with respect to the new model business operation. Sixty-nine clients is a fairly substantial list of entities, and if there is -- and so, you know, that seems to me to be a relevant number, a sufficient number, for the plaintiff to investigate to determine whether or not there is information in those clients that is relevant to the relationship between

18

the plaintiff and the defendant. Sixty-nine clients is a fair list. Certainly, contact information, certainly documentary information related to the relationship between the defendant and those clients will be necessary I think so that the plaintiff will have a fair opportunity to know whether or not there is information there.

All right. So I will -- and I will ask, Ms. Parker, I want you to -- and I will enter an order. I do want a transcript of today's hearing produced by the clerk's office.

Let's see, what else among the interrogatories, Mr. Bradley, needs to be revisited?

MR. BRADLEY: Well, there must be some misunderstanding. Number 19 I don't have as being updated, and that referred to interrogatory -- I mean again, I am re-arguing things that this Court already sustained. This Court already determined that I am entitled --

THE COURT: Okay. Mr. Bradley, I want you to focus on the question. What further discovery are you seeking?

MR. BRADLEY: Interrogatory number 19, requests for productions 9, 24, and 25.

THE COURT: Okay. Mr. Wyrsch, what about answers to interrogatory 19?

MR. WYRSCH: On August 20th of 2021, we filed -- we sent over supplemental responses that provided the information. We were in a little bit of a weird timing

19

pattern here because the motion to compel was filed in the summer and we had a hearing on it in July, and if you recall, one of the issues that we raised at the hearing was that there was no real opportunity to meet and confer prior to the motion to compel, and so we had sort of backwardsly engaged in a meet and confer after having the hearing on the motion to compel. So as a result of that, we had agreed to supplement the interrogatory responses. We did that on August 20th. I haven't heard anything that our response to that was insufficient, so I thought that issue was settled. I mean, the Court's order did specify that interrogatory, but I thought we had already met our obligation and I haven't heard that our supplemental response was somehow insufficient, so I thought that issue had settled.

MR. BRADLEY: I do see that there was a supplement on number 19, but again, I don't think that the client list as given -- you know, we have already highlighted this company was in existence in 2019 until the present. The issue is number 19, interrogatory number 19, references interrogatory 1(m), which is the various iterations of this company, and that is Quintessa, LLC, Quintessa Concepts, LLC, Quintessa Intake, LLC. And, Judge, if you look at the date of at least two of those, it looks as those these were doing the same things under different entity names. So what we still don't have are the client lists from these other iterations of the

20

company.

MR. WYRSCH:  My understanding, and I will certainly double check with my client, but my understanding is that the other entities, while Mr. Bradley accuses them of doing the same things, my understanding is that this particular lead generation service is a product of Quintessa, LLC, and it's only been doing it since 2019.  That's my understanding.  They had provided other marketing services which is what these other entities did.  I will double check that, but my understanding is this is the list of people who they provided services to that were similar in nature to what is going on here, but I will certainly double check and clarify that.  But my understanding is we have complied with the request as ordered by this Court, and I will double check and make sure that that is true.

THE COURT:  All right.  Let me ask you, Mr. Bradley, where is the indication in the interrogatories -- and I'm not at all implying that it's not there -- where you have asked for earlier iterations of Quintessa?

MR. BRADLEY:  I believe it's in interrogatory -- one of the subparts.  It's quite lengthy.  So in g, it talks about communications about the qualifying of leads which would identify the entity that we're talking about.

THE COURT:  Okay.  Now, what interrogatory are you referring to?

21

MR. BRADLEY:  Number 19.  It was asking for communications between these old entities like Quintessa Concepts and Quintessa Intake that would have been dealing with the handling of disengagements, so that in and of itself would have led to the discovery of the identity of the client list in a de facto type matter -- manner I should say.

THE COURT:  Interrogatory 19g as in golf?

MR. BRADLEY:  Correct, qualifying of leads and the communication with the entity handling of disengagements, which would be h.  So that would have gone back to identifying, you know, who they were communicating with, which was, you know, a de facto way of determining who these other previous clients would have been.  I believe Request for Production --

THE COURT:  I don't see -- and I apologize, it's not clear to me that you are asking for information relating to an entity, a defendant entity perhaps, other than the one named in the complaint.

MR. BRADLEY:  Well, that's because if you read the preamble to it, Your Honor, it says, "For each entity identified in your answer to Interrogatory 1(m)," 1(m) specifically asks them to identify any other entities that the owner has ever been a member, shareholder, or owner of including but not limited to, so other entities that the owner of Quintessa would have performed the same or similar types of

22

services through.  So that defines the scope of interrogatory 19 if you will.

THE COURT:  Okay.  Now, your addition to the definition of number 1(m) really doesn't -- I don't see it relating to this lawsuit.  "For each owner/member identified in (l)" -- being a member of Quintessa as well as the percentage owner of each individual -- "identify any other entities each individual has ever been a member, shareholder, or owner of including but not limited to the legal name of said entity, state of domicile, state of incorporation," that is fairly open ended and unrelated specifically to the allegations of this lawsuit.  What was the response?  Well, let me take a look.

MR. BRADLEY:  To 1(m) or 19, Your Honor?

