UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ERB LEGAL INVESTMENTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:20-CV-1255 |
| QUINTESSA LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**QUINTESSA LLC'S RESPONSE TO ERB LEGAL INVESTMENTS LLC'S
STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

1.     The "BULK MARKETING, FULL SERVICE PLATFORM AND GENERAL TERMS OF SERVICE" contract between ERB LEGAL INVESTMENTS, LLC (hereinafter "ERB") and Quintessa, LLC is attached hereto as Exhibit 1. *See* Exhibit 5, Paragraph 7, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC; Exhibit 1.

**RESPONSE: Uncontroverted.**

2.     Quintessa drafted the entire contract barring the handwriting modifying "cited At fault" to "At fault" on page 1 of the contract. *See* Exhibit 5, Paragraph 2, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC; Exhibit 1.

**RESPONSE: Controverted. Quintessa and Bradley extensively negotiated the contract prior to execution. *See* Ex. B (Quintessa 0151-0181). Bradley proposed terms to be added to the contract, one of which was accepted. *Id.* Further, Bradley admits that he is an attorney, reviewed the contract, had the opportunity to negotiate and make edits, and did in fact make or propose edits to the contract. *Id.***

3.     Quintessa's solitary allegation of breach against ERB appears in paragraph 11, which states "Further, Defendant [ERB] failed to properly or timely disengage at least 32 leads

1

that it has not paid for (and thus owes Plaintiff for)" and in paragraph 13, Quintessa claims this failure to pay constitutes a "breach of the parties' Contract." *See* Doc#143, ¶11, 13.

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted. The entirety of Count I describes the breach of contract. *See* D.E. 143 ¶¶ 5-14.**

4.      Quintessa then claims as a result of said breach that it "incurred damages in an amount in excess of $50,000." *See* Doc#143, ¶14.

**RESPONSE: Uncontroverted.**

5.      Yet in discovery, Quintessa states ERB owes Quintessa "$50,800 for 21 emailed leads that were never disengaged or paid for." *See* Exhibit 2, Quintessa's Fourth Supplemental Answers to Interrogatories, #10(d).

**RESPONSE: Controverted. The complete interrogatory response states:**

**$325,800.00 at a minimum, which includes $275,000.00 for leads that ERB paid for, plus an additional $50,800.00 for 21 emailed leads that were never disengaged or paid for. See documents produced concurrently herewith, specifically that titled "11 - Email Leads not disengaged (QUINTESSA 0190). This amount does not include amounts owed for any leads that ERB disengaged but either continued to represent or referred to other counsel. Quintessa reserves the right to supplement its Answer to this Interrogatory as discovery progresses.**

**Exhibit 2 No. 10.**

6.      Quintessa claims the 21 leads that ERB owes for are reflected in an exhibit produced by it called "11- Email Leads not disengaged (Quintessa 0190)." *See* Exhibit 3, 11- Email Leads not disengaged (Quintessa 0190)."

**RESPONSE: Controverted in part. Quintessa admits that Exhibit 3 identifies 21 leads that Quintessa contended that ERB received and did not properly disengage, but that ERB did not pay Quintessa for the leads. *See* Ex. 3.**

2

7.      Pursuant to the express terms of the contract, ERB was only required to "pre- fund" the marketing campaign. *See* Exhibit 1.

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted. Pursuant to the contract, ERB was required to pay for any leads that Quintessa sent to ERB that were not timely disengaged. Ex. A (Mingee Dec.) ¶¶ 8-14. Depending on the type of lead, each lead cost either $2,000 or $4,200 per individual. Ex. A (Mingee Dec.) ¶ 2; Exhibit 1 at 1. The contract further states:**

> **The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below unless otherwise agreed upon in writing by Quintessa Marketing. At 12am on the seventh day, leads will not be eligible for disengagement. Leads that are turned down or disengaged for the approved reasons described in this agreement will be credited back to your Campaign balance once Quintessa has verified and may be subject to internal audit which typically takes 5 days.**

**Exhibit 1 at 1. Accordingly, if ERB did not disengage a lead, it was required to compensate Quintessa for the cost of that lead. Ex. A (Mingee Dec.) ¶¶ 8-14; Exhibit 1 at 1.**

**In order to protect Quintessa, ERB was required to pay money in advance to Quintessa. Ex. A (Mingee Dec.) ¶ 19. Quintessa would track ERB's balance and charge against that balance for each lead. Exhibit 1 at 1; Ex. A (Mingee Dec.) ¶ 19-21. If ERB timely disengaged a lead for a valid reason under the contract, then that amount would be charged back. Exhibit 1 at 1; Ex. A (Mingee Dec.) ¶¶ 8-14. In order to "continue [ERB's marketing] campaign," ERB was required to pay additional funds once the account balance reached 10%. Exhibit 1 at 1; Ex. A (Mingee Dec.) ¶ 22. Nothing in the contract states that Bradley is entitled to keep leads for free if Bradley fails to properly fund the campaign. The contract**

**further states that all account balances are subject to "internal audit which typically takes 5 days." Exhibit 1 at 1; Ex. A (Mingee Dec.) ¶ 25.**

8.      At all times, ERB did <u>pre</u>-fund the marketing account in accordance with the terms of the contract. *See* Exhibit 5, Paragraph 3, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted in part. While ERB did pre-fund the marketing account on some occasions, that did not absolve ERB for paying for leads that Quintessa sent ERB that were not timely disenegaged. Ex. A (Mingee Dec.) ¶¶ 8-14. ERB failed to pay for all leads that it received from Quintessa. Ex. A (Mingee Dec.) ¶ 42.**

9.      ERB was never contractually required to *post*-fund the marketing account. That is, the parties never agreed that Quintessa would have the ability to spend *more* money than ERB had funded in its marketing account. *See* Exhibit 1.

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted. Pursuant to the contract, ERB was required to pay for any leads that Quintessa sent to ERB that were not timely disengaged. See Response to SUMF No. 7, above. Just as a client would owe a lawyer money even if the retainer has been exhausted, ERB owes Quintessa for all leads sent to ERB that were not timely disengaged. *Id.* If ERB did not want to pay for the leads, ERB should have timely disengaged the leads. *Id.***

10.      Pursuant to the terms of the contact, "Quintessa tracks and accounts for the funds each law firm has in its campaign at all times." *See* Exhibit 1.

**RESPONSE: Controverted in part. Quintessa admits that the contract includes this statement. However, to the extent that ERB is claiming that Quintessa had the sole duty to**

4

**track and account for funds, this is incorrect. ERB had its own independent duty to track and account for leads it received. Moreover, the tracking of funds is very fluid as Quintessa is frequently sending over new leads while ERB is disengaging them. Exhibit 1 at 1; Ex. A (Mingee Dec.) ¶ 26. Additionally, as stated in the contract, the leads are subject to "internal audit." Exhibit 1 at 1; Ex. A (Mingee Dec.) ¶ 25.**

11.    Quintessa had a contractual duty to notify ERB of "additional funding requirements" when ERB's account balance reached 10%. *See* Exhibit 1.

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted. The contractual provision at issue states:**

> **Campaign funding balance must remain above 10%. Once your balance reaches 10%, Quintessa will notify you of additional funding requirements to continue your campaign.**

**Exhibit 1 at 1. This paragraph does not create a duty for Quintessa to notify ERB of "additional funding requirements." *Id.* It created a duty for ERB to provide additional funding if it wanted to continue its marketing campaign. *Id.*; Ex. A (Mingee Dec.) ¶¶ 22-24.**

12.    Quintessa never notified ERB of any instance wherein its campaign account balance was in fact negative as a result of delivering more leads than ERB pre-funded. *See* Exhibit 5, Paragraph 4, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa informed ERB that after auditing its records, it discovered that ERB had accepted more leads than ERB had paid for. Ex. A (Mingee Dec.) ¶ 42. Quintessa demanded payment for these leads. Ex. A (Mingee Dec.) ¶ 42.**

13.     Quintessa admits in its petition "[f]ollowing an internal audit, Plaintiff [Quintessa] learned that it had sent Defendant [ERB] far more leads than Defendant [ERB] has paid for." *See* Doc. #143, ¶10.

**RESPONSE: Uncontroverted.**

14.     ERB never had a contractual duty to "track and account" for the funds within the campaign account. *See* Exhibit 1.

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted. ERB had its own independent duty to track and account for leads it received. See Response to SUMF No. 10, above.**

15.     Quintessa had a contractual duty to provide "prompt lead delivery … via email, portal notification and live call transfer." *See* Exhibit 1.

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted in part. The relevant contract provision states:**

> **QUINTESSA MARKETING will provide pre-qualified leads to The Bradley Law Firm. Prompt lead delivery is provided via email, portal notification and live call transfer.**

*See* **Exhibit 1 at 1.**

16.     By Quintessa's own admission, the 21 leads it claims it is owed money for were "emailed only." *See* Exhibit 3, 11- Email Leads not disengaged (Quintessa 0190).

**RESPONSE: Controverted in part. Quintessa admits that it described these leads as "emailed only" but denies the implication that these leads were only sent by email. Ex. A (Mingee Dec.) ¶¶ 27-34. All "emailed only" leads sent by Quintessa were also added to the**

6

**portal.** *Id.* **These "emailed only" leads were generally passengers in cars, and each passenger was listed separately underneath the entry for the potential client ("PC").** *Id.* **ERB had the ability and the obligation to separately disengage the PC and each passenger.** *Id.* **Indeed, on numerous occasions, ERB followed this procedure and either a) retained the PC while disengaging a passenger (see, e.g., Ex. 7 Kim Ratliff); b) disengaged the PC but retained the passenger (see, e.g., Ex. 7 Christopher Lewis); or c) retained the PC, retained one passenger, and disengaged a different passenger (s*ee, e.g.*, Ex. 7 Eyob Okubay).** *Id.*[1]

17.     Amarion Winston never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Christian Winston." *See* Exhibit 5, Paragraph 5, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Amarion Winston does not "only appear within the 'notes' section of a lead."** *See* **Ex. C; Ex. A (Mingee Dec.) ¶¶ 4-7, 27-34. The portal page for Christian Winston includes a separate entry for Amarion Winston, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment.** *See* **Ex. C; Ex. A (Mingee Dec.) ¶¶ 4-7, 27-34. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *See* **Ex. C; Ex. A (Mingee Dec.) ¶¶ 4-7, 27-34. By doing this, Quintessa gives ERB portal notification of each passenger.**

---

[1]     Bradley moved to strike SOF Nos. 16-52. The Court has not ruled on the motion, so Quintessa will respond to them. In addition, SOF Nos. 60-110 suffer from the same misunderstanding and/or false representations regarding how the portal operates. The responses to SOF Nos. 16-52 provide necessary context to explain how the portal operates.

*See* Ex. C; Ex. A (Mingee Dec.) ¶¶ 4-7, 27-34. **Each passenger is a separate lead.** *See* Ex. C; Ex. A (Mingee Dec.) ¶ 33.



