Case: 4:20-cv-01255-JSD   Doc. #: 189-1   Filed: 10/27/22   Page: 1 of 6 PageID #: 1638

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

ERB LEGAL INVESTMENTS, LLC,     )
                                     )
        Plaintiff,           )
                                     )
     vs.                 )        Case No. 4:20-cv-1255-DDN
                                     )
QUINTESSA MARKETING, LLC,     )
                                     )
        Defendant.       )

## <u>DECLARATION OF LAUREN MINGEE</u>

Pursuant to 28 U.S.C. § 1746, I, Lauren Mingee, hereby declare as follows:

1. I have personal knowledge of, or am otherwise competent to testify to, each and every fact set forth in this Declaration.

2. Ryan Bradley and his law firm ERB Legal Investments, LLC ("Bradley") agreed to pay $2,000 for each "Motor Vehicle Accident" lead and $4,200 for each "Commercial Policy/Motor Vehicle Accident Injury" lead.

3. For each lead provided to Bradley, Quintessa's representatives talked to the potential client ("PC") at length.

4. Quintessa representatives attempted to gather all of the information about the PC and other leads, including information about the PC, the accident, and any injuries.

5. Quintessa also attempted to ascertain, by talking to each PC at length, whether the PC was deemed at fault, whether the property damage exceeded $1,500, whether at least one of the parties had insurance coverage, and whether the PC sought or planned to seek treatment within 14 days of injury.

6. Quintessa also gathered information about any passengers in the car who may have been injured.

7. All of the information about the PC and passengers was gathered by Quintessa and inputted into the portal, to which Bradley had access.

8. Once the lead was transferred to Bradley through the portal, his firm had the obligation to determine whether a valid disengagement reason was present.

9. Bradley had to make this determination within 144 hours or seek an extension in writing.

10. Once the lead was transferred to Bradley, his firm had the obligation to ensure that the lead met all of the criteria in the contract if he did not want to be charged for the lead. That is why the 144-hour disengagement period exists.

11. Quintessa obtains all of the information that it reasonably can from the PC, but Quintessa does not have the same power that Bradley has to obtain police reports and insurance verification.

12. Bradley had to make this determination within 144 hours or seek an extension in writing.

13. If a valid disengagement reason existed and either 144 hours had not lapsed or Quintessa agreed to an extension *in writing*, Bradley could disengage the lead and Quintessa would not charge him.

14. In other words, during this period, Bradley could only disengage a lead if that lead satisfied one of the "approved disengagement reasons" listed in the contract.

15. Bradley could not disengage a lead for any other discretionary reason and could not disengage a lead after 144 hours without Quintessa approving his request for a written extension.

16. In fact, the only purpose for the 144-hour period is for Bradley to further vet the leads he is sent and disengage those leads if they meet one of the "approved disengagement reasons."

17. The only exception to this is if Quintessa agrees, in writing, to a disengagement or an extension for a reason not delineated in the contract.

18. Quintessa spends a lot of money on marketing to generate these leads.

19. Accordingly, Quintessa requires that clients pay in advance so that Quintessa will have a fund to bill against.

20. When fees exceed the fund, the client is required to replenish the fund.

21. Quintessa tracks and accounts for the funds in order to ensure that the law firm pays sufficient funds to continue the marketing campaign.

22. The contract states "Campaign funding **must** remain above 10%. Once your balance reaches 10%, Quintessa will notify you of additional funding requirements to continue your campaign."

23. This provision protects Quintessa because it allows Quintessa to stop the marketing campaign if the lawyer refuses to pay additional funds.

24. Notice of going below the 10% threshold in not a contractual obligation of Quintessa. Rather, it informs the law firm that law firm is in breach of its obligation to always keep the fund above 10%.

25. The contract also states that disengagements are subject to an "internal audit."

26. This contemplates that the tracking system will need review from time to time because of the continuous flow of leads and disengagements.

27.     Quintessa uses the portal to document its interaction with each potential client ("PC") and as a way to transmit each PC's information to the law firm (which has access to the portal).

28.     Each PC has an entry in the portal and has a disengagement button for the attorney to use, if necessary.

29.     In the profile for the PC, Quintessa also listed additional leads for each passenger in the car.

30.     The name, known contact information, and a description of injuries, if known, was included for each passenger.

31.     Each passenger also had their own unique disengagement button for the attorney to use.

32.     Each lead, including "emailed only" passenger leads, was separately identified in the portal entry for the PC.

33.     Each and every passenger is a separate lead and had their own individual disengagement button.

34.     ERB regularly made different decisions for PCs and passengers. For example, Bradley's Exhibit 7 demonstrates that, among other things, Bradley retained the PC while disengaging a passenger (see, e.g., Ex. 7 Kim Ratliff); b) disengaged the PC but retained the passenger (see, e.g., Ex. 7 Christopher Lewis); or c) retained the PC, retained one passenger, and disengaged a different passenger (*see, e.g.*, Ex. 7 Eyob Okubay).

35.     Prior to filing suit, Bradley never contended that he was only required to pay for plaintiffs, as opposed to leads.

36.     From the very beginning, Bradley could see the information Quintessa gathered in the portal, understood that he had to follow up with the clients to investigate and verify their claims, and understood that if the investigation revealed that one of the disengagement criteria existed, he could disengage the lead in accordance with the contract

37.     And after seeing how the contract operated, he funded the marketing campaign *five times.*

38.     At all times during the contract period, Bradley had an obligation to timely disengage leads for lack of insurance if he did not want to be charged for the lead.  At all times during the contract period, Bradley had the right to request an extension in writing and Quintessa had a right to accept or reject the request for an extension.  Quintessa and Bradley operated under these practices during the entire relationship, and nothing in the May 10, 2020 email or May 14, 2020 phone call modified those terms or represented a change in the relationship.

39.     When I stated in the May 10, 2020 email that "we give extensions on finding proof of insurance," I was simply conveying that we give extensions on a case-by-case basis. I did not mean and I never intended to mean that Quintessa would give Bradley a blanket extension for verifying insurance.

40.     Four days later, I and Leo Mingee had a telephone conversation with Bradley regarding this issue, which was recorded and has been transcribed. During that telephone conversation, Leo Mingee specifically told Bradley that Quintessa would not give him a blanket extension but would only consider them on a case-by-case basis. I did not mean and I never intended to mean that Quintessa would give Bradley a blanket extension for verifying insurance.

41.     To the best of my knowledge, Bradley never requested in writing any extension of the 144-hour period for any lead so that he could verify insurance coverage.

42.     Quintessa informed ERB that after auditing its records, it discovered that ERB had accepted more leads than ERB had paid for. Quintessa demanded payment for these leads.

43.     Exhibit B is a series of emails between myself and Ryan Bradley.

44.     Exhibit C is a true and accurate printout of all the information that is in the portal for the 51 dispute leads identified by Bradley in his Exhibit 4.

45.     Exhibits D and E are spreadsheets that contain all of the information in the portal collected by Quintessa for each lead sent to Bradley, including the disputed leads.

46.     The information contained in Exhibits C-E are records maintained in the normal course of business and are true and accurate to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Lauren Atkinson (Oct 27, 2022 20:08 CDT)

Executed on October 27, 2022