**E. RYAN BRADLEY 10/20/2022**

# EXHIBIT F

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ERB LEGAL INVESTMENTS, LLC, )
       )
  Plaintiff, )
       ) Cause No. 4:20-cv-1255-DDN
vs. )
       )
QUINTESSA MARKETING, LLC, )
       )
  Defendant. )

VIDEOTAPED DEPOSITION OF E. RYAN BRADLEY
Taken on behalf of the Defendant
October 20th, 2022

Jamie Jo Kinder, CCR 842, CSR 084.003306

## Page 2

         I N D E X
           Page

     EXAMINATION
QUESTIONS BY MR. WYRSCH       9

      EXHIBITS

| | |
|---|---|
| Deposition Exhibit 16 | 8 |
| Deposition Exhibit 4 | 27 |
| Deposition Exhibit 14 | 29 |
| Deposition Exhibit 5 | 88 |
| Deposition Exhibit 3 | 110 |
| Deposition Exhibit 17 | 117 |
| Deposition Exhibit 13 | 131 |
| Deposition Exhibit 15 | 152 |
| Deposition Exhibit 6 | 178 |
| Deposition Exhibit 2 | 179 |
| Deposition Exhibit 18 | 186 |
| Deposition Exhibit 19 | 191 |
| Deposition Exhibit 20 | 197 |
| Deposition Exhibit 21 | 198 |
| Deposition Exhibit 8 | 202 |
| Deposition Exhibit 10 | 205 |
| Deposition Exhibit 11 | 211 |

## Page 3

| | |
|---|---|
| Deposition Exhibit 22 | 221 |
| Deposition Exhibit A | 225 |

(Exhibits electronically sent to Reporter and attached.)

## Page 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ERB LEGAL INVESTMENTS, LLC, )
       )
  Plaintiff, )
       ) Cause No. 4:20-cv-1255-DDN
vs. )
       )
QUINTESSA MARKETING, LLC, )
       )
  Defendant. )

VIDEOTAPED DEPOSITION OF WITNESS, E. RYAN BRADLEY, produced, sworn, and examined on the 20th day of October, 2022, between the hours of 10:10 o'clock in the forenoon and 4:34 o'clock in the afternoon of that day, at The Bradley Law Firm, 1424 Washington Avenue, Suite 300, St. Louis, MO, before Jamie Jo Kinder, Missouri CCR 842, Illinois CSR 084-003306, a Certified Court Reporter within and for the State of Missouri, in a certain cause now pending before the United States District Court of the Eastern District of Missouri in the Eastern Division, wherein ERB LEGAL INVESTMENTS, LLC, is the Plaintiff, and QUINTESSA MARKETING, LLC, is the Defendant.

1 (Pages 1 to 4)

**E. RYAN BRADLEY  10/20/2022**

Page 37

your client to pay them $2,500 and/or $4,000 for somebody that has a worthless case.  So, yes, there were prequalifying criteria, which are espoused here, which are exactly what we discussed and they were supposed to be prequalified for all of these, and if it turned out that they were in fact not, we could turn them down for any one of these reasons.

Q   So you're basing your claim that these are the prequalification criteria based on a phone call that you had prior to entering the contract, is that it?

A   And there may be some e-mails.  I don't remember.  So I would have to go back.  Again, I don't have encyclopedic memory of all the e-mails that were exchanged and the text messages that were exchanged.  But 110 percent the prequalifying criteria were discussed, and if your client had not deleted all of the voice conversations that they had with these people, I think it would reflect that they were asking these questions, these questions, on every single lead to see if they were in fact qualified to even sign up.  Okay?  In fact, even in your answers to interrogatories --

Q   All right.

A   -- it says specifically in there that you guys were qualifying cases based upon this criteria.  So I'm at a loss, really.

Page 38

Q   I'm trying to understand.  You're talking about other things.  I'm just focusing on the contract.  You've said that the contract requires things called prequalification criteria.  I'm trying to understand your basis for saying the contract requires that and what those things are, so that's why I have asked you these things.

A   Okay.  We went over it.  Personal injury case.

Q   Anything else?

A   Plaintiff.

Q   Besides what you already said?

A   Can we go back to the top?

Q   Sure.

A   Okay.  So keep on going.  Has to be a personal injury lead, it has to be in Missouri, it has to be a motor vehicle accident, has to be a plaintiff, not just a lead, but a plaintiff.  Okay?  That means something.  You can't be a plaintiff in a case without the qualification criteria, really, that we talked about.  You can't be at fault and bring a plaintiff personal injury case against someone else.

So this term, in and of itself, means something, and it is the criteria upon which we discussed with Quintessa when we agreed to enter into their services and relied upon the statements on their website.  And, you know, the exact qualification criteria for which it allowed

Page 39

us to disengage, if it turned out that it wasn't accurate or whatever, is on the bottom.  So it has to be in Missouri.

So these are all things that, yes -- these are criteria and they -- I'm sorry.  And then the disengagement is also reflective of the criteria that we agreed upon.

Q   Would you agree with me that under the contract you had an affirmative duty to disengage within 144 hours?

A   At the time that the contract was entered into, that is correct.

Q   Did that change?

A   It 100 percent changed.

Q   What is the basis for claiming it changed?

A   Because if you look at the e-mails and the -- well, we had, I believe, a conversation.  There was a conversation that's audio transcribed.  You've got a copy of it and also there are e-mails where unequivocally extensions were given for finding insurance.  So to answer your question, Quintessa assumed the duty of qualifying the cases, and then I would pay the lump sum for them, and after awhile it became apparent that Quintessa was not prequalifying the cases pursuant to the terms that we had agreed upon, and instead they took the position, well, there's no evidence that there's not insurance instead of

Page 40

affirmatively finding out if there is insurance.  There's a difference.  Right?

So then I wanted this relationship to work out.  I thought it could be a good model.  So I'm like, hey, guys, you know, if you're going to start sending us cases without the insurance part of it, you have got to give us time to figure out if there is insurance.  And that's when Lauren Mingee said that's not a problem, something to that effect, we give extensions for insurance.