THE COURT:  To 1(m).  And I see it.  It's pretty much 1(m) is --

MR. BRADLEY:  It identifies two other companies.

THE COURT:  It does in response to 1(m), it identifies two other companies?

MR. BRADLEY:  Correct, Quintessa Intake and Quintessa Concepts, and then those are identified again in the answer to interrogatory number 19.

THE COURT:  And was information provided about them?

MR. BRADLEY:  In the answer to interrogatory, they answered as to those other entities and, you know, identified

a lawsuit against Quintessa, LLC, but it didn't identify Quintessa Concepts, Quintessa Intake.  My point is that if we go into the RFPs, which we'll get to next, I believe what has happened here -- and again, I don't have the benefit of seeing the client list that they tried to produce ineffectively pursuant to Rule 5 last week, but I am pretty sure it's limited to Quintessa's client list not these other entities.  That's my point.

THE COURT:  Okay.  Mr. Wyrsch, do you have any comment on that about those two other entities that Mr. Bradley indicated?  Are they related?  What's the defendant's position or comment with respect to those other two entities?

MR. WYRSCH:  So the interrogatory requested information related to any entity that provides marketing services to lawyers, so not just --

MR. BRADLEY:  To law firms.

THE COURT:  Go ahead.

MR. WYRSCH:  So we answered literally that they provide marketing services because my understanding is Quintessa Concepts provides -- if it does much at all, I think it was more of a theoretical entity that provided some kind of general marketing tools.  I think Quintessa Intake is actually an entity that provides services to Quintessa, LLC.  I think Quintessa Intake maybe, if I am recalling correctly, it

24

employs a lot of the people who are doing the intake calling. It's just like a separate entity for -- I don't know, I'm not their tax lawyer, but they felt the need to put the employees into a separate entity.  So the company that is providing the lead generation services is Quintessa, LLC.  That's the only one that is providing those types of services.  The other types of marketing services are in support of that, but they are not directly contracting with law firms to provide these lead generation services.  So that's why we responded on behalf of Quintessa, LLC because they are the only ones that have the contracts with those entities.

And I do want to note that I think there is another -- still some other confusion because of the way this all shook out.  When we had the hearing in July, the Court sustained the motion to compel as to subparts A through F but denied it as -- overruled it as G through J, and that's memorialized -- the Court ordered the parties to get together and file a joint motion -- or a joint proposed order outlining what the Court had ordered at the hearing, and both parties because we, of course, couldn't come to an agreement on it submitted their own proposed orders.  And this is back on I think document 64 and document 65.  And if you look on there, both parties agreed that the Court sustained the motion to compel as to subparts A through F and subject to an agreement of counsel overruled G through J, and both have that on their

25

proposed order. So when we did the supplemental interrogatory response, we were basing it on that. So the citation to subpart G wasn't addressed because our understanding had been that that particular subpart had been overruled by the Court and we were not required to respond to that. So I think that's where some of the disconnect is as far as that subpart.

I mean, like I said, my understanding is that as it comes to these similar lead generation services, we provided a full list of the clients. I will be happy to double check that again and make sure that I am correct, but that is my understanding that all of the clients who are similar to Mr. Bradley who have these lead contracts, that they are -- that they have been produced.

THE COURT: Let's proceed over to the questionnaire.

MR. BRADLEY: Judge, there are a couple other discovery items on the RFPs. If you want to take the questionnaire first, that's fine.

THE COURT: No, go ahead, we'll take the requests for production.

MR. BRADLEY: Okay. On number 9, it asks for any documents identified in the answer to number 15. Again, I don't have the benefit of the production, but this would include any contracts by and between the 69 previous -- or the 69 clients and Quintessa. I do not know if that is included or not.

26

MR. WYRSCH:  I'm sorry, where are you getting that?

THE COURT:  Go ahead.

MR. BRADLEY:  RFP number 9 asks, "Produce any documents identified in your answer to interrogatory number 15," which is the one we just described which would have been the prior clients, right.  So this specifically asks about contracts by and between those 69 clients and Quintessa, and I have heard nothing and I still don't have any production from Quintessa producing those contracts.

MR. WYRSCH:  No, it doesn't say that at all.  It says -- there is nothing in there that says "identify the contract."  It says the name of the entity or individual, the name of your primary contact, the date you provided services, the date you last provided services.  Then you asked for identifying communications regarding qualifying leads, again identifying communications regarding handling disengagements.  There is nothing in here that says provide a copy of all your contracts.  And so what we did in response -- I know you haven't seen it yet -- is the only responsive information that falls under those sub categories E and F and G is the Hupy lawsuit, which I am sure you are aware of, and we pointed you to those documents.  We were also trying to gather any specific communications between that firm, but the substance of that dispute is laid out in a federal lawsuit that was filed in Wisconsin.  I understand that you have that and so

27

you are aware of the allegations.  We are in the process of gathering any sort of specific communications that relate to that, but there is nothing in that interrogatory that I understood to require the production of every contract.

MR. BRADLEY:  Well, even if you don't interpret it that way, Your Honor, the next one that you have already sustained is number 24 which asks for a copy of any document evidencing the identities of other lawyers and law firms that they provided leads and marketing services to in the last five years.  That was already sustained which would inherently already include the contracts themselves.