18. Miracle Winston never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that she was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Christian Winston." *See* Exhibit 5, Paragraph 6, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Miracle Winston does not "only appear within the 'notes' section of a lead."** *See* **Response to SUMF No. 18, above; Ex. C. The portal page for Christian Winston includes a separate entry for Amarion Winston, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

19. Ari'Yon Fields-Winston never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that she was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Christian Winston." *See* Exhibit 5, Paragraph 7, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Ari'Yon Fields-Winston does not "only appear within the 'notes' section of a lead."** *See* **Response to SUMF No. 10, above; Ex. C. The portal page for Christian Winston includes a separate entry for Amarion Winston, including Name, Phone, Email, DOB, Street, City, State, Zip, and a**

**description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

20.    Shaquille Jones never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Antwan Miller." *See* Exhibit 5, Paragraph 8, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Shaquille Jones does not "only appear within the 'notes' section of a lead." *See* Response to SUMF No. 18, above; Ex. C. The portal page for Antwan Miller includes a separate entry for Shaquille Jones, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

21.    Marcus Pratt Sr never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Eunique Cooper." *See* Exhibit 5, Paragraph 9, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

10

**RESPONSE: Controverted. This is completely false. The name Marcus Pratt Sr does not "only appear within the 'notes' section of a lead."** *See* **Response to SUMF No. 18, above; Ex. C. The portal page for Eunique Cooper includes a separate entry for Marcus Pratt Sr, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

22.     Marcus Pratt Jr never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Eunique Cooper." *See* Exhibit 5, Paragraph 10, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Marcus Pratt Jr does not "only appear within the 'notes' section of a lead."** *See* **Response to SUMF No. 18, above; Ex. C. The portal page for Eunique Cooper includes a separate entry for Marcus Pratt Jr, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

23.     Madison Pratt never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal

11

notification that she was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Eunique Cooper." *See* Exhibit 5, Paragraph 11, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Madison Pratt does not "only appear within the 'notes' section of a lead."** *See* **Response to SUMF No. 18, above; Ex. C. The portal page for Eunique Cooper includes a separate entry for Madison Pratt, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

24.     Cracen Noah Ortega never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Manaha Ortega." *See* Exhibit 5, Paragraph 12, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Gracen Noah Ortega does not "only appear within the 'notes' section of a lead."** *See* **Response to SUMF No. 18, above; Ex. C. The portal page for Manaha Ortega includes a separate entry for Gracen Noah Ortega, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By**

12

**doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

25.     Michael Davis never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Toni Lambert." *See* Exhibit 5, Paragraph 13, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Michael Davis does not "only appear within the 'notes' section of a lead." *See* Response to SUMF No. 18, above; Ex. C. The portal page for Toni Lambert includes a separate entry for Michael Davis, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

26.     Todd Morris never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Antonio Dickerson." *See* Exhibit 5, Paragraph 14, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Todd Morris does not "only appear within the 'notes' section of a lead." *See* Response to SUMF No. 18, above; Ex. C. The portal page for Antonio Dickerson includes a separate entry for Todd Morris,**

**including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

27.     Pahmel Archer never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Damarcus Mason." *See* Exhibit 5, Paragraph 15, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Pahmel Archer does not "only appear within the 'notes' section of a lead." *See* Response to SUMF No. 18, above; Ex. C. The portal page for Damarcus Mason includes a separate entry for Pahmel Archer, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

28.     Travonna Fletcher never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that she was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Travorous Johnson." *See* Exhibit 5, Paragraph 16, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

14

**RESPONSE: Controverted. This is completely false. The name Travonna Fletcher does not "only appear within the 'notes' section of a lead."** *See* **Response to SUMF No. 18, above; Ex. C. The portal page for Tavorous Johnson includes a separate entry for Travonna Fletcher, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

29.    Leilani Purinton never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that she was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Tasha Downing." *See* Exhibit 5, Paragraph 17, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Leilani Purinton does not "only appear within the 'notes' section of a lead."** *See* **Response to SUMF No. 18, above; Ex. C. The portal page for Tasha Downing includes a separate entry for Leilani Purinton, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

15

30.     Remi Downing never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that she was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Tasha Downing." *See* Exhibit 5, Paragraph 18, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Remi Downing does not "only appear within the 'notes' section of a lead." *See* Response to SUMF No. 18, above; Ex. C. The portal page for Tasha Downing includes a separate entry for Remi Downing, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

31.     Zyler Downing never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Tasha Downing." *See* Exhibit 5, Paragraph 19, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Zyler Downing does not "only appear within the 'notes' section of a lead." *See* Response to SUMF No. 18, above; Ex. C. The portal page for Tasha Downing includes a separate entry for Zyler Downing, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section**

**provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

32.     Tesfay Awalom never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that she was a separate lead. Rather, his name only appeared within the "notes" section of a lead for "Eyob Okubay." *See* Exhibit 5, Paragraph 20, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Tesfay Awalom does not "only appear within the 'notes' section of a lead." *See* Response to SUMF No. 18, above; Ex. C. The portal page for Eyob Okubay includes a separate entry for Tesfay Awalom, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

33.     Kyshon Brown never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that he was a separate lead. Rather, his name only appeared within the "notes" section of a lead for "Jayda Burkett." *See* Exhibit 5, Paragraph 21, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Kyshon Brown does not "only appear within the 'notes' section of a lead." *See* Response to SUMF No. 18, above;**

17

**Ex. C. The portal page for Jayda Burkett includes a separate entry for Kyshon Brown, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.**

34.     Per the contract [Exhibit 1], the leads that ERB turned down or disengaged were required to be done through the "portal." *See* Exhibit 5, Paragraph 22, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC; *See* Exhibit 1, page 2 stating "*Leads that you turn down or disengage, must be done by using the Quintessa Marketing portal in order to receive credit back to your campaign.*"

**RESPONSE: Uncontroverted.**

35.     ERB cannot disengage leads as contemplated pursuant to the contract [through the portal] if they are "emailed only" and do not appear within the "portal." *See* Exhibit 5, Paragraph 23, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC;

**RESPONSE: Controverted. This is completely false. All "emailed only" leads sent by Quintessa were also added to the portal. *See* Ex. C; Ex. A (Mingee Dec.) ¶¶ 27-34. These "emailed only" leads were generally passengers in cars, and each passenger was listed separately underneath the entry for the PC. *Id.* ERB had the ability and the obligation to separately disengage the PC and each passenger. *Id.* Indeed, on numerous occasions, ERB followed this procedure and either a) retained the PC while disengaging a passenger (see, e.g., Ex. 7 Kim Ratliff); b) disengaged the PC but retained the passenger (see, e.g., Ex. 7**

18

**Christopher Lewis); or c) retained the PC, retained one passenger, and disengaged a different passenger (s*ee, e.g.*, Ex. 7 Eyob Okubay). *Id.***

36.     ERB had no method to individually turn down Amarion Winston through the portal. *See* Exhibit 5, Paragraph 24, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Amarion Winston, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 18. above). *See* Ex. C; Ex. A (Mingee Dec.) ¶¶ 27-34. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. *See* Ex. C; Ex. A (Mingee Dec.) ¶¶ 27-34. By doing this, Quintessa gives ERB portal notification of each passenger. *See* Ex. C; Ex. A (Mingee Dec.) ¶¶ 27-34. Each passenger is a separate lead. *See* Ex. C; Ex. A (Mingee Dec.) ¶¶ 27-34.**

37.     ERB had no method to individually turn down Miracle Winston through the portal. *See* Exhibit 5, Paragraph 25, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Miracle Winston, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17). *See* Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers. *Id.* By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead. *Id.***

38.    ERB had no method to individually turn down Ari'Yon Fields-Winston through the portal. *See* Exhibit 5, Paragraph 26, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Ari'Yon Fields-Winston, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

39.    ERB had no method to individually turn down Shaquille Jones through the portal. *See* Exhibit 5, Paragraph 27, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Shaquille Jones, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

40.    ERB had no method to individually turn down Marcus Pratt Sr through the portal. *See* Exhibit 5, Paragraph 28, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Marcus Pratt Sr, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

41.     ERB had no method to individually turn down Marcus Pratt Jr through the portal. *See* Exhibit 5, Paragraph 29, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Marcus Pratt Jr, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

42.     ERB had no method to individually turn down Madison Pratt through the portal. *See* Exhibit 5, Paragraph 30, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Madison Pratt, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in**

21

**Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

43.    ERB had no method to individually turn down Cracen Noah Ortega through the portal. *See* Exhibit 5, Paragraph 31, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Gracen Noah Ortega, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

44.    ERB had no method to individually turn down Michael Davis through the portal. *See* Exhibit 5, Paragraph 32, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Michael Davis, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to**

**allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

45.     ERB had no method to individually turn down Todd Morris through the portal. *See* Exhibit 5, Paragraph 33, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Todd Morris, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

46.     ERB had no method to individually turn down Pahmel Archer through the portal. *See* Exhibit 5, Paragraph 34, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Pahmel Archer, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

47.     ERB had no method to individually turn down Travonna Fletcher through the portal. *See* Exhibit 5, Paragraph 35, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Travonna Fletcher, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

48.     ERB had no method to individually turn down Leilani Purinton through the portal. *See* Exhibit 5, Paragraph 36, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Leilani Purinton, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

49.     ERB had no method to individually turn down Remi Downing through the portal. *See* Exhibit 5, Paragraph 37, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

24

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Remi Downing, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

50. ERB had no method to individually turn down Zyler Downing through the portal. *See* Exhibit 5, Paragraph 38, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Zyler Downing, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

51. ERB had no method to individually turn down Tesfay Awalom through the portal. *See* Exhibit 5, Paragraph 39, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Tesfay Awalom, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in**

**Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

52.     ERB had no method to individually turn down Kyshon Brown through the portal. *See* Exhibit 5, Paragraph 40, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. As described above, the portal includes a separate entry for Kyshon Brown, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Response to SUMF No. 36, above; Ex. C. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *Id.* **By doing this, Quintessa gives ERB portal notification of each passenger. Each passenger is a separate lead.** *Id.*

53.     Quintessa contractually agreed to provide pre-qualified personal injury leads to The Bradley Law Firm as a condition precedent to deducting money for those leads from ERB's marketing          account.     *See*     Exhibit     1     (emphasis     added).

Details of Services Provided by Quintessa Marketing:
Beginning on the effective date, 04/20/2020 , QUINTESSA MARKETING will begin to deliver Personal Injury leads in Missouri to _The Bradley Law Firm_.

QUINTESSA MARKETING will provide pre-qualified leads to The Bradley Law Firm. Prompt lead delivery is provided via email, portal notification and live call transfer.

The Marketing Campaigns are pre-funded with an initial payment of $50,000.
Tier 1/Tier 2 leads are deducted from the funded amount at the time of lead delivery.

26

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted in part. Quintessa admits that the contract states that Quintessa will provide pre-qualified leads. Quintessa admits that each lead was pre-qualified. The contract does not state that this is a "condition precedent" to deducting money for those leads.**

**Pursuant to the contract, ERB was required to pay for any leads that Quintessa sent to ERB that were not timely disengaged. Ex. A (Mingee Dec.) ¶¶ 8-14; Exhibit 1 at 1. Depending on the type of lead, each lead cost either $2,000 or $4,200 per individual. Ex. A (Mingee Dec.) ¶ 2; Exhibit 1 at 1. The contract further states**

> **The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below unless otherwise agreed upon in writing by Quintessa Marketing. At 12am on the seventh day, leads will not be eligible for disengagement. Leads that are turned down or disengaged for the approved reasons described in this agreement will be credited back to your Campaign balance once Quintessa has verified and may be subject to internal audit which typically takes 5 days.**

**Exhibit 1 at 1. Accordingly, if ERB did not disengage a lead, it was required to compensate Quintessa for the cost of that lead. Ex. A (Mingee Dec.) ¶¶ 8-14; Exhibit 1 at 1.**

54.      The pre-qualification criteria per the contract was a) either a "Motor Vehicle Accident" in Missouri for $2000 per Plaintiff [Tier 1] or a "Commercial Policy / Motor Vehicle Accident Injury" in Missouri for $4200 per Plaintiff [Tier 2], and b) could not be at fault, c) property damage could not be under $1500, and d) Defendant could not be uninsured or no PC UIM [meaning no "potential client" "underinsured motorist coverage"] and e) must have obtained medical treatment within 14 days of injury. *See* Exhibit 1.

27

| Lead Tier | Description | Price | Territory |
|-----------|-------------|-------|-----------|
| Tier 1 | Motor Vehicle Accident | $2,000 per Plaintiff | Missouri |
| Tier 2 | Commercial Policy/Motor Vehicle Accident Injury | $4,200 per Plaintiff | Missouri |

Turndowns and Disengagements
Approved reasons for turning down or disengaging a lead, unless otherwise agreed by Quintessa Marketing are as follows:
- Insured At fault
- Property Damage under $1,500
- Defendant Uninsured and no PC UM
- No medical treatment within 14 days of injury

*See* Exhibit 1.