As of that date we started taking these leads that were not prequalified for really most criteria and doing our due diligence and assuming that responsibility to figure out this stuff.  But in doing so, relied upon the fact that we were going to get extensions for this newfound contractual duty that we were assuming that was originally theirs.  Does that make sense?

Q   No, but I understand what you're saying.  So what was your understanding of what the disengagement period was for?

A   That if any of the criteria that they had signed up the case in good faith upon, right, that -- that there was -- that they were not at fault, that there was property damage over 1,500, that there was either liability insurance or UM, some insurance someplace, that they actually did get treatment within 14 days, that if any of

10 (Pages 37 to 40)

**E. RYAN BRADLEY  10/20/2022**

## Page 41

those turned out to not be the case, right, after a good faith investigation that we could say, hey, guys, hold up, this one actually doesn't meet qualification, and we could then disengage because we relied upon a good faith investigation by Quintessa to prequalify for all contract criteria. Right? This was a safety net.

Q   Okay. So at the time that you executed the contract, how did you determine whether or not the criteria were met? You said that -- I don't want to use your word, but what did you do to go about determining whether or not these four criteria were there?

A   Well --

Q   I'm speaking of the time period before this e-mail you received from Lauren, what was your process for --

A   So ERB's process would be the same that we have always used, and we've got an intake form and we also use a thing called Law Ruler, which is an intake system, and we would go through the nuts and bolts of all of the intake criteria on that, which included all of this stuff here, and open a case just like we would the last 20 years.

Q   So who was -- Who was involved in that process that you just described?

MR. LANGELLA: Let me just object because I believe we are bleeding into Topic 4. I object to the

## Page 42

extent that this topic does not describe a reasonable particularity and overbroad. Federal Trade Commission versus Am. Screening, LLC, No. 4:20-cv-1021 RLW, Eastern District of Missouri, July 16, 2021.

A   Okay.

MR. LANGELLA: You can answer.

A   Are we on Topic No. 4, I assume?

Q   (By Mr. Wyrsch) Yeah. I mean, a lot of these are going to bleed together.

A   Yeah. So you're asking me about -- Can you ask one more time? Sorry.

Q   You said that you do an intake form and you use Law Ruler.

A   Right.

Q   So I'm trying to understand who was, at the time of this happening, who was involved in that? Who was responsible for doing the intake form and using Law Ruler?

A   So to clarify --

MR. LANGELLA: I'll just object. Say it's vague and ambiguous. Are looking for the identities of the employees or --

MR. WYRSCH: Yes.

MR. LANGELLA: Okay.

A   Okay. So we had this contractual relationship with Quintessa for, I think, four months or so. I'm not

## Page 43

sure exactly how long. I would have to look at the documents and get an exact date. But I can't tell you a laundry list of people that were employed then. It's certainly possible that we had the same employees during that entire time. Certainly, we had new hires during that time. It's certainly possible that somebody was fired or resigned during that time.

That said, when we talked about Topic 4, I think that you had just wanted information about who provided the information on the spreadsheet, which I am prepared to tell you about. That's what we talked about the other day on the phone. If you're wanting something else --

Q   (By Mr. Wyrsch) No, I discussed the other things that were on here, including data entry and the portal and contact with leads.

A   I'm just talking about Topic No. 4.

Q   Yeah, I know.

A   So I e-mailed you after we talked. I thought -- I thought. It says wants information from spreadsheet and where it was derived from, and I'm prepared to tell you that. You want a list?

Q   What e-mail did you send it to?

A   Maybe I didn't provide that to you, but I put on here that you want information from spreadsheet and

## Page 44

where it was derived from.

Q   Let me ask you it this way: You mentioned the intake form. What did you mean by an intake form?

A   So we use Law Ruler, which has got a customizable intake criteria that, you know, can put whatever criteria I want in there and people will go in there and put that in. Right?

Q   Yes.

A   And that's what we use. When we were with Quintessa, the amount of leads that were coming in that were not necessarily prequalified per our criteria, sometimes we would get a lot during the day, and it was overwhelming the staff. So they came up with a written intake sheet that looks like this. Like, here's one for Derek Dunn, Jr., and they would write down the pertinent intake information on here and then scan this in to TrialWorks, which is our practice management software. So, does that --

Q   Can you show on the video what you're referring to?

A   So here's Derek Dunn, Jr.'s, new client info sheet, car crash.

Q   Have those been produced?

A   And the back.

Q   Is there a Bates number on those?

11 (Pages 41 to 44)

**E. RYAN BRADLEY  10/20/2022**

Page 65

A   Of course they did.  It's in an e-mail that they agreed to -- that they give extensions for insurance, and based upon, you know, the representations, my concerns, that were raised multiple times and so, yes, of course. And we started doing that and we started turning down and disengaging cases after 144 hours through various methods and got no feedback from them whatsoever that, hey, this isn't a proper disengagement.

So we relied upon that course of conduct to continue doing what we were doing.  Not once did they say, hey, no, after May 14th or whatever that date is that you just referenced, not once did they ever say, hey, this turndown for insurance purposes is beyond 144 hours and we're not going to give you a disengagement or credit. Right?  So we relied upon that.

Q   Okay.  Anything else that forms your basis for this new contractual duty?

A   Other than their website, the contract itself, the representations that were made about what this program was --

Q   I'm focusing specifically on what you claim is the new contractual duty for The Bradley Law Firm to investigate insurance?

MR. LANGELLA:  I'll just object --

Q   (By Mr. Wyrsch) Are you saying that the

Page 66

website --

A   I'm sorry.

MR. LANGELLA:  I'll just object to the form. Misstates his testimony and assumes that there was a contractual duty even incurred by The Bradley Law Firm or ERB Legal Investments, LLC.

Q   (By Mr. Wyrsch) You have been describing what you claim is a new contractual duty; correct?