MR. WYRSCH:  I mean, this is the first I am hearing about this, and I'll have to take that to them, but that is not how I read that and we've never had that discussion about producing the contracts.

MR. BRADLEY:  We argued it in a motion to compel.  It was sustained by the Court.

MR. WYRSCH:  The only thing in the motion to compel, if you go back and look at it, is about communications.  There is nothing in there that says produce the contracts.  Your motion to compel was about -- Your Honor, I shouldn't be directing it at him.  Your Honor, the motion to compel that we dealt with before, if you go back and look at it, was about communications with clients, not -- it did not reference anything about contracts.

28

THE COURT:  Okay.  In reviewing Request for Production 24, it says a copy of any document evidencing the identities of any other lawyer and/or law firms for whom Quintessa provided leads and/or marketing services in the last five years.  The term "any document", although it seems somewhat open ended, would at least include the document that establishes the relationship between those other entities and the defendant.

MR. WYRSCH:  And if the Court orders that, we will produce that.  That was not my understanding of what was requested in the motion to compel before.  It discussed communications.  I'm not aware of a specific request for all the contracts.  The Court's order -- and I will go back and say this.  The Court's order -- we did fight over the information related to the client list, and the Court's order only said to provide the list of the clients and that they could send this questionnaire over, so I don't think it was clear at all that the order was seeking the contracts or that he was requesting the contracts.  And, I mean, that's a lot of sensitive business information to be handing over when we had this whole fight over whether or not we just needed to provide the list of clients with the questionnaires.  If the Court orders us to do it, we will do it, but there was certainly no understanding on our part that that was required by the Court's previous order.

29

THE COURT: Okay. All right. I think that that is a relevant document. Now, I'm not adverse to redacting certain information. I don't want to invite a dispute, but, you know, I will allow given the nature of the business activities and the information on these documents, I will authorize a reasonable redaction to protect confidential proprietary information but only to the effect that the unredacted information provides plaintiff with information sufficient to allow it to observe any similarity between the plaintiff's relationship with the defendant and these entities' relationship with the defendant.

MR. WYRSCH: I guess, Your Honor, I'm a little confused because the point of the motion to compel and the reason the Court granted the motion to compel was because of the fraud allegation, and so he was permitted to send questionnaires to all the customers to ask about fraud, and we're going to get to that questionnaire in a bit. I don't understand how the contracts with all those entities and those specific terms relate to the fraud claim.

THE COURT: Do you have a response to that, Mr. Bradley?

MR. BRADLEY: Sure. It specifically addresses how disengagements are supposed to be applied for and all those sorts of things, and, you know, so it couldn't be less relevant.

30

THE COURT:  Okay.  It seems to me that if there is a similar establishment of activity of the business relationship between the defendant and these with similar operational provisions similar to the plaintiff's contract and the reasonable expectations that the plaintiff had, that it would be relevant to show that these 69 other entities had a similar working relationship with the plaintiff or if they differed. And as I said, there may be specific information that may be not relevant to that issue, characteristics of the relationships, but would involve confidential proprietary information, I'm not going to require -- that's not relevant to establishing the relationship and the operation of their relationships with the defendant, if it's not relevant to that, then I wasn't going to -- I'm not going to require it.

MR. BRADLEY:  And to the extent there is any redaction, Your Honor, we do ask for a privileged log.  In RFP 36, we would just ask that be supplemented if there is going to be any redaction.

THE COURT:  Okay.  I think that that is a fair request.

MR. BRADLEY:  The last one, Your Honor, is number 25, and that is a copy of all letters from lawyers, law firms, clients from whom Quintessa provided leads or marketing services wherein the lawyer or law firm or client and then there is A through E.  That was sustained by the Court.  I

31

have heard nothing from Mr. Wyrsch that Quintessa actually complied with the Court order and supplemented and produced documents relevant to this request. And again, I'm sitting here before you without the benefit of seeing what they purported to send last week, so I want to make sure that that has been answered as well.

THE COURT: Mr. Wyrsch, do you have a response to the statement with respect to Request for Production Number 25?

MR. WYRSCH: Yes. We have not supplemented the RFP. We were focused on the interrogatory, which was the subject of the e-mail between us, and I will supplement the RFPs in due course, as soon as possible, but the substance of it is handled by interrogatory 15 which requests to identify documents related to these complaints. As I said, in the interrogatory 15, the only one that was identified as to these specific requests was a dispute that the plaintiffs -- that Mr. Bradley was aware of with the law firm in Wisconsin, and there is a court complaint that lists all those things. My client is going back and trying to get any communications, so we will produce those in short order and we will supplement those responses, but I was focused on the interrogatory because that was the substance of the dispute between the parties over the e-mail, but we will get the RFP supplementals out forthwith.

THE COURT: Mr. Bradley, do you have any comment on

32

that?

MR. BRADLEY: I would like the Court to note that it's been over six months from the date that the Court unequivocally issued an order directing supplemental answers to each of these RFPs and here we are six months later and I still don't have this and by admission of defense counsel hasn't even started on it. I'm very frustrated with that. It has materially impacted us in terms of being able to comply with this Court's order and scheduling deadlines. This is not how things are supposed to operate in this Court.

THE COURT: Okay. So, Mr. Wyrsch, you are going to provide the communications from basically the clients, the lawyers, law firms, or clients for whom Quintessa provided leads and/or marketing services.