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted. Pursuant to the contract, ERB was required to pay for any leads that Quintessa sent to ERB that were not timely disengaged. Ex. A (Mingee Dec.) ¶¶ 8-14; Exhibit 1 at 1. Depending on the type of lead, each lead cost either $2,000 or $4,200 per individual. Ex. A (Mingee Dec.) ¶ 2; Exhibit 1 at 1. The contract further states**

> **The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below unless otherwise agreed upon in writing by Quintessa Marketing. At 12am on the seventh day, leads will not be eligible for disengagement. Leads that are turned down or disengaged for the approved reasons described in this agreement will be credited back to your Campaign balance once Quintessa has verified and may be subject to internal audit which typically takes 5 days.**

**Exhibit 1 at 1. Accordingly, if ERB did not disengage a lead, it was required to compensate Quintessa for the cost of that lead. Ex. A (Mingee Dec.) ¶¶ 8-14; Exhibit 1 at 1.**

**ERB is turning the contract on its head. The characteristics listed above are not "pre-qualification" criteria but instead "[a]pproved reasons for turning down or disengaging a lead." Exhibit 1 at 1.**

55.     Quintessa admits in its answers to Interrogatories the following were pre-qualification intake criteria: "…when attempting to prequalify a lead, Quintessa communicates with the potential client, asking detailed questions about a person's accident, any insurance information that is known, determinations of fault, status of injuries and medical treatment, and whether the case might implicate a commercial enterprise or insurance policy." *See* Exhibit 2, Quintessa's Fourth Answers to Interrogatories, #11(e).

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted. Pursuant to the contract, ERB was required to pay for any leads that Quintessa sent to ERB that were not timely disengaged. Ex. A (Mingee Dec.) ¶¶ 8-14; Exhibit 1 at 1. Depending on the type of lead, each lead cost either $2,000 or $4,200 per individual. Ex. A (Mingee Dec.) ¶ 2; Exhibit 1 at 1. The contract further states**

> **The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below unless otherwise agreed upon in writing by Quintessa Marketing. At 12am on the seventh day, leads will not be eligible for disengagement. Leads that are turned down or disengaged for the approved reasons described in this agreement will be credited back to your Campaign balance once Quintessa has verified and may be subject to internal audit which typically takes 5 days.**

**Exhibit 1 at 1. Accordingly, if ERB did not disengage a lead, it was required to compensate Quintessa for the cost of that lead. Ex. A (Mingee Dec.) ¶¶ 8-14; Exhibit 1 at 1.**

**ERB is turning the contract on its head. The characteristics listed above are not "pre-qualification" criteria but instead "[a]pproved reasons for turning down or disengaging a lead." Exhibit 1 at 1.**

**The complete answer to Interrogatory 11(e), which  is:**

**See documents produced by Quintessa pursuant to its Rule 26(a)(1) disclosures, specifically those titled "5 - Google Document prepared for**

**Plaintiff's Campaign," "6 - Information from Defendant's client portal for Plaintiff's Campaign (QUINTESSA 0005-0007)," "3 - Agreement between Plaintiff and Defendant (QUINTESSA 0001-0004)," "1 - Recorded telephone conversation between Ryan Bradley, Leo Mingee, and Lauren Mingee regarding disengagement of clients," "4 - Correspondence between Plaintiff and Defendant, including emails and text messages (QUINTESSA 0009-0189)," the spreadsheet titled "8 - Bradley Lawfirm leads," and the spreadsheet titled "9 - Bradley Lawfirm lead notes." For further answer, Quintessa attempts to [g]ather the information related to the criteria in "3 - Agreement between Plaintiff and Defendant (QUINTESSA 0001-0004)." Quintessa communicates with the potential client, asking detailed questions about a person's accident, including but not limited to, any insurance information that is known, determinations of fault, estimate of property damage, status of injuries and medical treatment, and whether the case might implicate a commercial enterprise or insurance policy. All of the information collected by Quintessa from the leads is contained in the spreadsheet titled "8 - Bradley Lawfirm leads," and the spreadsheet titled "9 - Bradley Lawfirm lead notes." Quintessa reserves the right to supplement its Answer to this Interrogatory as discovery progresses.**

*See* **Exhibit 2, Quintessa's Fourth Answers to Interrogatories, #11(e)**

**Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶¶ 3-14; Exhibit 1 at 1. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. *Id.* In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing.**

56.    Interrogatory #11(f) asked Quintessa "for each Lead, identify how Quintessa determined the Lead was pre-qualified per the terms of the Contract, describing in detail each qualifying fact."

**Response: Uncontroverted.**

30

57. Quintessa responded to Interrogatory #11(f) in relevant part: "Quintessa objects to Interrogatory #11(f) as it is vague and ambiguous. Quintessa further objects on the ground that such information is relevant only for the leads that are in dispute in this case. The burden of providing the requested information for every single lead sent pursuant to the parties' contract heavily outweighs any benefit of such information. Subject to and without waiving said objections, see documents produced by Quintessa pursuant to its Rule 26(a)(1) disclosures, specifically those titled "5 - Google Document prepared for Plaintiff's Campaign," "6 – Information from Defendant's client portal for Plaintiff's Campaign (QUINTESSA 0005-0007)," "3 - Agreement between Plaintiff and Defendant (QUINTESSA 0001-0004)," "1 - Recorded telephone conversation between Ryan Bradley, Leo Mingee, and Lauren Mingee regarding disengagement of clients," and "4 - Correspondence between Plaintiff and Defendant, including emails and text messages (QUINTESSA 0009- 0189)." For further answer, for each lead that is in dispute in this case, Quintessa determined that the lead met its qualification criteria by analyzing the information provided by the potential client."

**Response: Controverted. This does not accurately recite the response to Interrogatory No. 11(f). The full response is:**

> **Quintessa objects to Interrogatory #11(f) as it is vague and ambiguous. Quintessa further objects on the ground that such information is relevant only for the leads that are in dispute in this case. The burden of providing the requested information for every single lead sent pursuant to the parties' contract heavily outweighs any benefit of such information. Subject to and without waiving said objections, see documents produced by Quintessa pursuant to its Rule 26(a)(1) disclosures, specifically those titled "5 - Google Document prepared for Plaintiff's Campaign," "6 - Information from Defendant's client portal for Plaintiff's Campaign (QUINTESSA 0005-0007)," "3 – Agreement between Plaintiff and Defendant (QUINTESSA 0001-0004)," "1 – Recorded telephone conversation between Ryan Bradley, Leo Mingee, and Lauren Mingee regarding disengagement of clients," "4 - Correspondence between Plaintiff and Defendant, including emails and text messages (QUINTESSA 0009-0189)," the spreadsheet titled "8 - Bradley Lawfirm**

**leads," and the spreadsheet titled "9 - Bradley Lawfirm lead notes." All of the information collected by Quintessa from the leads is contained in the spreadsheet titled "8 - Bradley Lawfirm leads," and the spreadsheet titled "9 - Bradley Lawfirm lead notes." For further answer, for each lead that is in dispute in this case, Quintessa determined that the lead met its qualification criteria by analyzing the information provided by the potential client. Quintessa takes each potential client at his or her word when they provide facts or information about their case. The attorneys (including ERB) then verify these facts, and if they prove to be incorrect, the attorney can disengage the lead within the time frame allotted and for the reasons outlined in the parties' contract.**

**D.E. 153-2 at 11-12.**

58.      None of the material identified in paragraph #57 above establishes that any of the leads identified in Exhibit 3 were pre-qualified. *See* Exhibit 12[2], "5 - Google Document prepared for Plaintiff's Campaign;" Exhibit 13, "6 – Information from Defendant's client portal for Plaintiff's Campaign (QUINTESSA 0005-0007)" and Exhibit 14, "3 - Agreement between Plaintiff and Defendant (QUINTESSA 0001-0004)"

**Response: Controverted. As stated in its response to the interrogatory, among other things, Quintessa determined that the lead met its qualification criteria by analyzing the information provided by the potential client. *See* also Ex. A (Mingee Dec.) ¶¶ 3-14; Exhibit 1 at 1. All of the information collected by Quintessa from the leads was exported to the spreadsheet titled "8 - Bradley Lawfirm leads," and the spreadsheet titled "9 - Bradley Lawfirm lead notes." *See* Ex. C; Ex. D ("8 - Bradley Lawfirm leads"); Ex. E ("9 - Bradley Lawfirm lead notes,"); Ex. A (Mingee Dec.) ¶¶ 45-46. The portal page lists, among other things, information Quintessa received from the client regarding injuries, liability,**

---

[2] Exhibit 6 was originally a Microsoft Excel file that was converted to PDF, which cannot accommodate the columns as originally formatted in Excel. Further, the functionality of Excel was lost in the conversion process. Counsel is happy to email the Court or file with the Court the excel version of this exhibit if requested.

insurance, whether the accident was commercial or not, and other relevant information. *See* Ex. C-E; Ex. A (Mingee Dec.) ¶ 3-14. All of this information is relayed to ERB via the portal. Ex. A (Mingee Dec.) ¶ 3-14.

59.  ERB's duty to disengage a lead was only triggered upon the precedent condition that Quintessa deliver pre-qualified leads. *See* Exhibit 1.

**RESPONSE: Quintessa objects to this because it is legal argument, not a statement of fact. Subject to that objection, Quintessa states that it is controverted. Pursuant to the contract, ERB was required to pay for any leads that Quintessa sent to ERB that were not timely disengaged. Ex. A (Mingee Dec.) ¶¶ 8-14; Exhibit 1 at 1. Depending on the type of lead, each lead cost either $2,000 or $4,200 per individual. Ex. A (Mingee Dec.) ¶ 2; Exhibit 1 at 1. The contract further states**

> **The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below unless otherwise agreed upon in writing by Quintessa Marketing. At 12am on the seventh day, leads will not be eligible for disengagement. Leads that are turned down or disengaged for the approved reasons described in this agreement will be credited back to your Campaign balance once Quintessa has verified and may be subject to internal audit which typically takes 5 days.**

**Exhibit 1 at 1. Accordingly, if ERB did not disengage a lead, it was required to compensate Quintessa for the cost of that lead. Ex. A (Mingee Dec.) ¶¶ 8-14; Exhibit 1 at 1.**

**Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶¶ 3-14. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. Ex. A (Mingee Dec.) ¶¶ 3-17. In the event that ERB's investigation reveals that the information provided by the PC regarding the specific**

33

**turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. Ex. A (Mingee Dec.) ¶¶ 3-17.**

**If "ERB's duty to disengage a lead was only triggered upon the precedent condition that Quintessa deliver pre-qualified leads," then the entire disengagement process outlined in the contract would be redundant.**

60.   Every lead sent to ERB by Quintessa through the portal was entered into a lead system by ERB called "Law Ruler." *See* Exhibit 5, Paragraph 41, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. Upon information and belief, Law Ruler is ERB's case management software. Quintessa has no knowledge of how Law Ruler works or how ERB used it. However, to the extent that ERB is claiming that leads "[do] not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," (see SUMF 61-99 below) that is categorically false. As described at length above, each lead described below was sent through the portal, fulfilling Quintessa's obligation under the contract. *See* Response to SUMF No. 58-59, above; Exhibits C-E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler.**

**Bradley testified that someone at his firm copied and pasted everything from the Quintessa portal into Law Ruler. Ex. F (Bradley Dep.) 208:24-209:11. The evidence demonstrates that Bradley did take passenger cases included in a PC lead. For example, Ex. G is the Law Ruler entry for Mallory Grant. Ex. G. Located in her Law Ruler entry is information a passenger, Troy Jefferson. *Id.* Bradley's spreadsheet shows Mallory Grant**

34

**and Troy Jefferson as two separate clients and states that both were properly charged. D.E. 153-4 at 2-3. Bradley also admitted that it was the firm's protocol to open companions in Law Ruler as their own case and admitted it was an error when Rachel Schmitt failed to do so on three occasions.** *See* **Ex. H at 5.**

61.     There is no evidence that Amarion Winson was never pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

62.     Amarion Winson does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 42, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

63.     There is no evidence that Miracle Winston was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

64.     Miracle Winston does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 43, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

65.     There is no evidence that Ari'Yon Fields-Winston was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

66.     Ari'Yon Fields-Winston does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 44, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract. *See* Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler. *See* Response to SUMF No. 60, above; Exhibit H.**