A   I think that calls for a legal conclusion. But there were roles and responsibilities and perhaps even a duty, right, that initially were upon Quintessa to perform on good faith that they were not performing in good faith, and in reliance upon them saying we would give an extension for insurance after I raised the problem and the issue many times to them, we started turning down or disengaging cases for insurance after the 144 hours as referenced in the contract, and we have gone through all the bases of why we believed that that was the new dynamic, that was the new way of doing things, and that was further highlighted by the fact that Quintessa remained silent after we were disengaging cases after the 144 hours for insurance because not once did they say, hey, guys, this is beyond 144 hours.  If they had, we would have been alerted that, you know, well, this isn't the new agreement that we have.

Page 67

But they just remained silent, kept taking our money and not giving us apparently a disengagement credit, and then after we filed suit comes up with a laundry list of, oh, here, we found some other cases that we are going to charge you for.  So I think that probably answers your question.

Q   So is it your understanding that after this May 14th phone call and the May 9th e-mail and those things, that Quintessa was allowing The Bradley Law Firm to disengage any lead for insurance purposes after 144 hours?

A   Correct.

Q   Every one?

A   If it turned out that there was no -- if the defendant was uninsured or there was no potential client, UM, which means uninsured motorist, the answer to your question is yes.

Q   Any lead?

A   Any lead that didn't meet that criteria, yes.

Q   You could disengage after the 144 hours?

A   100 percent.

Q   Do I understand correctly, too, that you're only claiming that that was allowed for the insurance issue, not for the property damage issue?

A   We -- I was -- To answer your question, it was only as to the insurance issue.  The other ones I was -- as

Page 68

I described before, they were readily discernible.  I was okay with being able to figure out these within 144 hours. So it was only the insurance issue.

Q   Okay.  So if I understand correctly, that you still believed you had six full days, 144 hours, to disengage for whether or not the person's at fault?

A   Say that one more time.  I'm sorry.

Q   You still understood that you had a contractual obligation to disengage within 144 hours if the issue was that they were not -- that they were at fault, that the PC was at fault?

MR. LANGELLA:  I'll just object.  It calls for a legal conclusion as to whether that was a contractual obligation since Quintessa was supposed to be supplying prequalified leads, but you can answer.

A   My understanding was that we still needed to disqualify a case within 144 hours for the criteria other than insurance, if and only if, it was signed up in good faith through due diligence and prequalified by Quintessa as opposed to we're not sure if it was $1,500 or more, or we're not sure if they got medical treatment within 14 days, et cetera.  Right?  So to answer your question, yes.

Q   (By Mr. Wyrsch) If the lead came in and it did not state that the property damage was over $1,500, did not

17 (Pages 65 to 68)

**E. RYAN BRADLEY  10/20/2022**

Page 81

A  Signing a FOIA request, freedom of information request, for the police report.  It would be sending letters of representation to all at-fault parties and their insurance companies, if known.  It would be sending letters of representation to our clients and/or their family members that they live with, first party insurance companies, to open up claims and/or calling those insurance companies to open up claims.  So that's what we do on every single car accident case irrespective of whether it comes from Quintessa or wherever.  So that has never changed.

Q  So from the beginning of the relationship with Quintessa, when a lead came in, that was your investigative process for those leads?

A  Well, yeah.  But sometimes, I don't remember if on any Quintessa case, if we had to higher a private investigator.  Certainly I have hired private investigators on other cases, so it just depends upon the demands of that particular case.

Q  Did you follow -- And I understand correctly, you follow the same intake procedure for any lead you get regardless of the source of the lead?

A  Generally, of course.  Yes.  Yes.

Q  Who -- So do I understand correctly, I might have asked this before, so I apologize if I'm being repetitive.  The person who's in charge of contacting the

Page 82

clients, the potential clients when you get the leads, is that the three people we talked about before, Rachel, Lisa and Deanna?

A  Yes.  I mean, in addition, the attorney may have reached out and introduced themselves.  So I mean, if you wanted to go lead by lead or case by case, that should be reflected within our software, on case management software.

Q  Okay.

A  But I don't want to leave that out because that's an important part.

Q  Sure.  I appreciate that.  Was there anyone else on staff who was responsible for talking with the clients besides -- generally, besides what you have described?

A  Yes.  And again, you know, I didn't come up with a laundry list of employees.  If I need -- We outsource our payroll and stuff.  If you wanted to, I could have, but I didn't because I thought that you were just interested who put together the spreadsheet.  But if you wanted a list of every person employed from this date to this date, that's something I am sure that we could provide to you.

Q  That's not what I'm asking.  I'm asking specifically about people who would talk to the PCs during

Page 83

the investigation period.

A  Yes, and it's my understanding that that would have been Deanna Cass, Lisa Reiter, Rachel Schmitt, and then the attorneys and that would be me, Pat Henrichs, for a while I think maybe Brandon Rahimi worked here during that phase, but he was short-lived.  I don't think any other attorney worked here during that time period.

Q  Who was responsible for entering the information into the portal?  Sorry --

A  Quintessa.

Q  To the extent that you had to enter notes, who was responsible for entering the notes?

A  Rachel dealt with all of that.

Q  That was all Rachel?

A  Yes.

Q  Did you ever -- How often did you personally access the portal?

A  I think I did initially just to see what it looked like and never again.

Q  That's probably a good time to stop.

THE VIDEOGRAPHER:  We are going off the record at approximately 11:57 a.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  We are back on the record at approximately 12:08 p.m.

Page 84

A  Mr. Wyrsch, during the break I went back and refreshed my recollection --

THE VIDEOGRAPHER:  Microphone.

A  Sorry.  So during the break, you had asked me about that contract that contained additional terms.

Q  (By Mr. Wyrsch) Uh-huh (yes).

A  And I refreshed my recollection by going back, and there was an e-mail or a series of e-mails about proposing these additional terms and then I got an e-mail that said that Quintessa could not agree to three of the four additional terms, and then there was a DocuSign that was sent but then it was voided.  But then on -- Then I sent the contract that was actually, that had the signature on it without that printed language to Quintessa.  So hopefully that clarifies my testimony concerning the additional terms that you brought up.

Q  Okay.  So we'll just pull that back up.  That Exhibit 14 is what you're referring to, it's up on the screen shortly.

All right.  So those additional terms that are up there on Exhibit 14, you're saying that that was part of the document you sent back?