MR. WYRSCH: I'm sorry?

THE COURT: You are going to -- once again, you are going to comply with number 25, is that correct, supplement the information relating to number 25?

MR. WYRSCH: Right, which is -- which are documents related to the complaints that they had, not just any communications with the law firms, but any specific complaints as enumerated in the RFP.

MR. BRADLEY: No. I'm not here to argue redrafting what has already been sustained. It says what it asks for. That's a mischaracterization of the discovery request.

33

THE COURT: All right. Number 25 says, and I will state it in the record, "A copy of all letters from lawyers, law firms, or clients for whom Quintessa provided leads and/or marketing services wherein the lawyer, law firm, or client, A, challenged, complained of, or identified a misunderstanding in how Quintessa handled leads; challenged, complained of, or identified a misunderstanding of how Quintessa handled disengagements; claimed Quintessa improperly retained money deposits; claimed Quintessa engaged in fraud; and claimed Quintessa was in breach of contract." So it doesn't relate solely to formal litigation but includes communications where the defendant is alleged to have engaged in these activities whether or not there was any followup, formal claim, or administrative claim.

MR. WYRSCH: I understand that, yes. That is what I was trying to say is that there were subparts. It wasn't just any communication ever; it was related to those specific subparts.

THE COURT: Right.

MR. BRADLEY: And, Judge, I would add one more thing, and this was skipped over. It specifically talks about including its agents and/or employees because going back to our discussion earlier, apparently Quintessa doesn't have employees. It has a different entity that handles, as far as I understand it, has the employees, so that's why that portion

34

of it is important.

THE COURT:  And I think that that's a fair comment.

MR. WYRSCH:  Correct, Your Honor, we're not -- we wouldn't be withholding on behalf of that.  We are not making that distinction.  And I believe any communications related to like this would not be going to those employees.  It would be going to the owners of the company of Quintessa.  The employees that we were talking about at issue were the people who answer the phones and they talk to the lead.  They wouldn't be talking to the lawyers.  But if they're already with them, I would obviously produce those.  We aren't making that distinction.

THE COURT:  Okay.  All right.  Are we prepared then to move to the questionnaire?  Okay.

MR. WYRSCH:  Yes, Your Honor.

MR. BRADLEY:  I'm trying to find it.  Okay.  There is a cover letter, Your Honor, that precedes the questionnaire. I believe that is part of the exhibit as well.  I'm just trying to streamline this for everybody.

THE COURT:  All right.  At this time, I think the record should be clear that we're referring to document 93-1, and I know that there is document 93 that encompasses defendant's positions, specific positions, with respect to certain pages and paragraphs, and I am hopeful that as we go through 93-1, we will touch on all of those specifically

35

identified provisions.

But looking at 93-1, page 1, there is an issue with respect to the first sentence, "This letter is being sent to you", and the -- let me just go back and see. Okay. Mr. Wyrsch, how would you word the introductory letter in paragraph 1?

MR. WYRSCH: My only concern with that was the statement that it's by the authority of Your Honor because I think that gives it a strange judicial imprimatur that doesn't exist here. I think we just need to say the letter is being sent to you in connection with the above-referenced case.

THE COURT: Mr. Bradley, what's your thought about that?

MR. BRADLEY: Well, I think it's accurate. It specifically is in compliance with your directive, so that's I think accurate.

THE COURT: Well actually, I'm only mediating, so to speak, moderating, the nature of the communication between plaintiff and these entities that are produced in discovery, and other than the nature of the language that I think that the plaintiff, that, Mr. Bradley, you are entitled to use, I don't know that it is important to the recipient to know that the Court has -- I am certainly not ordering you to communicate with anyone.

MR. BRADLEY: Understood.

36

THE COURT: That's entirely up to you, but we're only mediating and perhaps changing a little bit the language that you use. So I'm in agreement with what Mr. Wyrsch said about the Court authorizing. You know, I'm not really authorizing or requiring anything to be done in response. So, "This letter is being sent to you in connection with the above-referenced case. Responding to this letter is entirely voluntary."

MR. BRADLEY: I would note that that second sentence was not in my original. That was added by the defendant and I contested that, although it's not red-lined here. I would like to take out "responding to this letter is entirely voluntary."

THE COURT: Okay. Is that not the case?

MR. BRADLEY: It is the case, but I just don't -- I don't want to highlight it because it makes it less likely that they will. It just seems to be --

THE COURT: Okay. At the bottom -- okay. All right.

MR. WYRSCH: Your Honor, I apologize, can I just say something. I sent this document with the red lines to Mr. Bradley and stated does this memorialize what we discussed on the phone, and he said it did, and that is the only reason I filed it. I had to wait days to file it because I was waiting for his approval. So the notion that I didn't properly red line something is wrong. I did make this

37

request, it was agreed to during our phone call, it was agreed to when I sent this red line over to him, and the notion that I did not reflect that is incorrect.

MR. BRADLEY:  Judge, I'll be happy to give you what I sent him which does not include that sentence.  I am not saying that he did anything nefarious at all.  I am simply stating that that second sentence is not what I proffered to him.

THE COURT:  Okay.  I'm going to leave that second sentence in just so the recipient doesn't have a question in that respect.