67.     There is no evidence that Jasmine Burns was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal. *See* Response to SUMF No. 58-59, above; Exhibits C-E.**

68.     Jasmine Burns does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 45, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract. *See* Response to SUMF Nos. 58-60; Exhibits C to**

37

**E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

69. There is no evidence that Antwan Miller was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

70. There is no evidence that Shaquille Jones was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

71. Shaquille Jones does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 46, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler.**

**According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

72.     There is no evidence that Marcus Pratt was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

73.     Marcus Pratt does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 47, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

74.     There is no evidence that Madison Pratt was ever pre-qualified by Quintessa for all contract criteria.

39

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

75.     Madison Pratt does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 48, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

76.     There is no evidence that Marcus Pratt, Jr. was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

77.     Marcus Pratt, Jr. does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 49, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

78.     There is no evidence that Cracen Noah Ortega was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

79.     Cracen Noah Ortega does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 50, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to**

**E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

80.     There is no evidence that Michael Davis was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

81.     There is no evidence that Todd Morris was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

82.     Todd Morris does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 51, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler.**

**According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

83.    There is no evidence that Pahmel Archer was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

84.    Pahmel Archer does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 52, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

85.    There is no evidence that Travorous Johnson was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

86.     Travorous Johnson does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 53, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

87.     There is no evidence that Travonna Fletcher was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

88.     Travonna Fletcher does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 54, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

44

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

89.     There is no evidence that Tasha Downing was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

90.     Tasha Downing does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 55, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to**

45

**E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

91.     There is no evidence that Leilani Purinton was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

92.     Leilani Purinton does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 56, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

93.     There is no evidence that Remi Downing was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

94.     Remi Downing does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 57, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract.** *See* **Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler.** *See* **Response to SUMF No. 60, above; Exhibit H.**

95.     There is no evidence that Zyler Downing was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal.** *See* **Response to SUMF No. 58-59, above; Exhibits C-E.**

96.     Zyler Downing does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 58, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

47

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract. *See* Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler. *See* Response to SUMF No. 60, above; Exhibit H.**

97. There is no evidence that Tesfay Awalom was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal. *See* Response to SUMF No. 58-59, above; Exhibits C-E.**

98. There is no evidence that Kyshon Brown was ever pre-qualified by Quintessa for all contract criteria.

**RESPONSE: Controverted. Quintessa made a good faith effort to obtain the relevant information regarding this lead and transmitted it to ERB via the portal. *See* Response to SUMF No. 58-59, above; Exhibits C-E.**

99. Kyshon Brown does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract. *See* Exhibit 5, Paragraph 59, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa has no way of knowing what was or was not entered into Law Ruler as that information is entirely within ERB's possession and control. However, to the extent that ERB is claiming that the lead "does not appear in Law Ruler because Quintessa did not send this lead through the portal as required by the contract," that is categorically false. As described at length above, this lead was sent through the portal, fulfilling its obligation under the contract. *See* Response to SUMF Nos. 58-60; Exhibits C to E. Quintessa cannot control whether ERB did or did not enter each lead into Law Ruler. According to Bradley, however, it was the firm's policy to enter passengers as separate leads in Law Ruler. *See* Response to SUMF No. 60, above; Exhibit H.**

100.    Quintessa charged ERB for 40 non-commercial cases that were not pre-qualified, resulting in damages of $80,000. *See* Exhibit 4[3], ERBQ000774 (excel spreadsheet identifying in yellow highlight the 40 improperly non-commercial charged cases and the reason therefore). *See* Exhibit 5, Paragraph 60, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa objects to Exhibit 4 because it is not admissible evidence. Exhibit 4 is a spreadsheet created by ERB. It purports to list every lead in dispute and the alleged reason why it was not qualified. ERB does not identify who created the document, what sources were used for the information contained in the spreadsheet, what information, if any, supports the statements made on the spreadsheet, or the evidentiary basis for claiming that the lead is not qualified.**

---

[3] Exhibit 4 was originally a Microsoft Excel file that was converted to PDF, which cannot accommodate the columns as originally formatted in Excel. Further, the functionality of Excel was lost in the conversion process. Counsel is happy to email the Court or file with the Court the excel version of this exhibit if requested.

49

Rule 56 requires that material cited to support a fact must be admissible in evidence. The spreadsheet is a document created for this litigation and not a business record kept and maintained in the usual course of business. Ex. F Bradley Dep. 92:3-19; *see United States v. Feliz*, 467 F.3d 227, 234 (2d Cir. 2006) (records created in anticipation of litigation are not business records). The exhibit is not admissible as it is the product of layers of hearsay. First, Bradley did not create the document – members of his staff did. Ex. F Bradley Dep. 92:3-19. Thus, he has no personal knowledge of its contents. Second, the document purports to identify the alleged defects of each lead by answering Y or N to dozens of categories. The only way to understand the basis for each Y or N response is to refer to three different sources of information, none of which are in the record and all of which are hearsay. Bradley testified that the responses were generated by his staff spending hundreds of hours poring over documents from Law Ruler, TrialWorks, and a binder that he had in front of him at the deposition. Ex. F Bradley Dep. 98:12-23; 125:5-127:19. Indeed, when asked to explain the basis for claiming a specific lead was not qualified, Bradley had to refer to leaf through the binder, examine the entry in Law Ruler, and examine the entry in TrialWorks before he could explain how they arrived at that conclusion. Ex. F Bradley Dep. 98:12-104:17. None of this information is in the record.

The third, this spreadsheet also inadmissible because the underlying information relied upon by Bradley is also hearsay. The information comes from intake forms filled out by the PC, letters from insurance companies, police reports, notes, and a variety of other third-party documents that contain hearsay and which are not admissible. Ex. F Bradley Dep. 125:5-127:19.

**Finally, the spreadsheet does not actually explain with any coherency the reason why the lead is not qualified. While the spreadsheet contains a column called "Reason for TD," Bradley testified that this, alone, does not explain why the lead was not properly qualified but instead the reader must look at the "spreadsheet as a whole." Ex. F Bradley Dep. 94:18-95:9. Given that the document is not self-explanatory, there is no way to discern what Bradley is claiming disqualifies the lead.**

**Moreover, Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶ 3-18. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. Ex. A (Mingee Dec.) ¶ 3-18. In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. Ex. A (Mingee Dec.) ¶ 3-18.**

**All of the information gathered for each of the disputed commercial cases is attached as Exhibits C-E, which is a printout of the Portal entries for each person and spreadsheets including the portal data. The documents demonstrate that Quintessa gathered or attempted to gather information regarding a number of items, including but not limited to, insurance, property damage, fault, and medical care. Ex. A (Mingee Dec.) ¶ 3-18. All of that information was transmitted to ERB via the portal. Ex. A (Mingee Dec.) ¶ 3-18.**

101.    Quintessa charged ERB for 11 commercial cases that were not pre-qualified, resulting in damages of $46,200. *See* Exhibit 4, ERBQ000774 (excel spreadsheet identifying in green highlight the 11 improperly charged commercial cases and the reason therefore). *See* Exhibit 5, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

51

**RESPONSE: Controverted. Quintessa states please see its response to SUMF No. 100.**

102.    Quintessa alleges it demanded payment from ERB for the leads it failed to properly or timely disengage, but ERB refused to make such payment. *See* Doc#143, ¶12.

**RESPONSE: Uncontroverted.**

103.    Quintessa never identified by name any plaintiffs / leads that ERB failed to "properly disengage" before it filed its lawsuit. *See* Exhibit 5, Paragraph 61, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted in part. Quintessa notified ERB that it had conducted an audit and discovered that Quintessa had more leads than Bradley had paid for and demanded payment. Ex. A (Mingee Dec.) ¶ 42. Quintessa subsequently provided the names of the leads. Ex. A (Mingee Dec.) ¶ 42.**

104.    Quintessa does not know when its "internal audit" began or ended when it came up with the 21 leads it seeks payment for. *See* Exhibit 2, Interrogatory 17.

**RESPONSE: Controverted. As stated in its response, Quintessa "does not know the exact date or time the audit began but can confirm it occurred in June 2020." *See* Exhibit 2, Interrogatory 17. As stated in its response, Quintessa "does not know the exact date or time the audit ended but can confirm it occurred in June 2020." *Id.***

105.    On May 9, 2020, it became readily apparent that Quintessa was not pre-qualifying leads per the terms of the agreement. This was especially true with regard to the insurance requirement. *See* Exhibit 5, Paragraph 62, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the**

52

**PCs, including the existence of insurance, and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶ 3-18. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. Ex. A (Mingee Dec.) ¶ 3-18. In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. Ex. A (Mingee Dec.) ¶ 3-18.**

**Moreover, Quintessa states that it cannot fully respond to the claim that "it became readily apparent that Quintessa was not pre-qualifying leads" as this phrase is a conclusory allegation lacking and factual or evidentiary support.**

106.    On May 9, 2020, attorney Patrick Hinrichs emailed Lauren V. Mingee concerning a lead "Mikke Blair" that following: "So there is no confirmation of insurance then. Cases should not be signed unless either the PC has insurance or they can give the actual name of Defendant's insurance. Just saying they believe there is insurance isn't enough." In response, Lauren v. Mingee, the owner of Quintessa, replied "*That is why we give extensions on finding proof of insurance*." *See* Exhibit 6, email dated May 9, 2020 and May 10, 2020.

**RESPONSE: Controverted. Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶ 3-18. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. Ex. A (Mingee Dec.) ¶ 3-18. In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. Ex. A (Mingee Dec.) ¶ 3-18.**

53

**The statement made by Ms. Mingee was that Quintessa would give extensions, which is consistent with the contract that states "The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below *unless otherwise agreed upon in writing by Quintessa Marketing*." *See* Exhibit 1 at 1 (emphasis added). When Ms. Mingee stated in the May 10, 2020 email that "we give extensions on finding proof of insurance," she was simply conveying that Quintessa gives extensions on a case-by-case basis. Ex. A (Mingee Dec.) ¶ 39. She did not mean and she never intended to mean that Quintessa would give Bradley a blanket extension for verifying insurance. *Id.***

**Quintessa does not contest that it would offer extensions on a case-by-case basis if agreed to in writing, as required by the contract. Quintessa expressly stated it was not providing a blanket extension. *See* Bradley Ex. 8 at 8:9-17.**

> **And it's not like, Hey, this is a blanket, you're going to have an extra, you know, 14 days on top of the seven to verify insurance on every single one. It's like, Hey, you know, this one is potentially a great case, but I really -- like we want this one to work, but here's what we have -- here's what will have to pan out. And so if it's a reasonable point and it's like, okay, well, yeah, I mean, that makes sense.**

*Id.*

**ERB does not contend that it ever requested an extension for any lead, much less that Quintessa ever agreed in writing to grant an extension as required by the contract. Instead, ERB would let the six-day period expire and then attempt to disengage the lead after the expiration of the deadline. ERB's post-deadline attempts to disengage did not satisfy the requirements of the contract.**

107.    After May 9, 2020, in reliance upon Quintessa's statement, ERB began investigating leads that Quintessa failed to pre-qualify for insurance. If leads turned out to be unqualified due to a lack of insurance, ERB disengaged the lead in reliance upon Quintessa's

statement. *See* Exhibit 5, Paragraph 63, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. Ex. A (Mingee Dec.) ¶¶ 3-17.**

**Moreover, Quintessa states that it cannot fully respond to the claim that "ERB began investigating leads that Quintessa failed to pre-qualify for insurance" as that information is entirely within ERB's possession and control. However, the statement made by Ms. Mingee was that Quintessa would give extensions, which is consistent with the contract that states "The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below *unless otherwise agreed upon in writing by Quintessa Marketing*." *See* Exhibit 1 at 1 (emphasis added). When Ms. Mingee stated in the May 10, 2020 email that "we give extensions on finding proof of insurance," she was simply conveying that Quintessa gives extensions on a case-by-case basis. Ex. A (Mingee Dec.) ¶ 39. She did not mean and she never intended to mean that Quintessa would give Bradley a blanket extension for verifying insurance. *Id.***

**ERB does not contend that it ever requested an extension for any lead, much less that Quintessa ever agreed in writing to grant an extension as required by the contract. Instead, ERB would let the six-day period expire and then attempt to disengage the lead after the**

55

**expiration of the deadline. ERB's post-deadline attempts to disengage did not satisfy the requirements of the contract.**

108.    On May 14, 2020, Ryan Bradley had a recorded telephone call with Lauren Mingee and Leo Mingee wherein the parties discussed Quintessa's signing unqualified leads who did not meet minimum criteria as called for in Exhibit 1 and outlining how the parties would move forward. In particular, the parties stated:

\*        Bradley reiterated there were 2 main issues: First, there were a lot of instances were ERB was having to qualify cases because Quintessa was not and we did not have the ability to qualify them within 144 hours. Second, Quintessa was qualifying cases as "commercial" when they were not. Exhibit 8, p. 3:8 – p. 4:7.