A  During the break, I went back and looked at the e-mails that were from two and a half years ago and these were additional terms that we had discussed and then

21 (Pages 81 to 84)

**E. RYAN BRADLEY 10/20/2022**

Page 89

original Excel document and whether it was protected or not, I don't know.

Q   I'll represent that I didn't steal this from you, so we did receive it from you.

A   Okay.

Q   Or at least the previous law firm received it from you.  It was in the file.

A   It may have been provided to them.  I'm not positive.

Q   Scrolling down to the bottom here, all of these entries are color coded; correct?

A   Correct.

Q   And zoom in here.  That's too much.  It says that the yellow highlighting of a case means that it was improperly charged noncommercial; correct?

A   Right.

Q   Green means improperly charged commercial; correct?

A   That's what it says.

Q   This is your document; correct?

A   Our law firm created this.  My law firm.

Q   And so the blue purports to mean properly charged noncommercial; correct?

A   That's what it says.

Q   And the peach, I don't know, is properly

Page 90

charged commercial; correct?

A   Total properly charged commercial.

Q   And you list out next to it the amount that you claim in damages per the unpaid -- or for the leads that were charged against your account; correct?

A   I apologize.  I broke a rubber band.  I'm like a 12-year-old kid with braces.

Q   Correct?

MR. LANGELLA:  Could you repeat the question?

Q   (By Mr. Wyrsch) Next to that sort of key is a listing of numbers that you claim are the damages in this case for leads that were improperly charged to you?

A   Well, that's what this document says, but I -- I don't think that I did that work.  I can tell you that I personally did the work on the answer to interrogatory that asked about damages.  So if you want to talk about damages, that's what I would rely upon as our position on damages.

Q   I'm asking about the spreadsheet for now.

A   The spreadsheet, I mean, it's what it says, but I don't know that necessarily is -- I personally did not go through and rely upon that for our damage calculation.  One of your topics is damage calculation. Right?

Q   Yeah, we'll get to that.  We are talking about the spreadsheet now.  Just to be clear, we are talking

Page 91

about -- I think it's a lot of things, but I think we specifically said Topic 13, 14, and 12 will be encompassed in this.  Do you want to read your objections?

MR. LANGELLA:  Yeah.  For Topic No. 12, object to the extent that the Defendant Quintessa destroyed evidence of the dates and times that ERB disengaged leads through the portal.  To the extent ERB has other information for any particular lead that demonstrates the dates, any such lead was disengaged, ERB will be prepared to testify as to that.

Further, the dates that each lead was received and disengaged was already known and requiring a corporate representative to testify as to the documentary evidence is cumulative and duplicative.  See, Dongguk University versus Yale University, 270 F.R.D. 70, 74-80, (D.Conn 2010), quashing noticed topics where the discovery already taken appeared adequate; Tri-State Hospital Supply Corp., 226 F.R.D. 118, 126 (D.D.C. 2005) 30(b)(6) depositions should be productive and not simply an excuse to seeking information that is already known.

The same objection applies to Topic 13 and Topic 15.  I believe that's all the topics you're asking for now.  You can answer.

MR. WYRSCH:  I'll note again my objection to you reading those in the record.  I offered to submit the

Page 92

written objections and I believe you're impinging on my five and a half hours.

Q   (By Mr. Wyrsch) All right.  So how was this document created?  Who created it?

A   I think that this document -- It was made at my request, by the collective work efforts of Rachel Schmitt, Deanna Cass and Lisa Reiter.

Q   And this was created for this litigation?

A   Correct.

Q   It was created after the lawsuit was filed?

A   Correct.

Q   And this was created to, at least in part, help respond to discovery requests?

A   Perhaps.

Q   It was produced in response to discovery requests, at least?

A   Okay.

Q   Correct?

A   I think so.

Q   So each of these categories here, what -- we've got a bunch of them across the file.  Where did the information that -- Sorry.  All of these various categories have questions, such as did Quintessa prequalify certified plaintiffs, was it a personal injury case.  That's column E.  Do you see that?

23 (Pages 89 to 92)

**E. RYAN BRADLEY  10/20/2022**

Page 93

A   Okay.

Q   And then there's a yes or no answer below that.

A   Right.

Q   All right.  And then there's a series of other questions that go all the way to the end of the spreadsheet.  Where did the information answered in those questions come from?

A   From every available source of information that we had concerning each particular lead, whether it be an e-mail, data within Law Ruler, data within TrialWorks, this binder.  I can't imagine any other sources because, I mean, ultimately the information would come from some source, and the source, that data, gets put into our database.  So we consulted our database for the basis for each of these.

Q   Okay.  So if you could turn to column AB that says "Reasonable for TD".

A   Right.

Q   And do I understand TD to mean turndown?

A   Correct.

Q   And that means that you turned down the lead?

A   Correct.

Q   All right.  And then typed in there, again, we're only going to focus on the green and yellow leads, is

Page 94

that right, as the ones that you turned down?

A   If that's what the key says.  I'll do whatever you want.

Q   Do you need me to show you the key again?

A   I don't remember.

Q   It's also right in front of you.

A   This is a different document.

Q   Let's do that.  We're going back down here.  The yellow means improperly charged noncommercial, green means improperly charged commercial.

A   Okay.

Q   And I can pull it up, but I believe in your summary judgment motion you specifically refer to this spreadsheet as indicating the reason that you contend that this -- each lead was not qualified.  Am I correct in that?

A   I think so.  I didn't prepare for summary judgment.  It's not a topic.

Q   Well, your affidavits are.  The -- but the -- For each of these leads, the reason that you claim they are disqualified or not qualified are listed in that column; correct?

A   No.  No.  I mean, here are the qualifying criteria and in the column next to, it is did it actually have -- like, for instance, did the prequalified, certified plaintiff have UM coverage.  Did it, yes or no?

Page 95

And then did they actually have coverage?  So the qualifying criteria are all of these.  Right?  So reason for turndown, you know, I think that -- I don't know if they, you know, put all of these things that were criteria for not being qualified in a reason for turndown, if that's what you're asking.