So is there an issue with respect to paragraph 2?

MR. BRADLEY:  None.

THE COURT:  What about paragraph 3?

MR. BRADLEY:  None from my end.

THE COURT:  And then what about paragraph 4?

MR. BRADLEY:  Yes, Your Honor.  Admittedly, I sent this over with language stating that we will seek permission from the Court to depose the corporate representative if we don't get a response, and that put in place a little more burden than is actually on me because under Rule 31(a)(1), depos are taken without leave of Court, so there is actually nothing that requires me to go get the Court's permission to take the depositions.  So after I wrote that and sent it to Mr. Wyrsch, it dawned on me that I kind of hamstrung myself a

38

little bit by including that language.  I highlighted that to Mr. Wyrsch.  So I wish to take that out because I don't think -- it doesn't reflect what the rules specifically state.

THE COURT:  All right.  So you would not take out the entirety of the sentence but that shaded language?

MR. BRADLEY:  Correct.  That is correct.  "Will seek permission from the Court," that language I would take out.

THE COURT:  Okay.  Actually, it would be "permission from the Court" is the language, not "will seek".  I expect you intend --

MR. BRADLEY:  That's correct, "permission from the Court," I'm sorry.

THE COURT:  Do you have any objection to that, Mr. Wyrsch?

MR. WYRSCH:  Yes, Your Honor, because your order was very clear that the only communication that they are supposed to have without our consent or your order is the questionnaire, and so the idea that they can send a deposition request would be in violation of that order, and that's why he had it in there originally, "will seek permission from the Court", and I think that is in keeping with the Court's order that bars communication with Quintessa's clients.  Your order is quite clear on that.

MR. BRADLEY:  Judge, the spirit of what we talked about earlier was, you know, they didn't want me picking up

39

the phone calling and contacting prior clients.  There is nothing that we discussed that would have modified the Rules of Civil Procedure as to my discovery process in sending out a subpoena without any further communication whatsoever.  That was never contemplated and I don't think was intended by the Court.

THE COURT:  Okay.  You know, we have the Case Management Order with respect to the numbers of depositions, and certainly if requests are going to be made to exceed the numbers, we can take that up at that time, but there is the potential that -- rather than "will seek", I think the appropriate word should be "may seek" instead of "will."

MR. BRADLEY:  Understood.  So we will change that.

THE COURT:  All right.  Then, "Please Note:  The Court has ordered that my firm and anyone else representing my firm may not communicate in any way other than this questionnaire without approval of either defense counsel or the Court," is there any objection to that paragraph?

MR. BRADLEY:  I think it accurately reflects what you have ordered, Your Honor.  I don't know that it's necessary to put it in this letter however.

THE COURT:  Any objection, Mr. Wyrsch?

MR. WYRSCH:  No, Your Honor.  I think it is necessary because we just need to put them on alert that they can't just pick up the phone and call Mr. Bradley, which was the whole

40

point of the protective order, so I think it's important to inform them that they are not supposed to contact him.

THE COURT:  Well, let me back up a little bit on that.  Okay.  Then the last sentence, I'll just leave it as it is.  Last sentence, "If you have any questions about this questionnaire, please call counsel for Quintessa, James Wyrsch, at" the phone number given.  Any objection to that being in there?

MR. BRADLEY:  Yes, Your Honor.  I strongly object to that because it now places defense counsel with the upper hand of being the gatekeeper of information between Quintessa's clients and me, so I strongly object to that.

THE COURT:  Okay.  Mr. Wyrsch.

MR. WYRSCH:  If they do have questions, someone needs to be the person to call.  I assume the Court doesn't want that responsibility.  I offered to Mr. Bradley, you know, if he wants to provide a scripted answer, if we want to, you know, agree on some parameters, I am fine with that.  I have no intention of doing anything nefarious.  And, you know, I could get the question and talk to him and come up with an answer that we can mutually agree upon.  I'm open to whatever, but I think that they need to have someone to call, and since it can't be him, it should be me.  But I'm open to any sort of parameters.

THE COURT:  Okay.  I would propose this:  "If you

41

have any questions about this questionnaire, please only e-mail plaintiff's counsel and defendant's counsel for guidance".

MR. BRADLEY:  I think that's a very good compromise.

THE COURT:  Okay.

MR. WYRSCH:  And then can we have it in there in the order that, I mean, no party is supposed to respond to it unless, you know, the parties confer and agree on a response or otherwise submit it to the Court?

THE COURT:  I don't have any objection to that.  The record will reflect that the Court is directing counsel for both parties that if they receive an e-mail jointly or otherwise from any of these recipients of this letter and questionnaire, that they shall notify opposing counsel and shall cooperate to provide a joint response to any question posed by the recipient.

MR. BRADLEY:  Your Honor, one thing I would like to get clarification on is, I know that the whole purpose of this is to protect Quintessa's current clients and that's understandable.  Does this also equally apply to people that they no longer have a business relationship with?  Because the same considerations don't seem to be present for those people.

THE COURT:  Well, I'm not going to answer that until I'm faced with that specific issue.

MR. BRADLEY: Understood.  Okay.

42

THE COURT: Okay. So now moving on to the questionnaire, and I am assuming -- let's see, go to number 5, "Did you or the business ever contract with Quintessa for the purchase of personal injury leads." Okay. How would it be otherwise considered that would be relevant, Mr. Bradley?