**RESPONSE: Controverted in part. Quintessa admits that Bradley stated he was having difficulty confirming the existence of insurance within 144 hours. Exhibit 8, p. 3:8 – p. 4:7. Bradley also mentioned an issue with "commercial" cases but stated that issue had been resolved. *Id.***

\*        Lauren Mingee acknowledges Quintessa does sign up some leads even though there is no proof of insurance (and why) and then specifically states "*And if we need to extend that window for insurance and for verification, that's not a problem*." Exhibit 8, p. 5:13-22. Ryan Bradley responds "ok." Exhibit 8, p. 5:13-23.

**RESPONSE: Controverted. The full context of Ms. Mingee's response is included found in Exhibit 8, p. 4:11-6:11. Notably, Bradley repeatedly agreed that Quintessa could sign up clients without establishing the existence of insurance and responded affirmatively that he understood that Quintessa had "to be able to give the attorney the reins" and that**

**"there is a level of qualifying on your end because someone could give us all the information and give us the wrong insurance, and you're still going to have to qualify it."** *Id.*

\*        Lauren Mingee stated Quintessa relies upon the law firms to help qualify the cases and that Quintessa extends if an accident just happened so that the law firm can get the police report. Exhibit 8, p. 6:1-9. Ryan Bradley responds "yeah" and Mrs. Mingee confirms "*and that's not an issue*." Exhibit 8, p. 6:10-11.

**RESPONSE: Controverted in part. The full context of Ms. Mingee's response is included found in Exhibit 8, p. 4:11-6:11. Notably, Bradley repeatedly agreed that Quintessa could sign up clients without establishing the existence of insurance and responded affirmatively that he understood that Quintessa had "to be able to give the attorney the reins" and that "there is a level of qualifying on your end because someone could give us all the information and give us the wrong insurance, and you're still going to have to qualify it."** *Id.*

**The reference to extensions is consistent with the contract that states "The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below** *unless otherwise agreed upon in writing by Quintessa Marketing***."** *See* **Exhibit 1 at 1 (emphasis added). ERB does not contend that it ever requested an extension for any lead, much less that Quintessa ever agreed in writing to grant an extension as required by the contract. Instead, ERB would let the six-day period expire and then attempt to disengage the lead after the expiration of the deadline. ERB's post-deadline attempts to disengage did not satisfy the requirements of the contract.**

\*        Leo Mingee and Lauren Mingee then discuss Quintessa's granting of extensions for insurance for their other clients, to wit:

57

LAUREN MINGEE: So I think, you know,
with all of our people -- what is it -- you know, our
guys in Texas and California, how long do we extend for
insurance?
LEO MINGEE: I don't think it's months.
I mean --
LAUREN MINGEE: No. I mean --
LEO MINGEE: We'll -- we'll give like --
And it's not like, Hey, this is a blanket, you're going
to have an extra, you know, 14 days on top of the seven
to verify insurance on every single one. It's like,
Hey, you know, this one is potentially a great case, but
I really -- like we want this one to work, but here's
what we have -- here's what will have to pan out. And
so if it's a reasonable point and it's like, okay, well,
yeah, I mean, that makes sense.

Exhibit 8, p.8:2-17.

**RESPONSE: Controverted in part. Quintessa admits that the transcript accurately reflects the conversation that was had. However, Quintessa was not discussing other clients but was specifically discussing their contract with Bradley. Leo Mingee specifically told Bradley that Quintessa would not give him a blanket extension but would only consider them on a case-by-case basis. Ex. I (Leo Mingee Dec.) ¶ 2. Neither Leo nor Lauren Mingee meant and never intended to mean that Quintessa would give Bradley a blanket extension for verifying insurance. Ex. A (Mingee Dec.) ¶ 40; Ex. I (Leo Mingee Dec.) ¶ 2.**

**However, the reference to extensions is consistent with the contract that states "The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below *unless otherwise agreed upon in writing by Quintessa Marketing*." *See* Exhibit 1 at 1 (emphasis added). ERB does not contend that it ever requested an extension for any lead, much less that Quintessa ever agreed in writing to grant an extension as required by the contract. Instead, ERB would let the six-day period expire and then attempt to disengage the lead after the expiration of the deadline. ERB's post-deadline attempts to disengage did not satisfy the requirements of the contract.**

58

\*      Lauren Mingee reiterated later in the conversation "… *we do give extensions on insurance*." Exhibit 8, p.9:16-17.

**RESPONSE: Controverted in part. Quintessa admits that the transcript accurately reflects the conversation that was had. However, the reference to extensions is consistent with the contract that states "The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below *unless otherwise agreed upon in writing by Quintessa Marketing*." *See* Exhibit 1 at 1 (emphasis added). ERB does not contend that it ever requested an extension for any lead, much less that Quintessa ever agreed in writing to grant an extension as required by the contract. Instead, ERB would let the six-day period expire and then attempt to disengage the lead after the expiration of the deadline. ERB's post-deadline attempts to disengage did not satisfy the requirements of the contract.**

**Leo Mingee specifically told Bradley that Quintessa would not give him a blanket extension but would only consider them on a case-by-case basis. Ex. I (Leo Mingee Dec.) ¶ 2. Neither Leo nor Lauren Mingee meant and never intended to mean that Quintessa would give Bradley a blanket extension for verifying insurance. Ex. A (Mingee Dec.) ¶ 40; Ex. I (Leo Mingee Dec.) ¶ 2.**

\*      Leo Mingee stated that Quintessa was unfamiliar with Missouri insurance laws and indicated "*And so, I mean, like as we learn more and more about, like, the intricacies of Missouri, we're going to be able to qualify based on those things and know beforehand that, you know, we're -- like, yeah, if this is dropped or it's (indiscernible) fight, we're -- we're kind of expecting it, but it does require some research to find out.*" Exhibit 8, p. 11:20 – p. 12:1.

59

**RESPONSE: Controverted in part. Quintessa admits that the transcript accurately reflects the conversation that was had. However, the reference to extensions is consistent with the contract that states "The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below *unless otherwise agreed upon in writing by Quintessa Marketing*." *See* Exhibit 1 at 1 (emphasis added). ERB does not contend that it ever requested an extension for any lead, much less that Quintessa ever agreed in writing to grant an extension as required by the contract. Instead, ERB would let the six-day period expire and then attempt to disengage the lead after the expiration of the deadline. ERB's post-deadline attempts to disengage did not satisfy the requirements of the contract.**

\*      The parties discuss the cost of the leads and ERB's expectation that every lead will materialize into a case at that price point to which Lauren Mingee acknowledges and agrees, to wit:

RYAN BRADLEY: Okay. You know, I guess I
just get a little worried because, like, these numbers,
you know, 2,000 and 4200, you know, I -- I'm expecting
that every single one of these cases at that price is
going to materialize into a case that we can --
LAUREN MINGEE: Yeah.
RYAN BRADLEY: -- that we can run with.
Because if it starts dwindling from there and it's only,
you know, 60 percent of them turn into cases, then my
margins get real tight. And it's like, well, shit, you
know.
LAUREN MINGEE: Yeah.
RYAN BRADLEY: I don't know if it's worth
it.
LAUREN MINGEE: Yeah. No. And
completely. And I think, you know, what you'll see is
that -- And the hope is like, okay, in seven days, all
right, it is -- you know, if there is verified
insurance, then, you know, they are willing to treat and
you were setting them up with treatment, then it's a

60

case and they stick with you. Now, if a case drops out down the road for something else, right, obviously we can't control that.

RYAN BRADLEY: Understood. Understood. And I get that.

LAUREN MINGEE: And so our -- but our goal is -- with these cases is not -- not to just sign you shit cases. Like we don't want you to just sit there and just sign up junk; but like on this one, for instance, just like you said, the one that was signed this morning, like, okay, well, if the girlfriend's at fault or she received a ticket, well, if the ticket was for no insurance, well, that's fine, you know, because you can still go after the defendant, but if she was cited 100 percent at fault, then you can't go after the defendant.

RYAN BRADLEY: Right.

LAUREN MINGEE: Right. And we --

RYAN BRADLEY: Exactly.

LAUREN MINGEE: You know, and we understand that. So if you come back and say, hey, yeah, this is a fantastic (indiscernible) and he, you know, had a broken hand, but it ends up like the girlfriend was 80 percent at fault, like we can't really go after, you know, the defendant or -- on anything, you know, then we -- we get that --

RYAN BRADLEY: Yeah.

LAUREN MINGEE: -- and understand that and move on. But also what we do and what we kind of explain to the clients too whenever they disengage is, you know, we have a saying, we disengage with grace. So if it's disengaged right away, like we signed it and then two seconds later the attorney's like no. Right? But if they take 24 hours or something and then we're even able talk with them, Hey, listen, we uncovered every stone, it ends up being that, you know, your girlfriend was actually cited at fault because she had no insurance, like, I'm so sorry, there's just nothing we can do.

Exhibit 8, p. 12:2-p. 14:10.

*See* Exhibit 5, Paragraph 64, Affidavit of E. Ryan Bradley, owner of ERB Legal Investments, LLC;

Exhibit 7, audio recording of this telephone call; *See* Exhibit 8, a certified transcription of this

phone call.

61

**RESPONSE: Controverted in part. Quintessa admits that the transcript accurately reflects the conversation that was had. In the quoted portion, however, Ms. Mingee acknowledges that ERB is hopeful that each lead will materialize into a case. However, Ms. Mingee did not agree that each case would, in fact, materialize into a case. Indeed, Ms. Mingee expressly stated "Now, if a case drops out down the road for something else, right, obviously we can't control that."** *Id.* **at 12:22-24.**

109.    Kyshon Brown was "emailed only" on April, 29, 2020, prior the May 14, 2020 phone call wherein the parties discussed ERB helping qualify cases and getting extensions to do so.

**RESPONSE: Controverted. Quintessa admits that it described these leads as "emailed only" but denies the implication that these leads were only sent by email. Ex. A (Mingee Dec.) ¶¶ 27-34. All "emailed only" leads sent by Quintessa were also added to the portal.** *Id.* **These "emailed only" leads were generally passengers in cars, and each passenger was listed separately underneath the entry for the potential client ("PC").** *Id.* **ERB had the ability and the obligation to separately disengage the PC and each passenger.** *Id.*

110.    Jasmine Burns never appeared as a separate lead within the portal with entries for "PC First Name," "OC Middle Name" and "PC Last Name" and as such ERB never received portal notification that she was a separate lead / plaintiff. Rather, his name only appeared within the "notes" section of a lead for "Travorous Johnson." *See* Exhibit 5, Paragraph 65, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Controverted. This is completely false. The name Jasmine Burns does not "only appear within the 'notes' section of a lead."** *See* **Ex. C; Ex. A (Mingee Dec.) ¶¶ 4-**

62

**7, 27-34. The portal page for Kimontrell Williams includes a separate entry for Jasmine Burns, including Name, Phone, Email, DOB, Street, City, State, Zip, and a description of Injuries and Treatment (similar to the image in Quintessa's response to SUMF No. 17).** *See* **Ex. C; Ex. A (Mingee Dec.) ¶¶ 4-7, 27-34. This section provides information about the passenger and a separate disengagement button to allow the attorney to make an independent decision about this and other passengers.** *See* **Ex. C; Ex. A (Mingee Dec.) ¶¶ 4-7, 27-34. By doing this, Quintessa gives ERB portal notification of each passenger.** *See* **Ex. C; Ex. A (Mingee Dec.) ¶¶ 4-7, 27-34. Each passenger is a separate lead.** *See* **Ex. C; Ex. A (Mingee Dec.) ¶ 33.**

111.    A true and accurate copy of Quintessa's website, www.quintessamarketing.com, as it existed on April 4, 2020 as reported by www.web.archive.org is attached as Exhibit 10.  Therein, Quintessa makes the following statements, each of which are taken verbatim from its website:

\*      Quintessa Marketing delivers comprehensive marketing services for client acquisition to attorneys and law firms. Ex. 10, p. 1.