Q   Yeah.

A   I think you have to look at the spreadsheet as a whole.

Q   Okay.  It's good to clarify.  So if I were to look at this spreadsheet, I'm looking at each cell and if it says, you know, for example, did plaintiff actually obtain treatment within 14 days of crash?  Yes.  Well, here, I mean, the UM coverage issue is kind of trumped, I guess, by the defendant had insurance; right?

A   Yeah.  That was an either/or.  If they have -- If the defendant has liability, then it doesn't matter if there's any UM coverage.  It has to be one or the other.

Q   So for this first lead, and I don't know the easiest way for you to do this, but what is the reason you claim the first lead is not qualified?

A   Are you asking me to read the spreadsheet to you?

Q   I'm asking you to tell me.  I have asked you to prepare for this and the basis for the disengagement for

Page 96

each one.

A   What topic are we on?

MR. LANGELLA:  You said 13, 15 and --

A   Thirteen, factual basis.

MR. LANGELLA:  I think 12 -- 12, 13 and 15.

MR. WYRSCH:  Is it 12 through 15?

MR. LANGELLA:  I will just -- You agree I'll have the same running objection?

MR. WYRSCH:  Sure.

MR. LANGELLA:  I'll just object and say the document speaks for itself.  That AA column or AB column, I think, indicates why it was turned down, but you can answer.

MR. WYRSCH:  Well, if that's the case, but he just said it wasn't.

A   No.  Hold on.  What topic are we on?  Thirteen?

Q   (By Mr. Wyrsch) Twelve.  Thirteen.

A   So 12 is the dates that we received and disengaged.

Q   Thirteen, the factual basis for each decision you have disengaged and the sources of information to support this disengagement.

A   Okay.  The factual basis for each disengagement is contained in a ton of documents.  Right?

24 (Pages 93 to 96)

**E. RYAN BRADLEY  10/20/2022**

Page 97

I had Rachel, Lisa and Deanna go through all of this stuff. Right? And create this spreadsheet that would have been our best good faith effort to try to distill from all of this collective data why each particular lead would not have been qualified. Right?

So I can sit here and read to you which is the summary of what our investigation concluded because, I mean, it stands for itself. If you want to go lead by lead, I can reference each of the data to try to further elaborate on why each was turned down.

Q   Well, let's start with the first one. So the first one it says, "Reason for TD. Client found at fault, claim denied." What does claim denied mean?

A   Well, it would indicate that they are found at fault and it would never have met the contract criteria that the person was not at fault.

Q   What does claim denied mean? That was my question.

A   Oh.

Q   Does that mean the insurance claim was denied?

A   Perhaps. It could be denied for a myriad of reasons.

Q   I'm just asking you to explain the phrase that's in the document you produced. Does claim denied just mean insurance claim was denied?

Page 98

A   I would suspect, yes.

Q   So what is the basis for the factual finding by your staff that the client was found at fault?

A   This document that you're showing me here does not indicate why any particular person was at fault.

Q   I understand that. So I'm asking you this reason for turndown is that the client was at fault, where is that information derived from?

A   I just told you.

Q   This specific person?

A   Can you give me the name?

Q   It is Ahmed Alriferi, A-L-R-I-F-E-R-I.

A   Once again, the sources for all of this data would have been the information in TrialWorks, the information in Law Ruler and/or the information in this binder. So as I told you, it took us hundreds of hours to go through and figure out and distill all of this information collectively. Okay?

Now if you want to spend the time for me to recreate that, we can start with Mr. Alriferi and I can start going through here and referencing the sources of data that my employees spent hundreds of hours doing, if that's what you want.

Q   Well, when we talked about this the other day, when we specifically discussed this spreadsheet and what I

Page 99

was looking for, you represented that you thought that most of that information could be found in Law Ruler, that you have Law Ruler open.

A   And TrialWorks.

Q   You didn't mention TrialWorks.

A   Sir, let's be fair. Before the deposition started, you asked if the Law Ruler was cloud-based and I said it may be, but I also need access to TrialWorks, which is server-based. That's why we are here in my office in this cramped environment. So I'm prepared to access everything we've got, between the binder, TrialWorks and Law Ruler to answer any questions that you've got as to any one of these leads. But I just want you to understand that the enormous undertaking in terms of time and effort that collectively we, as a very small law firm, put into this was hundreds of hours, but I am prepared to -- for any one of these people to talk about that by referencing these sources. I'm prepared to do that.

Q   You were supposed to be educated prior to the deposition to do that.

A   And I'm not an encyclopedia. There are a ton of cases here. There is no way for me to remember for each one why they were turned down.

Q   You can't remember the source of -- Well, let's try this. Try to tell me what the reason, that the

Page 100

basis to claim that the client was found at fault here?

A   What's the last name? I'm sorry.

MR. LANGELLA:  Alriferi.

A   Ahmed Alriferi. Okay. We turned them down -- He received violations and was found at fault, according to notes in the file, and in correspondence here is a letter of rep to the --

MR. LANGELLA:  And, Jim, just to make sure I understand. You want, like, a police report or whatever?

MR. WYRSCH:  No. Let me -- I'm trying to say it in plain English. There's a spreadsheet that has been given to me that claims that all of these -- all of these leads are unqualified for specific reasons.

MR. LANGELLA:  Right.

MR. WYRSCH:  And that's great, but that wouldn't prove to me that that's actually true. So I'm trying to understand how that conclusion was arrived at.

MR. LANGELLA:  Right. And that's going to require going into each individual one and taking a look at everything, and whether it's a police report or a denial letter indicating something or the client.

MR. WYRSCH:  That's why I sent the topic over.

A   Okay. So on 9/23 there's a note from Lisa Reiter that due to new information regarding violations the client received from the accident, PTH, which would be

25 (Pages 97 to 100)

**E. RYAN BRADLEY  10/20/2022**

Page 101

Patrick Henrichs, has instructed me to turn the case down, which means if he got violations that he was at fault, right, which is a prequalifying criteria, which means that it should never have been signed up.

Q   Let's break this down a bit.  Where are those notes that you're reading?