MR. BRADLEY: I would have just left it "did you or the business ever contract with Quintessa" because one of the issues, Your Honor, is whether these are leads or plaintiffs because the contract as drafted by Quintessa specifically talks about the provision of plaintiffs to my firm, not leads, but it does both refer to plaintiffs and/or leads, so I don't know if some of these law firms are like no, we contracted for plaintiffs. I make that distinction. I think it's an important distinction in this case, and we'll be hearing more about that later on, but I think that this unduly, narrowly focuses this and slants the discovery in favor of Quintessa's warped interpretation of what it was supposed to provide. They weren't supposed to provide as leads. It was plaintiffs. So I disagree with that language.

THE COURT: Let me ask, just in the operation of -- well, let me ask Mr. Wyrsch. Are there other companies that provide this kind of a service other than the defendant?

MR. WYRSCH: Yes, Your Honor.

THE COURT: Okay.

MR. WYRSCH: My understanding is yes.

43

THE COURT:  Okay.  So there are people who solicit potential litigants who are --

MR. WYRSCH:  They are not solicited.

THE COURT:  Not soliciting.  Well, tell me --

MR. WYRSCH:  My understanding of how the business works is that they do -- Quintessa does internet marketing with search terms and things like that.  I don't know the ins and outs of it, but that they do internet marketing.  People search for a personal injury lawyer.  One of the proposed ads on the search term is the number for Quintessa on behalf of -- in this jurisdiction like at the time would be on behalf of Mr. Bradley.  So the person would then call the number, they would explain the situation, tell them that they can take their information, that they know a personal injury lawyer.  I don't know the specific words that are used so I don't want to do that, but my understanding is it's all calls coming into a call center.  They then say, you know, there is this lawyer.  If the person wants to contract with that lawyer, then they help facilitate that.  They take down the information related to the case.  So it's not any sort of active solicitation.  It's all passive solicitation based on internet marketing.

THE COURT:  Okay.  But they receive a plaintiff's lawyer's contact information.

MR. WYRSCH:  Yes, I believe -- I believe that depending on where the person lives, if they have a

44

relationship there, then they -- that information is given to them, and I believe there is even a retainer sent that the law firm provides that they give to the client for their signature if they want to do it, and then that lead is sent over to the law firm and then they take it from there.

THE COURT:  Okay.  Is that a fair description, Mr. Bradley?

MR. BRADLEY:  I believe it's a simplistic recitation of what happens.  I would agree with that.

THE COURT:  Okay.  So, you know, a plaintiff's attorney would receive information about this other person who is looking for a lawyer to represent them?

MR. BRADLEY:  Yes, and the person would be initially a lead to Quintessa and then qualified as a plaintiff by Quintessa and then and only then provided to the law firm.

THE COURT:  Okay.

MR. BRADLEY:  Which is different than just giving us leads.

THE COURT:  No, I understand, except that as far as the recipient of this questionnaire, they are not going to know about the operation of the enterprise.  They are not going to know that they themselves are being qualified, and as far as they know, using the term "lead" is sufficient for them to know where they fit into the relationship.  Isn't that a fair statement?

45

MR. BRADLEY:  Perhaps to the lead, yes, but to the law firm which this would be going to, I think it's a distinction that's important.

THE COURT:  Okay.  How about adding the term "qualified personal injury lead"?

MR. BRADLEY:  Again, the word "lead" is the. ...

THE COURT:  "Qualified personal injury potential client"?

MR. BRADLEY:  If that's what the Court orders, I will modify it.  I just thought leaving it "ever contract with Quintessa."  You know, by definition, we are sending these to law firms that Quintessa has identified as it providing personal injury leads to, so adding that extra descriptive phase on here I just think is problematic.

THE COURT:  Okay.  Leaving it as "ever contract with Quintessa," that is fairly open ended and could involve business relationships unrelated to the nature of the business relationship between the plaintiff and the defendant in this lawsuit.  So I'm going to leave it at that, "for the purchase of qualified personal injury potential clients."

Okay.  Number 6, it doesn't look -- well, let's see, okay, "If your answer to number 5 is 'yes', please answer the following as to that business relationship:  A, the beginning date; B, the end date; C, was a contract entered into.  If yes, please produce a copy of that contract."  Okay.  I take

46

it from the blue addition that this language in both C and D was added by the defendant. And so what's the problem from the plaintiff's perspective, Mr. Bradley?

MR. BRADLEY: No, this was language I proposed that the defendant struck.

THE COURT: Oh, okay. Mr. Wyrsch, what's the problem with this language?

MR. WYRSCH: The problem is that the Court's order to get this information was premised on the representation by plaintiff that this all related to the fraud claim, and that was the basis for the Court's order, that was the basis for their claim, and so we're trying -- you know, this is very open ended as it is written. Do you have a contract, please produce a contract. This is not a request for production; it's a questionnaire. And "did you have any dispute concerning the performance of the contracted services" in part D, again, that's not narrowly -- it's too broad and it's not narrowly tailored to the information that's being sought about, the fraud claim. So we're just trying to limit it to what the reason that the plaintiff gave for wanting the questionnaire and the reason that the Court ordered it, which was to be related to the active fraud claim in the case.