\*      From advertising and outreach with Video Production, Website Development, Search Engine Optimization (SEO) and Search Engine Marketing (SEM) to Intake Department development, training, quality assurance and conversion optimization with in-house staff. We help those who seek legal assistance find you, and help you turn them into clients. Ex. 10, p. 1.

\*      Quintessa specializes in giving personal injury law firms a competitive edge in advertising. While the marketplace is crowded in Google, it can cost hundreds of thousands of dollars in marketing spend without a guaranteed ROI. Some large firms come into a new market willing to spend a million without a guaranteed ROI, which we think is ludicrous. We give you

leads and cases that allow you to not only market you brand, but guarantee your ROI in your market. Ex. 10, p. 1.

\* Whether your new to PI, or have tried every lead generation firm out there, we know what works and what doesn't. We advertise on almost every media form, and send those leads to you. We also sign up every viable client on your retainer agreement so you can save in your investigator costs as well. Need more info on a client? No problem. We also have our own highly trained intake department that acts as an appendage to your law firm to assist in getting potential clients information. So, if you are a small firm or a large firm, we can help you get new clients and build your case count up immediately. Ex. 10, p. 1-2.

\* Lead Generation: More Leads, How You Like Them, When You Need Them. To supplement your internal marketing strategies for client acquisition, let our multi-channel, nationwide marketing campaigns deliver exclusively to you the exact qualified client you are seeking. More Clients on YOUR Schedule. You tell us the Qualifiers, we deliver them right to you. Ex. 10, p. 13.

**RESPONSE: Uncontroverted.**

112. The prior to signing Quintessa's "BULK MARKETING, FULL SERVICE PLATFORM AND GENERAL TERMS OF SERVICE" contract, E. Ryan Bradley, owner of ERB Legal Investments, LLC personally performed due diligence on Quintessa, including but not limited to reading their website at www.quintessamarketing.com and read all of the above statements listed in paragraph 111 in deciding to hire Quintessa. *See* Exhibit 5, Paragraph 70, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

64

**RESPONSE: Controverted. Quintessa has no way of knowing or testing what diligence Ryan Bradley did or did not do prior to signing the contract. Bradley has provided no corroboration for this statement.**

113.   On May 9, 2020 Quintessa indicated ERB would enter the "southern Illinois" market and ERB replied on May 14, 2020 after the recorded phone call and confirmed. *See* Exhibit 11, email between Quintessa employee Lea Ann Pickett and E. Ryan Bradley dated May 11, 2020.

**RESPONSE: Uncontroverted.**

114.   Exhibit 9 is a compilation of screenshots from the portal that pertain to the 21 at-issue leads Quintessa claims compensation for that were taken by ERB prior to being locked out of the portal.

**RESPONSE: Controverted in part. Quintessa admits that Exhibit 9 contains screenshots that reflect, in part, information from the portal related to the 21 at-issue Quintessa leads. As discussed at length above, however, this is not a comprehensive view of all information related to each lead. *See* Ex. C-E. Moreover, Quintessa states that it has provided ERB access to the portal and ERB is not currently "locked out."**

115.   Toni Lambert's incident occurred in Decatur, IL according to the intake performed by ERB in Law Ruler. *See* Exhibit 5, Paragraph 68, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Uncontroverted.**

116.   Antwan Miller's incident occurred in Joliet, IL according to the intake performed by ERB in Law Ruler. *See* Exhibit 5, Paragraph 69, affidavit of E. Ryan Bradley, owner of ERB Legal Investment, LLC.

**RESPONSE: Uncontroverted.**

**Statements of Facts re MSJ on Counts I and II**

117.    Exhibit 4 lists in detail each and every lead in either green (commercial cases that were improperly charged at $4200 per lead) or yellow (non-commercial cases that were improperly charged at $2000 per lead) that Quintessa improperly charged ERB for along with the reason why it was not qualified. *See* Affidavit, Exhibit 15, ¶2.

**RESPONSE: Controverted. Quintessa states please see its response to SUMF No. 100.**

118.    For each of the leads identified in Exhibit 4 [Doc. #153-4] with dates <u>prior</u> to May 9, 2020 in the "Date Quintessa sent lead to ERB" column there is no evidence that Quintessa pre-qualified those for all contract criteria. *See* Affidavit, Exhibit 15, ¶3.

**RESPONSE: Controverted. Quintessa states please see its response to SUMF No. 100. Additionally, Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶ 3-18. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. Ex. A (Mingee Dec.) ¶ 3-18. In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. Ex. A (Mingee Dec.) ¶ 3-18.**

**All of the information gathered for each of the disputed commercial cases is attached as Exhibits C-E, which is a printout of the Portal entries for each person and spreadsheets including the portal data. The documents demonstrate that Quintessa gathered or attempted to gather information regarding a number of items, including but not limited to, insurance, property damage, fault, and medical care. Ex. A (Mingee Dec.) ¶ 3-18. All of that information was transmitted to ERB via the portal. Ex. A (Mingee Dec.) ¶ 3-18.**

66

119.    For each of the leads identified in Exhibit 4 [Doc. #153-4] with dates on or after May 9, 2020 in the "Date Quintessa sent lead to ERB" column there is no evidence that Quintessa pre-qualified those for all contract criteria. *See* Affidavit, Exhibit 15, ¶4.

**RESPONSE: Controverted. Quintessa states please see its response to SUMF No. 100. Additionally, Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶ 3-18. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. Ex. A (Mingee Dec.) ¶ 3-18. In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. Ex. A (Mingee Dec.) ¶ 3-18.**

**All of the information gathered for each of the disputed commercial cases is attached as Exhibits C-E, which is a printout of the Portal entries for each person and spreadsheets including the portal data. The documents demonstrate that Quintessa gathered or attempted to gather information regarding a number of items, including but not limited to, insurance, property damage, fault, and medical care. Ex. A (Mingee Dec.) ¶ 3-18. All of that information was transmitted to ERB via the portal. Ex. A (Mingee Dec.) ¶ 3-18.**

120.    For each of the leads identified in Exhibit 4 [Doc. #153-4] with dates on or after May 9, 2020 in the "Date Quintessa sent lead to ERB" column there is no evidence that ERB was able to qualify them for the insurance contract criteria. *See* Affidavit, Exhibit 15, ¶5.

**RESPONSE: Controverted. Quintessa states please see its response to SUMF No. 100. Additionally, Quintessa fulfilled its obligations under the contract to provide pre-qualified**

67

**leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶ 3-18. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. Ex. A (Mingee Dec.) ¶ 3-18. In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. Ex. A (Mingee Dec.) ¶ 3-18.**

**All of the information gathered for each of the disputed commercial cases is attached as Exhibits C-E, which is a printout of the Portal entries for each person and spreadsheets including the portal data. The documents demonstrate that Quintessa gathered or attempted to gather information regarding a number of items, including but not limited to, insurance, property damage, fault, and medical care. Ex. A (Mingee Dec.) ¶ 3-18. All of that information was transmitted to ERB via the portal. Ex. A (Mingee Dec.) ¶ 3-18.**

121.    For each of the leads identified in Exhibit 4 [Doc. #153-4] with dates on or after May 9, 2020 in the "Date Quintessa sent lead to ERB" ERB was unable to utilize the "disengage" button in the portal after 144 hours because the "disengage" feature was turned off. *See* Affidavit, Exhibit 15, ¶6.

**RESPONSE:  Uncontroverted that, if ERB failed to timely disengage a lead for a reason stated in the contract and did not seek an extension in writing, the disengage button would be turned off because pursuant to the terms of the contract, ERB no longer had the right to disengage a lead. Ex. A (Mingee Dec.) ¶¶ 9-14.**

122.    Quintessa at all times had control over the portal functionality. *See* Affidavit, Exhibit 15, ¶7.

**RESPONSE:  Controverted in part. Quintessa agrees that it had basic control of the portal. However, to the extent that "functionality" is ambiguous, ERB certainly had the ability to input information in the notes section of each PC and to timely disengage each lead.**

123.    For each of the leads identified in Exhibit 4 [Doc. #153-4] with dates on or after May 9, 2020 in the "Date Quintessa sent lead to ERB" ERB would enter a "note" into the portal to disengage the lead since the "disengage" button did not function. *See* Affidavit, Exhibit 15, ¶8.

**RESPONSE:  Controverted in part. Quintessa admits that ERB frequently attempted to disengage a lead via the notes section after the expiration of the 144 hour period, which is not permitted under the contract without Quintessa agreeing to an extension in writing. Ex. A (Mingee Dec.) ¶¶ 9-14.**

124.    After ERB entered the disengage note described in paragraph 123, it would be erased and/or deleted. *See* Affidavit, Exhibit 15, ¶9.

**RESPONSE: Controverted. This is absolutely false. Quintessa never deleted any note, and ERB does not even identify a single instance where this occurred. Quintessa admits that ERB frequently attempted to disengage a lead via the notes section after the expiration of the 144 hour period, which is not permitted under the contract without Quintessa agreeing to an extension in writing. Ex. A (Mingee Dec.) ¶¶ 9-14. Moreover, in Exhibits C and E, the belated attempts to disengage by ERB paralegal Rachel Schmitt can be seen in the notes section of various portal entries.**

125.    ERB paid Quintessa a total of $280,400.00. *See* Affidavit, Exhibit 15, ¶10.

**RESPONSE:  Uncontroverted.**

126.    Quintessa properly earned $112,000 by delivering 56 non-commercial cases to ERB, identified in Exhibit 4 [Doc. #153-4] as blue. *See* Affidavit, Exhibit 15, ¶11.

69

**RESPONSE: Controverted in part. Quintessa admits that it properly earned these leads but denies the implication that Quintessa improperly charged for any lead. Quintessa properly earned $280,400 and is owed an additional $50,800 for leads ERB received, did not timely engage for a contractually permissible reason, and did not pay for.** *See* **D.E. 153-2, Nos. 8 and 10.**

127.    Quintessa properly earned $12,600 by delivering 3 commercial cases to ERB, identified in Exhibit 4 [Doc. #153-4] as orange. *See* Affidavit, Exhibit 15, ¶12.

**RESPONSE: Controverted in part. Quintessa admits that it properly earned these leads but denies the implication that Quintessa improperly charged for any lead. Quintessa properly earned $280,400 and is owed an additional $50,800 for leads ERB received, did not timely engage for a contractually permissible reason, and did not pay for.** *See* **D.E. 153-2, Nos. 8 and 10.**

128.    Quintessa properly earned a total of $155,800.00 from ERB. *See* Affidavit, Exhibit 15, ¶13.

**RESPONSE: Controverted in part. Quintessa admits that it properly earned this amount but denies the implication that Quintessa improperly charged for any lead. Quintessa properly earned $280,400 and is owed an additional $50,800 for leads ERB received, did not timely engage for a contractually permissible reason, and did not pay for.** *See* **D.E. 153-2, Nos. 8 and 10.**

129.    Quintessa improperly charged against ERB's marketing fund 40 non-commercial leads that were not pre-qualified at the rate of $2000 per lead, resulting in damages of $80,000.00. [Doc. #153-4]; *See* Affidavit, Exhibit 15, ¶14.