A   Well, the only thing I have accessed so far is TrialWorks.  So I'm in TrialWorks right now.  I can go to Law Ruler.  Let's see if there is a note in there.  Hold on a second.

Okay.  So in Law Ruler, he's in here, and I doubt there would be any information in this -- pertaining to him since he was opened in TrialWorks.  Once a case is opened in TrialWorks, everything pretty much happens in there.  Right?

Q   Okay.

A   The only thing in Law Ruler is the intake done by Quintessa, which Deanna Cass copied and pasted into the file.  Right?  And it says was PC at fault and Quintessa put no.  Right?  And then that's it.  Right?  So then here are the violation notices.  I have actually got a copy of the citation pulled up within his file showing that he was operating an uninsured motor vehicle.  Contract criteria; right?  He didn't even have insurance.  I don't know if he had a person that had insurance or not.  That was one of

Page 102

the things they should have investigated.

The second one was for operating -- following too closely.  So he was cited at actually being at fault, which is a contract criteria.  He was cited for driving too fast for conditions or failure to reduce speed to avoid an accident, all arising from this incident.  Right?  So the lead was never properly prequalified for the criteria of not being at fault.

Q   I understand that.  I'm simply asking you for the reasons.  So you provided -- You said that there's copies of the citation.  Is that in TrialWorks?

A   Correct.

Q   Okay.  And then you said there's a note in there.  Who is the note written by?

A   Lisa Reiter.

Q   And then referencing the citation, read the note again.

A   The note from Lisa Reiter is, "Due to new information regarding violations the client received from the accident, PTH has instructed me to turn the case down."

Q   Okay.  And your understanding is that the basis of that was these violations that you have in the record?

A   That he caused the crash.

Q   Right.

Page 103

A   Of course.

Q   And where did you obtain the violations?

A   Where did we obtain them?  Well, it says -- There's a web address on here of cookcountyclerkofcourt.org for payment and court options.  I don't know if -- I don't know how that particular piece of information was obtained.  All I know is that is the factual basis for why it was turned down.

Q   Okay.

A   Which is, you know, what your notice wants.

Q   And on that one that lead was sent to you on July 24th?

MR. LANGELLA:  Just object.  The document speaks for itself.  You can answer.

A   If that's what it says.

Q   (By Mr. Wyrsch) According to the documents?

A   I don't have encyclopedic knowledge of it.

Q   According the document, it says 7/24.

A   That's what this Excel sheet says.

Q   Okay.  And then the -- The date of that note again was?

A   Hold on one second.  And that is what -- I'm sorry.  What?

Q   The date of that note?

A   9/23/20.

Page 104

Q   Which also matches the date of the term "disengagement" on column Y?

A   Correct.

MR. LANGELLA:  Same objection.

Q   (By Mr. Wyrsch) And that's after -- The time period between July 24th and September 23rd is greater than 144 hours; correct?

A   You're assuming we had a duty to turn this case down, which we never did.

Q   I'm asking a very specific question, which, again, I'm just asking you the time.  That time frame is more 144 hours; correct?

A   Can you ask your question one more time?

Q   The time between July 24th, 2020, and September 23rd, 2020, is more than 144 hours; correct?

A   Of course, it's many days, yes.  That's when you turn down the client, yes.

Q   No. 2 is yellow, Bianca Ball, and the reason for turndown is no insurance for either party.  What is the source of that information?

A   Information from all of our databases, which would include --

Q   Specifically --

A   Can I finish my answer?  Which would include TrialWorks, Law Ruler as well as perhaps this binder.  So

26 (Pages 101 to 104)

**E. RYAN BRADLEY  10/20/2022**

Page 125

Law Ruler?

A   You would have to look at all three of those sources that I just looked at, and one or more of them would have the information, and it took, again, forever.

Q   And then when you go to Law Ruler, I think we kind of went through a couple of them, you might -- the source of information might be in a note?

A   Correct.

Q   It might be in a document?

A   Correct.

Q   It might be in a document you received from a third-party?

A   Sure.

Q   It might be in the intake form you received from the lead?

A   It could be a culmination of all of that, correct.

Q   Those are all the different sources you would have to look at to understand the sources of information to arrive at that conclusion?

A   Sure.  It could come from a ticket that we just went through not too long ago.  I mean, I had the actual ticket.  Right?  So of course, you know, those are all sources of data that we rely upon to arrive at that conclusion, yes.

Page 126

Q   Okay.  And you said the intake forms, at least the one that we looked at, that was filled out by the client himself?

A   I have no personal knowledge of that.  I would assume that they filled out their intake form.

Q   It wasn't filled out by anyone at The Bradley Law Firm?

A   No clue.  I'm not a handwriting expert.  I have no idea.  I assume that they did.  Sometimes, however, maybe a paralegal calls in and goes over the intake and writes it down based upon what they say.  I can't tell you under oath unless we looked at it and I recognized the handwriting.  But I would suspect it's one of two options, either what I just described or the person that's in the crash that they provide that information, and then of course we verify it.

Q   Sure.  And then obviously police reports, those are documents generated by third-party?

A   We don't write police reports.

Q   Tickets or documents generated by a third-party?

A   Not us, of course.

Q   Those -- you showed me -- You read about an insurance denial letter, denial coverage letter.

A   Sure.

Page 127

Q   That's obviously coming from the insurance company?

A   Sure.

Q   That's a document from a third-party?

A   True.

Q   So if we wanted to go through and ascertain the sources of information for each one of these leads that are in dispute, we would have to go through that same process of looking at Law Ruler; right?

A   Correct.

Q   Looking at Trial --

A   Works.

Q   Works?

A   Works.

Q   Yeah, and then looking at this binder?

A   Correct.

Q   Is there anything else we'd have to look at to gather that information?

A   Not that I am aware of, no.

Q   Okay.

A   I mean, I would also add, I haven't mentioned this, there is of course your all's information in the portal, but I don't think that -- I don't know that -- we didn't rely upon, I think, the portal to come to these conclusions because the data in the portal was notoriously

Page 128

inaccurate.