THE COURT: Okay. Do you have a response, Mr. Bradley?

MR. BRADLEY: Sure. I mean, it's relevant as to the

47

fraud claim of course, but I'm allowed to discover any potentially relevant evidence that's admissible at trial, and again I go back to Rule 608 about character for truthfulness and specific instances of conduct which specifically can come into evidence, so at this point we shouldn't be arguing what's admissible.  This is certainly designed to highlight other instances of conduct by these actors wherein there was a dispute that, you know, potentially was like mine or even it would be admissible under Rule 608.  So at this juncture, I don't think it's appropriate to narrowly define the scope of this.

MR. WYRSCH:  Judge, 608 is discussing general reputation of credibility, specific incidents of, you know, issues of truthfulness and this is asking for breach of contract claims.  The request was made for this information as it related to a pattern and practice of fraud, so the request should be narrowly tailored to the issue of fraud.  You know, we have already had to give up the client's business relationships to expose them to these, you know, baseless claims, and now he is just asking for a fishing expedition to find out every little thing that has ever happened and that's beyond what he was asking for in the motion.  It's beyond what the Court ordered.  This should be narrowly tailored.  This is an extreme request, and it's exposing my client to potential harm if this goes the way it is, and the Court already

48

narrowed the request and provided this questionnaire, and asking all these open-ended questions I think is just going too far.

THE COURT:  Okay.

MR. BRADLEY:  Your Honor, discovery is not a narrowly defined type thing.  In fact, Rule 26 -- I can't find the specific language -- it talks about the -- in subsection B, it talks about that we should have -- relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. This is reasonably -- this fits that definition.

THE COURT:  Actually, the rule -- the rule states that the parties may obtain discovery -- this is Rule 26(b)(1), "The parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit".  Then it goes on to say that, "Information within this scope of discovery need not be admissible in evidence to be discoverable."

So, you know, Rule 26 narrowly constrains the focus

49

of discovery.  It has evolved, and so adverting back to the beginning of the questionnaire, I am going to require the inclusion of the word "voluntary" in front of the word "questionnaire".

MR. BRADLEY:  Are you talking about on the cover letter, Your Honor?

THE COURT:  No, I am talking about on the questionnaire itself.

MR. BRADLEY:  Put the word "voluntary" before "questionnaire"?

THE COURT:  Yes, sir.  And with respect to six, I will allow "was a contract entered into" and then "if yes, you may produce a copy of that contract to the sender's office."

Yes, sir?

MR. BRADLEY:  I would just like to reiterate, we have talked about the fraud claim and breach of contract claim. There are other claims pending here.  There are counterclaims that we asserted against them for, you know, improperly retaining funds.  There are other issues in this case beyond fraud and breach of contract, so again, this questionnaire is not just limited to fraudulent conduct.  For instance, if they improperly kept money that was -- because all the accounts are prepaid, if they improperly kept money and didn't give it back, that's another instance of I think relevant information that could come in that doesn't apply to fraud.  So I just

50

want to make that distinction to the Court because Mr. Wyrsch keeps bringing this and tethering the questionnaire back to the fraud claim which I don't think is right.

MR. WYRSCH: Your Honor, I'm doing that because that was the motion that he filed. He filed it talking about a pattern and practice of fraud. That was the reason that he needed this information. I don't think we'd ever get to a position where we are talking about a pattern and practice of breach of contract. That's not -- that's beyond the scope of what is normal. You allowed him to pursue evidence regarding a pattern and practice of fraud. That's why I keep talking about it because that was why he asked for it and that's the reason you gave it to him. So, you know, he might have other claims, but that's not what he was seeking this information for and it's not what the Court gave him this information for.

MR. BRADLEY: But there is a counterclaim for abuse of process and conversion, which, you know --

MR. WYRSCH: You didn't bring that up in your motion.

MR. BRADLEY: It doesn't matter. It's relevant. That's what we're talking about, whether or not it's relevant.

THE COURT: Okay. I will allow D. C will be, "Was a contract entered into. If yes, you may produce a copy of that contract to the sender's office" or however you want to put it that identifies the addressee of where that copy of the contract should go.

51

"At any time, did you have any dispute with Quintessa, LLC or Lauren Mingee concerning your performance of the contracted services.  If your answer is yes, please state in detail the nature of the dispute" and then -- okay.  I don't have any objection to that.

MR. WYRSCH:  Your Honor, the only thing I would add there is Ms. Mingee is no longer a defendant in the case and so any reference to her should be stricken.

MR. BRADLEY:  Judge, she is the actor.  She is the actor.  She is the agent behind Quintessa.  You know, we're mincing words here.

THE COURT:  Yeah, I'm not going to strike her name because of her relationship to the litigation.

MR. WYRSCH:  Can we strike her name from the case caption on the top since she is no longer a defendant?

THE COURT:  I don't have any objection to that.  Well, you mean in the Court's records?

MR. WYRSCH:  No.  On the top of the questionnaire, it says ERB Legal Investments versus Quintessa, LLC and Lauren Mingee.

MR. BRADLEY:  I don't have a problem with that.