**RESPONSE:**

70

**Controverted. Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶¶ 3-14; Exhibit 1 at 1. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. *Id.* In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. *Id.***

**All of the information gathered for each of the disputed commercial cases is attached as Exhibits C-E, which is a printout of the Portal entries for each person and spreadsheets including the portal data. The documents demonstrate that Quintessa gathered or attempted to gather information regarding a number of items, including but not limited to, insurance, property damage, fault, and medical care. Ex. A (Mingee Dec.) ¶ 3-18. All of that information was transmitted to ERB via the portal. Ex. A (Mingee Dec.) ¶ 3-18.**

130.    Quintessa charged against ERB's marketing fund 11 commercial cases that were not pre-qualified at the rate of $4200 per lead, resulting in damages of $46,200.00. [Doc. #153-4]; *See* Affidavit, Exhibit 15, ¶15.

**Controverted. Quintessa fulfilled its obligations under the contract to provide pre-qualified leads by making a good faith effort to gather the information from the PCs and to provide all of that information to ERB. Ex. A (Mingee Dec.) ¶¶ 3-14; Exhibit 1 at 1. Once the lead is sent to ERB, the burden is on ERB to conduct further investigation. *Id.* In the event that ERB's investigation reveals that the information provided by the PC regarding the specific turn down criteria is incorrect, ERB has the right to disengage the lead but must do so in a timely manner or seek an extension in writing. *Id.***

**All of the information gathered for each of the disputed commercial cases is attached as Exhibits C-E, which is a printout of the Portal entries for each person and spreadsheets including the portal data. The documents demonstrate that Quintessa gathered or attempted to gather information regarding a number of items, including but not limited to, insurance, property damage, fault, and medical care. Ex. A (Mingee Dec.) ¶ 3-18. All of that information was transmitted to ERB via the portal. Ex. A (Mingee Dec.) ¶ 3-18.**

131.    Quintessa still has $29,600 of ERB's marketing funds that have not been returned. *See* Affidavit, Exhibit 15, ¶16.

**RESPONSE: Controverted. Quintessa properly earned $280,400 and is owed an additional $50,800 for leads ERB received, did not timely engage for a contractually permissible reason, and did not pay for. *See* D.E. 153-2, Nos. 8 and 10.**

132.    Plaintiff's total damages, excluding interest, costs and attorneys' fees, are $155,800.00. *See* Affidavit, Exhibit 15, ¶17.

**RESPONSE: Controverted. Quintessa properly earned $280,400 and is owed an additional $50,800 for leads ERB received, did not timely engage for a contractually permissible reason, and did not pay for. *See* D.E. 153-2, Nos. 8 and 10.**

133.    Plaintiff declared Quintessa to be in breach of contract on July 17, 2020. *See* Affidavit, Exhibit 15, ¶18.

**RESPONSE:  Uncontroverted.**

### Statements of Facts re MSJ on Count II

134.    That at the inception of the business relationship between ERB and Quintessa, ERB provided Quintessa with its "contingency fee contract" so that Quintessa could sign "Plaintiffs"

on its behalf. See Exhibit 16, email dated April 21, 2020 and Exhibit 17, the That contingency fee agreement.

**RESPONSE:  Uncontroverted.**

135.    After the May 14, 2020 recorded phone call (See SOF¶108), ERB emailed Quintessa a new contingency fee contracts to use in signing up Plaintiffs (one for Missouri, and one for Illinois) that memorialized the contract criteria so that newly signed Plaintiffs would be aware of the criteria that must be met in order to be an ERB client. The email is attached as Exhibit 18 and the attachments thereto are marked as Exhibits 19 (Missouri) and Exhibit 20 (Illinois).

**RESPONSE: Controverted in part. Quintessa has no knowledge regarding ERB's intent for sending the new contingency fee contract.**

136.    Both of the new contingency fee contracts (Exhibits 19 and 20) unequivocally stated at the very top "*You understand we are accepting your personal injury case on a contingency fee contract, subject to the terms and conditions below, based upon the understanding that a) you were not at fault in causing the crash, b) there is automobile insurance coverage (liability or uninsured motorist), c) that there is at minimum $1500 in property damage and d) that you have physical injuries for which you sought medical treatment within 14 days and are continuing to need medical treatment as a result of these injuries. We reserve the right to reject your case if any one of these factors is not applicable to your case and we will not charge you any fee.*"

**RESPONSE:  Uncontroverted.**

137.    Quintessa never used the amended contingency fee contracts (Exhibits 19 and 20) to sign up new "Plaintiffs" and continued to utilize the old contingency fee contract (Exhibit 17).

**RESPONSE:  Controverted in part. Quintessa admits that it did not use the amended contingency fee contract but denies the implication that Quintessa ever agreed to use the**

**amended contingency fee contract. Bradley has not offered any evidence that Quintessa agreed to use the contingency fee contract.**

138.    At no time did Quintessa ever alert ERB that it would not use the new contracts.

**RESPONSE:  Controverted. Quintessa never agreed to use the amended contingency fee contract.**

139.    On June 4, 2020, it came to E. Ryan Bradley's attention that Quintessa was not using the new contracts to sign up new "plaintiffs" and emailed Quintessa stating "*Can you guys check to make sure that you received the amended contract that I sent over three or four weeks ago? The old one is still being used and I would like to use the updated one. If you need me to send it again, I will. Thank you, ryan.*" *See* Exhibit 21, email from E. Ryan Bradley dated June 4, 2020.

**RESPONSE:  Uncontroverted.**

140.    Lauren Mingee replied to Exhibit 21 that same day and stated "*Can you resend we can confirm we have it*." *See* Exhibit 22, email from Lauren Mingee to E. Ryan Bradley dated June 4, 2020.

**RESPONSE:  Uncontroverted.**

141.    On June 10, 2020, E. Ryan Bradley replied stating "Here are the 2 contracts I sent over …. Please use this" and again attached Exhibits 19 and 20 to that email. *See* Exhibit 23.

**RESPONSE:  Uncontroverted.**

142.    Despite the above, Quintessa never used the amended contingency fee contracts (Exhibits 19 and 20) to sign up new "Plaintiffs" and continued to utilize the old contingency fee contract (Exhibit 17).

**RESPONSE:  Controverted in part. Quintessa did not use the amended contingency fee contract because it never agreed to use the amended contingency fee contract. Moreover,**

74

**despite this, ERB made two additional payments of $50,000 to Quintessa, demonstrating that the ERB did not require the use of the amended contingency fee contract.**

143.    The phone calls between "leads" procured by Quintessa on behalf of ERB occurred between April 27, 2020 and August 1, 2020.

**RESPONSE:  Controverted. The phone calls with leads sent to ERB began no later than April 21, 2020. Quintessa cannot state with specificity when the last phone call with a lead sent to ERB occurred.**

144.    Quintessa recorded its phone calls with "leads" through Talkdesk, a third party. *See* Exhibit 2, Interrogatory 11(c).

**RESPONSE:   Controverted in part. Quintessa admits that it used the service Talkdesk to record leads. Quintessa cannot confirm whether every phone call was recorded.**

145.    Talkdesk provides cloud-based software services for call center operations. Such services include telephone services that allow customers to place and receive calls through the Talkdesk platform and to record and store telephone conversations. *See* Exhibit 24, affidavit of Kieran King, CEO of Talkdesk, Inc., ¶2.

**RESPONSE:  Uncontroverted.**

146.    Talkdesk's policy regarding the retention of customers' call recordings. As noted in the document, the default retention period for call recordings is 180 days (six months). As also noted in the document, customers have the ability configure the retention period to be longer or shorter than the default period on demand as needed. *See* Exhibit 24, affidavit of Kieran King, CEO of Talkdesk, Inc., ¶3.

**RESPONSE:   Object that this "fact" is vague, ambiguous, and confusing. Controverted in part. Quintessa admits that Kieran King attached a copy of the Call and**

**Voicemail Recording Retention Policy that was in effect beginning in January 22, 2021, which was after the conclusion of the relationship between Quintessa and ERB and all of the acts described herein. Quintessa admits in paragraph 3 of Kieran King's affidavit, he states that "As noted in the document, the default retention period for call recordings is 180 days (six months). As also noted in the document, customers have the ability configure the retention period to be longer or shorter than the default period on demand as needed." *See* Exhibit 24. Quintessa denies that this policy was necessarily in effect prior to January 21, 2021. ERB has not provided any evidence regarding the Talkdesk policy, if any, prior to January 21, 2021, which would be the operative policy for all but ten days of the time period described by ERB of April 27, 2020 to February 1, 2021.**

147.     Quintessa Marketing ("Quintessa") has been a Talkdesk customer since on or about January 3, 2017. During that time, and pursuant to the policy described above, Quintessa has configured its own retention period on several occasions. Specifically, I have been informed and on that basis belief that Exhibit B to this declaration is a log of the instances in which Quintessa's retention period was configured by Quintessa on the Talkdesk platform. The log shows that Quintessa's retention period was configured on the following dates for the following periods:

a. On January 3, 2017, the retention period was configured to Talkdesk's default period of 180 days.

b. On January 6, 2017, Quintessa configured its retention period to retain call recordings indefinitely. That is, they set the policy to "do not delete."

c. On August 27, 2019, Quintessa configured its retention period to a period of 30 days.

d. On April 27, 2020, Quintessa configured its retention period to a period of 180 days.

e. On March 18, 2021, Quintessa configured its retention period to a period of 1095 days.

*See* Exhibit 24, affidavit of Kieran King, CEO of Talkdesk, Inc., ¶4.

**RESPONSE: Uncontroverted.**

148.    ERB subpoenaed all call recordings from Talkdesk for the at-issue leads that Quintessa failed to pre-qualify but Talkdesk does not have those recordings. *See* Exhibit 24, affidavit of Kieran King, CEO of Talkdesk, Inc., ¶5.

**RESPONSE: Uncontroverted. Quintessa further state that it also attempted to obtain all call recordings for the at-issue leads and learned that they had been deleted.**

149.    For calls that occurred between April 1, 2020 and April 26, 2020, Quintessa's retention period was 30 days from the date of the recording. Accordingly, those call recordings would generally no longer have been accessible starting 30 days after they occurred, *i.e.*, on or around May 1, 2020 to May 26, 2020, depending on the date the call occurred. *See* Exhibit 24, affidavit of Kieran King, CEO of Talkdesk, Inc., ¶6.

**RESPONSE:  Uncontroverted.**

150.    Similarly, for calls that occurred between April 27, 2020 and August 1, 2020, Quintessa Marketing's retention period was 180 days from the date of the recording. Accordingly, those call recordings would generally no longer have been accessible starting 180 days after they occurred, *i.e.*, on or around October 27, 2020 to February 1, 2021, depending on the date the call occurred. *See* Exhibit 24, affidavit of Kieran King, CEO of Talkdesk, Inc., ¶7.

**RESPONSE:  Uncontroverted.**

151.   Quintessa waited until June 10, 2021 to attempt to recover call recordings from April 20, 2020 to July 24, 2020, beyond the time for retention it itself set up. *See* Exhibit 24, affidavit of Kieran King, CEO of Talkdesk, Inc., ¶8.

**RESPONSE:  Controverted in part. Leo Mingee attempted on numerous occasions to recover the call recordings through the Talkdesk website. Quintessa admits that after numerous failed attempts to locate the files on the Talkdesk website, Quintessa called Talkdesk technical support for assistance.**

152.   ERB notified Quintessa of its material breach of contract on July 17, 2020 with cure date of July 24, 2020.

**RESPONSE:  Uncontroverted.**

153.   As of July 17, 2020 (the date Quintessa was notified of imminent litigation), all calls from 4-1-20 through 4-26-20 were already deleted per Quintessa' retention policy but call records from April 27, 2020 onward would have been available for preservation.

**RESPONSE:  Uncontroverted.**

154.   Quintessa was sued for breach of contract "among other things" [upon information and belief fraud] by the law firm of Hupy and Abraham. *See* Exhibit 2, Interrogatory 15.

**RESPONSE:  Uncontroverted.**

### QUINTESSA'S STATEMENT OF ADDITIONAL FACTS

1.   Bradley agreed to pay $2,000 for each "Motor Vehicle Accident" lead and $4,200 for each "Commercial Policy/Motor Vehicle Accident Injury" lead. *See* Bradley Ex. 1; Declaration of Lauren Mingee ("Ex. A (Mingee Dec.)") ¶ 2.