Q   To the extent that one of these reasons for TD, and this might be somewhat repetitive, just bear with me, is the -- that determined that the person did not have insurance?

A   Okay.  What "the person"?

Q   Well, I guess that's the question.  Where it says -- Where one of the reasons for TD says, like, look at number two there, no insurance for either party.

A   Right.

Q   Who made that determination?

A   Well, it would have been based upon our investigation that we performed in good faith and by calling the information that was provided, be it insurance companies, sending a letter of representation, getting a turndown letter like we just reviewed that said, hey, there is no insurance.

Q   Okay.

A   Things like that.

Q   And that would have been a conclusion reached by?  Would you be one of the persons to make that decision?

A   To turn it down?

Q   That that is the reason that it was -- it doesn't qualify?

MR. LANGELLA:  I'm just going to object.  It's

32 (Pages 125 to 128)

E. RYAN BRADLEY  10/20/2022

Page 201

A   And independently by going into Law Ruler and searching for that name and it is not in there.

Q   Okay.  So I mean it's not in Law Ruler, but I guess the particular question I have is that you're claiming it's not in Law Ruler because Quintessa did not send this lead as a separate lead within the portal?

A   Yeah.  Can you go back to the portal again?

Q   Uh-huh (yes).

A   So can you go to the list view?

Q   What's that?  Here?

A   Like get rid of the filter and go back to where there was like a bunch of leads.  Right?

Q   I didn't have that.  This thing?

A   No.  Go back to where you don't -- Well, there was like 15 different names on the same screen as different leads.  Right?

Q   I don't think so.

A   So get rid of this name.

Q   Okay.

A   Or reset maybe.

Q   It's working.  It takes a while to get all of it on one page.

A   All right.  So we go down -- So I think the point is that these people over on the end were not separate lead entries here.

Page 202

Q   Okay.

A   And that is what was relied upon to enter into Law Ruler, and when they clicked on these, okay, they would see is Wesley Garrison and put that in through Law Ruler.

Q   Okay.

A   Now, whether or not these people over here were on there, I don't have any personal information in that and that's not something that I prepared for today because it wasn't a topic to specifically address.  But I can tell you unequivocally that none of these passengers and stuff that you have got on the screen as exist today ever made it into our Law Ruler system, and our company policy is that every single individual that has a case goes into Law Ruler.

Q   Okay.  Are you sure about that?

A   What do you mean?

(Deposition Exhibit No. 8.)

Q   (By Mr. Wyrsch) I'm going to show you what has been marked as Exhibit No. 8.  This is a lead e-mail July 12th to -- from Lauren to you; correct?

A   Okay.

Q   If we can scroll down.  This is an e-mail from you on July 12th.

A   Christian Winston.

Q   It says, "I found a few errors on our end.

Page 203

Three were companions were not opened in Law Ruler as their own case, which is a hundred percent not our protocol.  I e-mailed Rachel about those and those are our fault."

A   That's exactly what I just said.  Every single individual that we sign up should be in Law Ruler, a hundred percent.

Q   You're also saying here that the companions, the passengers --

A   Right.

Q   -- were supposed to be entered into Law Ruler.

A   Okay.

Q   That is your protocol; correct?

A   It is.

Q   All right.

A   Every individual, right, with a case.

Q   Right.  Including the companions?

A   Okay.

Q   Those are the passengers?

A   Okay.

Q   Right?

A   Okay.

Q   And they should have been entered into Law Ruler?

A   Sure.  But I think that the contract, if you look at it, requires Quintessa to deliver them through

Page 204

various specific methods, one of which is a portal.

Q   Right.  As we saw, they are in the portal?

A   Well, so you say today.  I'm telling you, based upon what I have got in this binder and from the people that were doing the leads, they were not there on separate entries within the portal.

Now again, whether that's a byproduct that they didn't scroll down far enough and weren't trained on this properly or that they -- whatever it is.

Q   How do you square that with this statement here, where you specifically say it was an error for Rachel not to enter three companions into Law Ruler as their own case?

A   Sure.  I mean, if we come across a companion, a hundred percent we should be putting those into Law Ruler.  Whether it is readily discernible or not is a different story.  You know, if in fact we find a companion, our company policy is a hundred percent to put it in as a separate -- separate lead.  Right?  The whole point is we shouldn't have to hunt for companions within the portal.  They should be entered as their own separate leads, and I can't --

Q   Where in the contract does it say that?

A   Well, it talks about how they would be delivered within the portal, e-mail and live call transfer,

51 (Pages 201 to 204)

**LEXITAS LEGAL**

www.lexitaslegal.com       Phone: 1.800.280.3376       Fax: 314.644.1334

Page 205

or something to that effect, and also I don't understand how you can square what does "e-mailed only" mean.  I mean, I'm at a loss to understand what does e-mailed only mean for a lead status.  If you're claiming that it's in the portal just like these other ones, what's the significance of that status?

Q   Am I understanding correctly that you take the information from the portal and put it into Law Ruler; correct?

A   Not me, but my intake staff.

Q   Your firm?

A   Correct.  Whoever is doing the leads, they will take the information from the e-mail or the portal, whatever it is that we get, all right, and put it into Law Ruler.

(Deposition Exhibit No. 10.)

Q   (By Mr. Wyrsch) I'm going to show you what has been marked as Exhibit No. 10.  Well, first, let's go back to Exhibit -- Let's go back to Exhibit, what we called 17, your Exhibit 4 to the summary judgment.  All right.  Look at -- Scroll down to Mallory Grant.  Do you see that one?

A   Okay.

Q   It's a blue one?

A   What's blue again?

Q   That means --

Page 206

A   Commercial?  No.  Properly.

Q   Noncommercial properly charged.

A   So why are we talking about that?

Q   In Exhibit 10, is this Law Ruler?

A   It -- Yeah.  Uh-huh (yes).  Law Ruler.

Q   You produced a series of printouts from Law Ruler regarding various claims; correct?

A   I believe so.

Q   This is the activity log?

A   Right.  Notes section, I believe.  Oh, yeah, yeah.  Yes.  Activity log.

Q   And then so -- This section here, is this in Law Ruler?  Does it appear like this is in Law Ruler?