THE COURT:  Okay.  All right.  Then we go to C, "From your perspective, did Quintessa, LLC and/or Lauren Mingee fail to fully perform any contractual duties."  I think what we're -- how is that not redundant of 6d?  Oh, it is.  Let me

52

see here, I'm allowing C and D.

So turning to the next page where it says there is an "e" stricken and then it says "c", I suppose that is intended to be "e".  Irrespective, it seems like it is redundant, so I am not going to allow that question.

The next one is on the next page.  We are talking about 93-1, page 5, and the language is, "From your perspective, did Quintessa, LLC and/or Lauren Mingee engage in any fraudulent conduct in connection with the provision of those services, make any false representation."  I'm not going to allow that.  The statement of whether or not there was a dispute between the parties regarding the contracted services, that is sufficient, so there won't be any asking about false representations.

Going to page 6, "Have you or your business ever threatened litigation against Quintessa, LLC."  Have you or your business ever engaged in litigation.

MR. BRADLEY:  "Engaged in" instead of "threatened?"

THE COURT:  Right, "litigation against Quintessa, LLC."

And then the next one, "Has Quintessa, LLC ever threatened litigation against you."  So it will be the same, "Has Quintessa, LLC ever engaged" -- I think rather than "engaged", that's sufficiently non-specific, so we'll say "have you or your business ever commenced or filed" -- we'll

53

just say "filed litigation against Quintessa".

And then the next one, "Has Quintessa ever filed litigation."

Okay.  And I think if there is information from the responses of the -- responses to the questionnaire, further discovery may be allowed along those leads, you know, upon that information.  Okay.

MR. BRADLEY:  The only other thing is, Your Honor, when the lawsuit -- I forgot the other law firm that you referenced, Mr. Wyrsch -- was filed, I did communicate prior to this Court's entry with the managing partner up there and then this Court subsequently made an order to where we couldn't contact former clients, and I have not done so and I have ceased all communication with them.  Does that prohibit me from continuing to reply to anything that that law firm may be asking me to provide or should that even happen?

THE COURT:  Are you asking for a -- I'm not sure I understand.  You are talking about if you receive a request for information from a litigant in another case --

MR. BRADLEY:  Correct.

THE COURT:  -- are you at liberty to provide that information?  I'm not in a position to answer that question because I would need more specific information about what request is being made.  As far as information developed in this case about the discovery and all, I'm just not in a

54

position to answer the question at this time.

All right. I will -- we'll get a transcript of the hearing. I will get hopefully a specific order on file, and I will give the parties -- as I go through and fashion that, I will give the parties a limited amount of time to comply with information that has been indicated by the Court.

All right. At this time, Mr. Bradley, did you have anything else to bring to the Court's attention about this matter?

MR. BRADLEY: No, Your Honor. The only other thing I envision is, I mean, I consented to an extension of the deadlines in the scheduling order at the defendant's request. I don't know how long we're looking at in terms of getting this sent out and getting a reply back. The letter doesn't even, you know, say a day or a number of days that we would like to get a response. Certainly, that is going to impact the discovery deadlines, so we may be coming back to the Court for that purpose.

THE COURT: Well, how much time do you want to give the recipients of the questionnaire to respond?

MR. BRADLEY: Ask for a response within 14 days.

THE COURT: I think that's a fair amount of time. And then so you can add that request of them, it being a voluntary questionnaire, and then I'll let counsel fashion a proposed scheduling plan for the balance of the litigation.

55

MR. WYRSCH:  Great.

MR. BRADLEY:  Thank you, Your Honor.

THE COURT:  All right.  And let's see, I will informally suggest -- let's see, Mr. Wyrsch, I think this is more typically directed at defense counsel.  You can take Mr. Bradley to lunch the first time, and you don't have to go to Tony's, but you can go someplace nice and talk about, you know, in a cooperative way providing information, and then, Mr. Bradley, within a month after that, you can take Mr. Wyrsch to lunch --

MR. BRADLEY:  Understood.

THE COURT:  -- and talk about the parties' relative positions.

MR. BRADLEY:  Understood.  We already agreed upon a mediator, so we're halfway there.

THE COURT:  Oh, is that right?

MR. BRADLEY:  We did.

THE COURT:  Okay.  Do you have a date?

MR. BRADLEY:  We don't.

THE COURT:  Okay.  All right.  Don't take the mediator to lunch.

MR. BRADLEY:  They make enough money already, they buy their own lunch.

THE COURT:  All right.  Thank you, both, very much for being available.  I appreciate your being flexible.  I had

56

two naturalizations this morning and I released someone from custody, so they all appreciated your flexibility.

MR. BRADLEY:  Thank you, Judge.

THE COURT:  All right.  Thank you very much.  We will be in recess.  Thank you.  Thank you, Ms. Parker.

**(PROCEEDINGS CONCLUDED AT 1:25 P.M.)**

57

CERTIFICATE

I, Angela K. Daley, do hereby certify that I am a duly appointed official court reporter for the United States District Court for the Eastern District of Missouri.

I further certify the foregoing is a true and accurate transcription as heard and understood from the taped proceedings held in the above-entitled case as has been transcribed from said tape to the best of my ability.

This reporter does not certify any transcript nor takes any responsibility for missing or damaged pages of this transcript when said transcript is copied and delivered by any party other than this reporter.

March 8, 2022        ----          /s/Angela K. Daley