2.   Bradley was required to pay for every lead received unless he timely disengaged the lead for an approved reason. *See* Bradley Ex. 1. Specifically, the contract stated that:

> The Bradley Law Firm will have six full days (at least 144 hours) to turn down or disengage the lead for approved reasons described below unless otherwise agreed upon in writing by Quintessa Marketing. At 12am on the seventh day, leads will not be eligible for disengagement. Leads that are turned down or disengaged for the approved reasons described in this agreement will be credited back to your Campaign balance once Quintessa has verified and may be subject to internal audit which typically takes 5 days.

*See* Bradley Ex. 1; Ex. A (Mingee Dec.) ¶¶ 3-14.

3.     The contract specified the "approved reasons" to disengage.

> Turndowns and Disengagements
> Approved reasons for turning down or disengaging a lead, unless otherwise agreed by Quintessa Marketing are as follows:
> - At fault
> - Property Damage under $1,500
> - Defendant Uninsured and no PC UM
> - No medical treatment within 14 days of injury

*See* Bradley Ex. 1.

4.     For each lead provided to Bradley, Quintessa's representatives talked to the potential client ("PC") at length. Ex. A (Mingee Dec.) ¶ 3.

5.     Quintessa representatives attempted to gather all of the information about the PC and other leads, including information about the PC, the accident, and any injuries. Ex. A (Mingee Dec.) ¶ 4.

6.     Quintessa also attempted to ascertain, by talking to each PC at length, whether the PC was deemed at fault, whether the property damage exceeded $1,500, whether at least one of the parties had insurance coverage, and whether the PC sought or planned to seek treatment within 14 days of injury. Ex. A (Mingee Dec.) ¶ 5.

7.     Quintessa also gathered information about any passengers in the car who may have been injured. Ex. A (Mingee Dec.) ¶ 6.

79

8.      All of the information about the PC and passengers was gathered by Quintessa and inputted into the portal, to which Bradley had access. Ex. A (Mingee Dec.) ¶ 7.

9.      Once the lead was transferred to Bradley through the portal, his firm had the obligation to determine whether a valid disengagement reason was present. Ex. A (Mingee Dec.) ¶ 8.

10.     Bradley had to make this determination within 144 hours or seek an extension in writing. Ex. A (Mingee Dec.) ¶ 9.

11.     Once the lead was transferred to Bradley, his firm had the obligation to ensure that the lead met all of the criteria in the contract if he did not want to be charged for the lead. Ex. A (Mingee Dec.) ¶ 10. That is why the 144-hour disengagement period exists. *Id.*

12.     Quintessa obtains all of the information that it reasonably can from the PC, but Quintessa does not have the same power that Bradley has to obtain police reports and insurance verification. Ex. A (Mingee Dec.) ¶ 11.

13.     Bradley had to make this determination within 144 hours or seek an extension in writing. Ex. A (Mingee Dec.) ¶ 12.

14.     If a valid disengagement reason existed and either 144 hours had not lapsed or Quintessa agreed to an extension *in writing*, Bradley could disengage the lead and Quintessa would not charge him. Ex. A (Mingee Dec.) ¶ 13.

15.     In other words, during this period, Bradley could only disengage a lead if that lead satisfied one of the "approved disengagement reasons" listed in the contract. Ex. A (Mingee Dec.) ¶ 14.

16. Bradley could not disengage a lead for any other discretionary reason and could not disengage a lead after 144 hours without Quintessa approving his request for a written extension. Ex. A (Mingee Dec.) ¶ 15.

17. In fact, the only purpose for the 144-hour period is for Bradley to further vet the leads he is sent and disengage those leads if they meet one of the "approved disengagement reasons." Ex. A (Mingee Dec.) ¶ 16.

18. The only exception to this is if Quintessa agrees, in writing, to a disengagement or an extension for a reason not delineated in the contract. Ex. A (Mingee Dec.) ¶ 17.

19. Quintessa spends a lot of money on marketing to generate these leads. Ex. A (Mingee Dec.) ¶ 18.

20. Accordingly, Quintessa requires that clients pay in advance so that Quintessa will have a fund to bill against. Ex. A (Mingee Dec.) ¶ 19.

21. When fees exceed the fund, the client is required to replenish the fund. Ex. A (Mingee Dec.) ¶ 20; Bradley Ex. 1.

22. Quintessa tracks and accounts for the funds in order to ensure that the law firm pays sufficient funds to continue the marketing campaign. Ex. A (Mingee Dec.) ¶ 21.

23. The contract states "Campaign funding **must** remain above 10%. Once your balance reaches 10%, Quintessa will notify you of additional funding requirements to continue your campaign." Ex. A (Mingee Dec.) ¶ 22; Bradley Ex. 1.

24. This provision protects Quintessa because it allows Quintessa to stop the marketing campaign if the lawyer refuses to pay additional funds. Ex. A (Mingee Dec.) ¶ 23.

25. This provision does not negate Bradley's responsibility to pay for leads he received and did not timely disengage. *Id.*

26.     Notice of going below the 10% threshold in not a contractual obligation of Quintessa. Ex. A (Mingee Dec.) ¶ 24. Rather, it informs the law firm that law firm is in breach of its obligation to always keep the fund above 10%. Ex. A (Mingee Dec.) ¶ 24.

27.     The contract also states that disengagements are subject to an "internal audit." Ex. A (Mingee Dec.) ¶ 25.

28.     This contemplates that the tracking system will need review from time to time because of the continuous flow of leads and disengagements. Ex. A (Mingee Dec.) ¶ 26.

29.     Quintessa uses the portal to document its interaction with each potential client ("PC") and as a way to transmit each PC's information to the law firm (which has access to the portal). Ex. A (Mingee Dec.) ¶ 27.

30.     Each PC has an entry in the portal and has a disengagement button for the attorney to use, if necessary. Ex. A (Mingee Dec.) ¶ 28.

31.     In the profile for the PC, Quintessa also listed additional leads for each passenger in the car. Ex. A (Mingee Dec.) ¶ 29.

32.     The name, known contact information, and a description of injuries, if known, was included for each passenger. Ex. A (Mingee Dec.) ¶ 30.

33.     Each passenger also had their own unique disengagement button for the attorney to use. Ex. A (Mingee Dec.) ¶ 31.

34.     Each lead, including "emailed only" passenger leads, was separately identified in the portal entry for the PC. Ex. A (Mingee Dec.) ¶ 32.

35.     Each and every passenger had their own individual disengagement button. Ex. A (Mingee Dec.) ¶ 33.

36.    ERB regularly made different decisions for PCs and passengers. Ex. A (Mingee Dec.) ¶ 34. For example, Exhibit 7 demonstrates that, among other things, Bradley retained the PC while disengaging a passenger (see, e.g., Ex. 7 Kim Ratliff); b) disengaged the PC but retained the passenger (see, e.g., Ex. 7 Christopher Lewis); or c) retained the PC, retained one passenger, and disengaged a different passenger (s*ee, e.g.*, Ex. 7 Eyob Okubay). Ex. A (Mingee Dec.) ¶ 34.

37.    Prior to filing suit, Bradley never contended that he was only required to pay for plaintiffs, as opposed to leads. Ex. A (Mingee Dec.) ¶ 35.

38.    From the very beginning, Bradley could see the information Quintessa gathered in the portal, understood that he had to follow up with the clients to investigate and verify their claims, and understood that if the investigation revealed that one of the disengagement criteria existed, he could disengage the lead in accordance with the contract. Ex. A (Mingee Dec.) ¶ 36.

39.    And after seeing how the contract operated, he funded the marketing campaign *five times.* Ex. A (Mingee Dec.) ¶ 37.

40.    At all times during the contract period, Bradley had an obligation to timely disengage leads for lack of insurance if he did not want to be charged for the lead.  Ex. A (Mingee Dec.) ¶ 38. At all times during the contract period, Bradley had the right to request an extension in writing and Quintessa had a right to accept or reject the request for an extension. Ex. A (Mingee Dec.) ¶ 38. Quintessa and Bradley operated under these practices during the entire relationship, and nothing in the May 10, 2020 email or May 14, 2020 phone call modified those terms or represented a change in the relationship. Ex. A (Mingee Dec.) ¶ 38.

41.    When Lauren Mingee stated in the May 10, 2020 email that "we give extensions on finding proof of insurance," she was simply conveying that Quintessa gives extensions on a case-by-case basis. Ex. A (Mingee Dec.) ¶ 39.  She did not mean and never intended to mean that

Quintessa would give Bradley a blanket extension for verifying insurance. Ex. A (Mingee Dec.) ¶ 39.

42.     Four days later, Lauren and Leo Mingee had a telephone conversation with Bradley regarding this issue, which was recorded and has been transcribed. Ex. A (Mingee Dec.) ¶ 40. During that telephone conversation, Leo Mingee specifically told Bradley that Quintessa would not give him a blanket extension but would only consider them on a case-by-case basis. Ex. A (Mingee Dec.) ¶ 40; Ex. I (Leo Mingee Dec.) ¶ 2. They did not mean and never intended to mean that Quintessa would give Bradley a blanket extension for verifying insurance. *Id.*

43.     To the best of Quintessa's knowledge, Bradley never requested in writing any extension of the 144-hour period for any lead so that he could verify insurance coverage. Ex. A (Mingee Dec.) ¶ 41.

44.     Rachel Schmitt was responsible for entering data from the portal into Law Ruler. Ex. F, Bradley Dep. 83:11-19. Bradley only looked at the portal once "initially just to see what it looked like and never again." *Id.*

45.     Bradley testified that someone at his firm copied and pasted everything from the Quintessa portal into Law Ruler. Ex. F Bradley Dep. 208:24-209:11.

46.     The Law Ruler printouts show that the copied and pasted included the passenger information. Ex. G.

47.     The evidence demonstrates that Bradley did take passenger cases included in a PC lead. For example, Ex. G shows the Law Ruler entry for Mallory Grant. Located in her Law Ruler entry is information about a passenger, Troy Jefferson. *Id.* Bradley's spreadsheet shows Mallory Grant and Troy Jefferson as two separate clients and states that both were properly charged. D.E. 153-4 at 2-3.

84

48.     Bradley admitted that it was the firm's protocol to open companions in Law Ruler as their own case. *See* Ex. H at 5.

49.     Bradley agrees that Quintessa had an obligation to make a good faith effort to obtain this information. Bradley Dep. 40:17-41:6.

50.     Bradley admits that "there are a lot of instances where we are having to qualify them" Ex. 8 at 3:8-21.

51.     The spreadsheet is a document created for this litigation. Ex. F Bradley Dep. 92:3-19.

52.     Bradley did not create the document – members of his staff did. Ex. F Bradley Dep. 92:3-19.

53.     Bradley testified that the Y or N responses on the spreadsheet were generated by his staff spending hundreds of hours poring over documents from Law Ruler, TrialWorks, and a binder that he had in front of him at the deposition. Ex. F Bradley Dep. 98:12-23; 125:5-127:19.

54.     When asked to explain the basis for claiming a specific lead was not qualified, Bradley had to refer to leaf through the binder, examine the entry in Law Ruler, and examine the entry in TrialWorks before he could explain how they arrived at that conclusion. Ex. F Bradley Dep. 98:12-104:17. Law Ruler, Trial Works, and the binder are not in the summary judgment record.

55.     Bradley admits that the contract required him to disengage leads for any of the disengagement reasons within 144 hours. Ex. F Bradley Dep. 67:7-68:3. His claim is that contract was modified to allow for unlimited extensions for insurance, but he admits that disengagement for any other reason had to be done within 144 hours. *Id.*

Date: October 27, 2022                    Respectfully submitted,

                                          KHAZAELI WYRSCH LLC

                                          By: /s/ James R. Wyrsch
                                          James R. Wyrsch, 53197(MO)
                                          911 Washington Avenue, Suite 211
                                          Saint Louis, MO 63101
                                          (314) 288-0777
                                          (314) 400-7701 (fax)
                                          james.wyrsch@kwlawstl.com

                                          **Attorney for Quintessa Marketing, LLC**