A   I don't know what this purpose of representation is.  Can you scroll down?  That looks to me like -- This looks to me like a cut and paste of the lead from you all into the notes section perhaps.

Q   Okay.  So if we go down to -- scroll down past this.  This is a text message from Ms. Grant; is that right?

A   Okay.

Q   So does this appear in Law Ruler?  That's what I'm trying to understand.

A   Does this what?

Q   Does this appear like this is Law Ruler or is

Page 207

this separate?

A   I think if you click on the e-mail it looks like those.

Q   But it's within Law Ruler?  This is not a separate e-mail from like Outlook or something?

A   I think that Outlook is a plug-in to -- Like the Outlook integrates with Law Ruler, and you can send e-mails to and from Law Ruler, both automated and non, that use Outlook.

Q   Okay.  I'm trying to understand your document production.  This document, is this coming from Law Ruler or is this coming from a separate e-mail?

A   I don't understand.

Q   Do you know -- Is this document in Law Ruler or some other --

A   Yeah.  If it's sent through Law Ruler, then it should always be in Law Ruler.  Yeah.  It houses all text messages, e-mails and all communication.

Q   All right.  So now you're down to page 33, and it says new lead intake.

A   New lead intake.  Okay.

Q   It has these case details, all of this information.

A   I got it.

Q   And here you see down here the reference to

Page 208

Troy Jefferson.

A   Okay.  I can read that, yes.

Q   Did you say earlier this was a cut and paste from the portal into --

A   That would be my speculation.  I think that that would make sense because again when we would get those leads, I believe they would be cut and pasted, at least the operative information, into the notes section.

Q   Okay.  I'm going to go back to Exhibit -- I'm going back to the spreadsheet version.  This is back to your summary judgment Exhibit 4; right?

A   Uh-huh (yes).

Q   I'm going to go right here.  Troy Jefferson, that's a separate lead?

A   Where?

Q   Right where the hand is.

A   Okay.

Q   And it even says "Grant" after it?

A   Okay.

Q   So that's a passenger that got its own Law Ruler, its own entry in your spreadsheet?

A   Sure.  It should be done like that if we're properly advised of it.  Of course.

Q   What's different about this than the other ones?

52 (Pages 205 to 208)

**E. RYAN BRADLEY  10/20/2022**

Page 209

A   Again, some of them, according to what my staff told me that were doing the leads, including Rachel, was that they were not really apprised of the lead because it was buried in the notes, the passenger would be.  So they did not make it into their own entry within Law Ruler.  Just because you have got -- All right.  You guys send over an e-mail.  She cuts and pastes it into a lead for Law Ruler.  Law Ruler only has one lead per entry.  Right?  Just because that name is buried within the minutia, right, doesn't necessarily mean that it was opened in Law Ruler as its own lead.  Does that make sense?

Q   No.  I mean, but it did happen at least in this instance where a passenger was --

A   Sure, it got caught.  So I give credit to my staff for catching it and putting it into Law Ruler as its own lead, yes.  But that's not one that I think that we said that did not make it into Law Ruler.  Am I missing something?

Q   No.

A   Okay.  You're just making the point that it's a companion case passenger that made it into Law Ruler?

Q   Right.

A   Understood.

Q   Was not -- It's not in the portal as its own lead.  Going back to the portal.  Look for Jefferson,

Page 210

nothing shows up.

A   I'm sorry.  What?

Q   Nothing shows up.

A   You're telling me in the portal that person is not in the portal?

Q   Correct.  They are not separately entered.  So you hit filter by Jefferson and nothing shows up, and you hit Grant and, first of all, it lists over here separately Troy Jefferson, and there was a decision to e-sign attorney retain Troy Jefferson.

A   Okay, but it's not its own separate lead entry.

Q   Down here it's got its own separate section, passenger, with its own action button.  Do you see that?

A   Yes, but it's buried within another lead at the bottom.

Q   But it has its own action button?

A   Today it appears as though that there is an action button next to it.  Who knows if it's operable or not.

Q   You don't know one way or the other?

A   No clue.  I assume not because it's after 144 hours.

Q   Right.  What you don't know is if whether that was there in 2020?

Page 211

A   I have no personal knowledge of whether that was there or not, and as a corporate representative you asked me to testify to the use of the portal.  I prepared to what I think that that means, even though it was, you know, vague.  If I would have had more specificity I could tell you whether or not the portal looked like this or not by talking to my employees.  I didn't do that, though, because it wasn't a topic described with that particular detail.

Q   Again, I'll just note that I specifically included the affidavits that you filed and all of the things that we have been discussing comprise about 60 to 70 entries in your affidavit.  So I think it was fairly encompassed in the topics that we provided here.

(Deposition Exhibit No. 11.)

Q   (By Mr. Wyrsch) So going to your Exhibit 8, my Exhibit 11, turning the page.  This is the transcript that you had made of the telephone recorded phone call --

A   Correct.

Q   -- that you referred to a number of times; is that correct?

A   Yes.

Q   And then it's dated on there?

A   Yep.

Q   Doesn't have a date.  But this is the one you

Page 212

keep referring to; correct?

A   Yes.

Q   So turning to page nine of that.  You would agree with me that in this conversation Leo Mingee specifically says, we'll give like, and it's not like, hey, this is a blanket, you're going to have an extra, you know, 14 days on top of the seven to verify insurance on every single one.  It's like, hey, you know, this one is potentially a great case, but I really -- like we want this one to work, but here's what we have -- here's what will have to pan out.  And so if it's a reasonable point and it's like, okay, well, yeah, I mean, that makes sense.

A   Okay.

Q   You understand that here he's specifically saying there's no blanket extension that's going to be granted for insurance purposes?

A   You need to read above that.  Number one, he's talking about what they do in Texas and California.  Okay?  Not pertaining to what they are doing to me.  They don't reference the e-mail where Lauren Mingee specifically says not a problem, that's why we give extensions for insurance.

Q   This conversation was after this e-mail; correct?

A   Correct.

Q   Five days after the e-mail?

53 (Pages 209 to 212)