UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ERB LEGAL INVESTMENTS, LLC, | ) |
| | ) |
| Plaintiff and | ) |
| Counterclaim defendant, | ) |
| | ) |
| v. | )  No. 4: 20 CV 1255 DDN |
| | ) |
| QUINTESSA, LLC, | ) |
| | ) |
| Defendant and | ) |
| Counterclaim plaintiff. | ) |

## MEMORANDUM & ORDER

This matter is before the Court on the cross-motions of the parties for summary judgment. (Docs. 145, 154, 158, 198.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c). The Court heard the arguments of the parties on December 19, 2022.

For the reasons set forth below, ERB's motions for summary judgment are denied, and Quintessa's motion for summary judgment is granted in part and otherwise denied.

## BACKGROUND

This case arises out of a contract between ERB Legal Investments, LLC, a law firm, and Quintessa, LLC, a lead generation and marketing service, for the provision of personal injury leads. The parties executed the contract on April 21, 2020. (Doc. 153-1 at 2.) Quintessa contracted to provide "pre-qualified leads" to ERB, promptly delivered via email, notification in an online portal, and live call transfer. (*Id*. at 1.) The contract split leads into two tiers, charging "$2,000 per Plaintiff" for tier 1 motor vehicle accidents and "$4,200 per Plaintiff" for tier 2 commercial policy/motor vehicle accident injuries. (*Id*.) The contract provided that ERB's account would be pre-funded with an initial payment of

$50,000, and payment for leads would be deducted from the account "at the time of lead delivery." (*Id.*)  It further provided that the balance of the account "must remain above 10%," and that when the balance reached 10%, Quintessa would notify ERB of additional funding requirements to continue the marketing campaign. (*Id.*)

ERB could turn down or disengage leads for four approved reasons: The lead was at fault; property damage was under $1,500; the defendant was uninsured and the potential client did not have uninsured/underinsured motorist coverage;[1] or the lead did not receive medical treatment within 14 days of injury. (*Id.*)  Unless Quintessa otherwise agreed in writing, ERB had six full days, or 144 hours, to turn down or disengage a lead. (*Id.*)  Funds deducted for leads that ERB disengaged for approved reason would be credited back to ERB's account once verified by Quintessa, subject to an internal audit. (*Id.*)  The contract required ERB to turn down or disengage leads using the Quintessa portal. (*Id.*)

On May 8, 2020, a representative of ERB contacted Quintessa via e-mail to state that a lead did not meet ERB's criteria due to lack of insurance. (Doc. 153-6 at 2.)  After a brief exchange, Lauren Mingee, Quintessa's CEO, replied, "This is why we give extensions on finding proof of insurance." (*Id.* at 1.)  On May 14, 2020, the parties' representatives – Leo and Lauren Mingee for Quintessa and Ryan Bradley for ERB – discussed the six-day disengagement period.  When Mr. Bradley expressed that his firm struggled to qualify some leads within the 144-hour period, Ms. Mingee replied, "[I]f we need to extend that window for insurance and for verification, that's not a problem." (Doc. 153-8 at 6:20-22.)  She stated later in the conversation, "Now, if all the stars align right, of course we want it done in seven days; but if an accident just happened and they have to . . . you know, wait for the police report, we do extend that." (*Id.* at 7:4-7, 8-9.)  Mr. Mingee further elaborated on Quintessa's policy regarding extensions to verify leads:

> And it's not like, Hey, this is a blanket, you're going to have an extra, you know, 14 days on top of the seven to verify insurance on every single one.

---

[1] The contract reads "no PC UM."  In its statement of facts, ERB stated that the criterion read "no PC UIM," which it defined as "no potential client underinsured motorist coverage." (Doc. 153 at ¶ 54.)  Quintessa does not define the term in its own statement of facts.

> It's like, Hey, you know, this one is potentially a great case, but I really – like we want this one to work, but here's what we have – here's what will have to pan out.

(*Id*. at 9:10-15.) Near the end of the conversation about lead disengagement, Mr. Bradley expressed concern regarding the conversion of leads to cases: "I'm expecting that every single case at that price is going to materialize into a case . . . that we can run with. Because if it starts dwindling from there and it's only, you know, 60 percent of them turn into cases, then my margins get real tight." (*Id*. at 13:4-6, 8.) Ms. Mingee indicated her understanding. (*Id*. at 13:16-17.)

The parties continued to dispute the pre-qualification of leads sent by Quintessa. (Doc. 201-2 at 1-30.) On July 17, 2020, Mr. Bradley and Ms. Mingee exchanged emails wherein Mr. Bradley stated his understanding that ERB could request credits even if it took over seven days to receive insurance verification, and Ms. Mingee responded that Quintessa did not "have a blanket if no insurance you can disengage." (*Id*. at 36-37.) The parties then declared each other in material breach of the contract. (*Id*. at 33-34.)

On September 15, 2020, Quintessa removed this action to federal court. (Doc. 1.) In early 2021, Quintessa's suit against ERB, originally filed in Oklahoma state court and removed to the Western District of Oklahoma, was transferred to this Court and consolidated with this action. (Docs. 36, 143.) The following claims remain: ERB's claims for breach of contract, fraud, and conversion; and Quintessa's claim for breach of contract.

ERB moves for summary judgment on Quintessa's counterclaim for breach of contract (Doc. 145); its claim for breach of contract and counterclaim for conversion (Doc. 154); and its claim for fraud (Doc. 158). Quintessa also moves for summary judgment on ERB's claim for fraud. (Doc. 198.)

## **GENERAL LEGAL PRINCIPLES**

Summary judgment is appropriate "if there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party." *Shrable v. Eaton Corp.*, 695 F.3d 768, 770 (8th Cir. 2012); *see also* Fed. R. Civ. P. 56(a). The party moving

for summary judgment must demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence may prompt a reasonable jury to return a verdict for either the plaintiff or the defendant, and it is material if it would affect the resolution of a case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252 (1986); *Rademacher v. HBE Corp.*, 645 F.3d 1005, 1010 (8th Cir. 2011).

The burden shifts to the non-moving party to demonstrate that disputes of fact do exist only after the movant has made its showing. *Anderson*, 477 U.S. at 252.  It is the nonmoving party's burden to set forth affirmative evidence and specific factual support by affidavit and other evidence to avoid summary judgment. *Id.* at 256; *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 530 (8th Cir. 1999).  If reasonable minds could differ as to the import of the evidence, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.  The court must view the facts in the light most favorable to the non-moving party, but it is not required to accept unreasonable inferences or sheer speculation as fact. *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009).

## **DISCUSSION**

### *Quintessa's claim for breach of contract*[2]

ERB first moves for summary judgment on Quintessa's counterclaim for breach of contract. (Doc. 145.)  It argues that it did not breach the contract by failing to pay for leads that Quintessa had delivered but not accounted for, as the contract required ERB to pre-fund its account and Quintessa to monitor the account's funds. (Doc. 147 at 12.)  Quintessa responds that the pre-funding obligation exists to protect Quintessa from law firm clients that receive leads but do not pay for them; when fees exceed funds available in the pre-funded account, the client must replenish the fund to pay the fees. (Doc. 196 at 3-4.)

---

[2] The parties briefed argument regarding the delivery of some leads via e-mail, rather than via the portal as directed by the contract.  Following additional discovery, ERB moved to strike its arguments regarding lead delivery, which the Court granted by docket text order. (Docs. 184, 192.)  The Court therefore does not address the parties' argument regarding lead delivery.

Quintessa further argues that its tracking and accounting functions under the contract ensure that the client pays its fees, and they do not negate the client's responsibility to pay for leads received. (*Id*. at 4.) It states that the contractual language, "Campaign funding must remain above 10%," puts the client on notice of the client's own obligation to keep the account funded. (*Id*.)

ERB also contends that there is no evidence that the 21 leads were pre-qualified by Quintessa, so ERB was not obligated to disengage them. (Doc. 147 at 18.) It argues that none of the 21 leads were qualified as plaintiffs, so Quintessa was not entitled to charge ERB for them under the terms of the contract. (*Id*. at 19.) Quintessa argues in response that its representatives met its obligations to ERB by making a good-faith effort to obtain the relevant information from potential plaintiffs. (Doc. 196 at 10.) Quintessa notes that the contract does not require it to provide leads that fit the four disengagement criteria, as it does not have the same power as ERB to obtain police reports, insurance coverage verification, and medical records. (*Id*.) Its limited ability to verify the information provided by potential plaintiffs creates the need for the 144-hour disengagement period. (*Id*.) It argues that neither the May 10, 2020, email nor the May 14, 2020, phone call modified the terms or relationship established by the contract. (*Id*.) ERB replies that Quintessa failed to provide affirmative evidence of the pre-qualification of the 21 leads. (Doc. 202 at 4.)

"A breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Mo. Military Academy*, 304 S.W.3d 98, 104 (Mo. 2010). The cardinal rule of contract interpretation is to ascertain the intention of the parties and to give effect to that intention. *Burrus v. HBE Corp.*, 211 S.W.3d 613, 616-17 (Mo. Ct. App. 2006) (citing *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. 1973)). "The parol evidence rule bars extrinsic evidence, unless an integrated contract is ambiguous." *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 361 (Mo. 1991). A contract is ambiguous when it is reasonably susceptible to different constructions, but a

contract is not rendered ambiguous by the fact that the parties do not agree upon the proper construction to be given it. *Burrus*, 211 S.W.3d at 617. The construction of a contract is a question of law. *Lee v. Bass*, 215 S.W.3d 283, 288 (Mo. Ct. App. 2007). "However, where an ambiguity is found, the resolution of the ambiguity is a question of fact for the jury to determine using extrinsic evidence." *Teets v. American Family Mut. Ins. Co.*, 272 S.W.3d 455, 462 (Mo. Ct. App. 2008) (overruled on other grounds).

It is not clear from the face of the contract whether Quintessa was authorized to continue ERB's campaign once its pre-funded account was depleted. The provision is reasonably susceptible to at least two constructions. First, it obligated Quintessa to notify ERB when its account reached a balance of 10%, and ERB's campaign would not continue until it funded its account. Second, as Quintessa argues, the contract obligated ERB to ensure that its funding balance remained above 10%, and the provision protects Quintessa from ERB's failure to pay its fees.

Similarly, the contract is ambiguous as to the meaning of "pre-qualified leads." The contract states that Quintessa "will provide pre-qualified leads to [ERB]." (Doc. 153-1 at 1.) It does not define the pre-qualification criteria. Merriam-Webster defines "prequalify" thusly: "to qualify as a candidate; to meet the preliminary requirements for something." *Prequalify*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/prequalify (last visited Dec. 14, 2022). ERB contends that the pre-qualification criteria are contained within the disengagement criteria. The disengagement criteria, though, are listed in a different section of the contract than the term "pre-qualified," and the contract does not draw any connection between pre-qualification and the criteria for disengagement.

Moreover, the contract does not specify what Quintessa was required to do to pre-qualify a lead. Quintessa argues that it had a limited ability to verify the information provided by leads and that it met its obligation by making a good-faith effort to obtain the relevant information. ERB argues that Quintessa's good-faith efforts were insufficient and that the contract required Quintessa to verify the information provided by leads. The contract's silence on the issue of pre-qualification procedure creates an ambiguity, and the resolution of the ambiguity is a question for the jury.

Because the contract is ambiguous as to ERB's payment obligation and pre-qualification, the Court denies ERB's motion for summary judgment on Quintessa's claim for breach of contract.

### *ERB's claim for breach of contract*

ERB next moves for summary judgment on its own claim for breach of contract and conversion. (Doc. 154.) It contends that the contract ambiguously refers to both "leads" and "plaintiffs." (Doc. 156 at 7.) The contract required Quintessa to deliver "pre-qualified leads," and it stated that Quintessa would deduct payment for "leads." (Doc. 153-1 at 1.) However, the pricing tiers stated the charges "per Plaintiff." (*Id*.) ERB argues that the ambiguity permits the Court to consider parol evidence to determine the parties' intent, including the representations that Quintessa made on its website. (Doc. 156 at 8.) It asserts that it began investigating leads sent by Quintessa in reliance on Quintessa's extracontractual statement that it would permit extensions to determine insurance coverage, but Quintessa did not modify the portal to allow disengagement. (*Id*. at 9-12.)

Quintessa responds that the contract is not ambiguous, as the terms make clear that leads are deducted from the pre-funded account at the time of the lead delivery; it argues that ERB knew that it was buying only leads. (Doc. 196 at 12.) It notes that Bradley made an edit to the contract before signing it, so Quintessa was not solely responsible for drafting the contract, and that evidence exists to demonstrate the parties' intent that ERB pay Quintessa for leads. (*Id*. at 13.) Quintessa argues that the 144-hour disengagement period existed to allow ERB to investigate and verify the lead information, and it did not grant a blanket extension of the disengagement deadline. (*Id*. at 15-16.) It notes that ERB never requested an extension of the 144-hour period in writing. (*Id*. at 17.) Lastly, Quintessa argues that it fulfilled its obligations under the contract when it attempted to gather all relevant information before sending the lead to ERB; it reiterates that the 144-hour disengagement period existed to account for instances where the information provided to Quintessa was incorrect. (*Id*. at 19.)

In reply, ERB states that the contract is unambiguous in stating that Quintessa could charge only for plaintiffs, not for leads. (Doc. 202 at 8-9.) ERB then states that, if the Court concludes that the contract is ambiguous, it should determine that extrinsic evidence is admissible; if the Court finds that the proffered extrinsic evidence is inadmissible, it simultaneously asserts that summary judgment should be denied and that the Court may construe the ambiguous terms against Quintessa. (*Id*. at 9-10.)

The contract uses three terms to refer to the targets of the marketing campaign: lead, plaintiff, and potential client (referred to in the contract as "PC"). It uses "lead" or "leads" twelve times and "plaintiff" twice. (Doc. 153-1 at 1.) In the pricing table, the types of cases are split into two "lead tiers," and the table then lists the tier prices "per Plaintiff." (*Id*.) It refers to "potential clients" only once, in the turndown/disengagement section. (*Id*.) In the next section, it provides that "Tier 1/Tier 2 leads are deducted from the funded amount at the time of lead delivery." (*Id*.)

The Court concludes that the contract is unambiguous as to the meaning of leads, plaintiffs, and potential clients. Though it uses three different terms, it is clear from the face of the contract that Quintessa agreed to provide personal injury leads to ERB, and ERB agreed that payment for those leads would be deducted from its account when the leads were delivered by Quintessa. Quintessa would credit ERB's account for leads that it turned down or disengaged for an approved reason within 144 hours. Nothing in the contract suggests that ERB would only be obligated to pay for a lead once the lead materialized into a case, i.e., when the lead became a plaintiff. Because the contract is unambiguous as to the meaning of "leads" and "plaintiffs," the Court cannot consider parol evidence of the parties' intent as to the definition of these terms. There is not a genuine dispute of material fact as to the meaning of "leads" and "plaintiffs."

As discussed above, the contract is ambiguous as to what constitutes a "pre-qualified lead," and the resolution of the ambiguity is a question for the jury. Therefore, there are genuine disputes of material fact as to the balance of ERB's claim for breach of contract, i.e., that Quintessa continuously sent and charged ERB for leads that were not pre-qualified. The Court denies ERB's motion for summary judgment on its own claim for

breach of contract and will allow parol evidence to determine the parties' intent as to the meaning of "pre-qualified" in the contract.

### *ERB's claim for conversion*

ERB argues that it is entitled to summary judgment on its claim for conversion because Quintessa did not have a good faith basis to keep ERB's funds. (Doc. 156 at 14-15.) Quintessa argues in response that the facts do not establish a tortious misappropriation of funds and, at minimum, there is a genuine dispute of material fact. (Doc. 196 at 20-21.)

Misappropriated funds placed in the custody of another for a definite purpose may be subject to a suit for conversion when the plaintiff delivers funds to the defendant for a specific purpose, and the defendant diverts those funds to another, different purpose. *Gadberry v. Bird*, 191 S.W.3d 673, 675-76 (Mo. Ct. App. 2006). Because genuine disputes of material fact remain as to the breach of contract claim, which underlies the claim for conversion, the Court denies ERB's motion for summary judgment on its conversion claim.

### *ERB's claim for fraud*

ERB argues that Quintessa made several representations that were materially false. (Doc. 159 at 4.) ERB contends that Quintessa's pre-contract representations regarding its ability to deliver qualified clients and its statements that it would permit extensions for determining insurance coverage were materially false. (*Id*. at 5.) ERB further asserts that Quintessa's failure to use amended contingency fee agreements provides evidence of Quintessa's knowledge of its false representations. (*Id*.) Last, ERB contends that Quintessa's failure to preserve call recordings between the parties entitles ERB to an adverse evidentiary inference, and the failure is further evidence of Quintessa's false representations. (*Id*. at 6.)

In response, Quintessa first argues that ERB failed to plead its allegations regarding pre-contract representations and Quintessa's failure to use amended contingency fee agreements, so summary judgment should be denied as to those claims. (Doc. 198 at 22.) Quintessa further argues that its alleged failure to use the amended contingency agreements

- 9 -

does not constitute a material misrepresentation. (*Id.* at 23.) Regarding the call recordings, Quintessa notes that it mistakenly believed it had access to calls that had already been destroyed by Talk Desk, a third party; after learning of the destruction of the calls, Quintessa arranged with Talk Desk to preserve calls for a longer period. (*Id.*) It argues that ERB has not shown an entitlement to sanctions and has not established prejudice. (*Id.* at 24.)

ERB argues in reply that Quintessa provides no explanation for changing the default retention of calls with Talk Desk from 180 days to 30 days. (Doc. 202 at 12.) Replying to Quintessa's argument regarding pre-contract representations and the failure to use the amended agreements, ERB contends that the fraud claim encompasses Quintessa's "bait and switch" tactics. (*Id.*)

Quintessa also moves for summary judgment on ERB's claim for fraud. (Doc. 198.) It argues that ERB has not established the existence of a false representation regarding extensions to determine insurance coverage, nor has ERB proffered evidence to support its contention that Quintessa sent leads knowing they were unqualified. (Doc. 199 at 5-7.) ERB argues in response that Quintessa's precontractual representations compared with its performance under the contract amount to a bait and switch. (Doc. 205 at 4.) It reiterates its arguments stated in the briefing for its own motion regarding disengagement extensions, the amended contingency fee agreements, and the Talk Desk call recordings. (*Id.*) Quintessa argues in reply that it fulfilled its contractual obligations, that its representatives informed Bradley that he would not receive a blanket disengagement extension, and that the failure to use the amended contingency fee agreements is irrelevant. (Doc. 206 at 2-3.) It further argues that the lack of call recordings is irrelevant, as ERB has not shown prejudice or any discrepancies in the information provided by Quintessa about a lead. (*Id.* at 3.) Lastly, it contends that ERB has not offered any evidence to support the allegation that Quintessa knowingly provided unqualified leads. (*Id.* at 4.)

The Court first addresses ERB's claim that Quintessa's pre-contract representations on its website were materially false and amount to a "bait and switch." "Although the pleading requirements under Rule 8(a) are relatively permissive, the essential function of

notice pleading is to give the defendant fair notice of what the claim is and the grounds upon which it rests." *WireCo WorldGroup, Inc. v. Liberty Mutual Fire Ins. Co.*, 897 F.3d 987, 992-93 (8th Cir. 2018) (cleaned up) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The permissive nature of the pleading requirements of the Federal Rules of Civil Procedure "do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *Northern States Power Co. v. Federal Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004).

Count 2 of ERB's amended complaint alleges that Quintessa fraudulently misrepresented the disengagement window and engaged leads it expressly knew were unqualified.  Neither Count 2 nor any other section of the complaint includes allegations regarding Quintessa's website or pre-contract representations by Quintessa.  ERB's complaint "was specific as to the nature, bases, and grounds" of Quintessa's alleged fraudulent misrepresentation.  *Id*. at 993.  It did not contain any information that would have put Quintessa on notice that ERB sought to hold it liable for the content of its website or any other pre-contractual representations.  Therefore, the theory that Quintessa is liable for fraudulent misrepresentation on the basis of its pre-contract website representations is not properly before this Court.

In order to prevail on a claim of fraudulent misrepresentation, ERB must show: (1) a false, material representation; (2) the speaker's knowledge of its falsity or ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the statement; (5) the hearer's reliance on its truth, and the right to rely thereon; and (6) proximate injury. *Moses.com Securities, Inc. v. Comprehensive Software Systems, Inc.*, 406 F.3d 1052, 1064 (8th Cir. 2005) (citing *Gast v. Ebert*, 739 S.W.2d 545, 547 (Mo. 1987)).  Failure to establish any one of the essential elements of fraud is fatal to recovery.  *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 132 (Mo. 2010).  "Because fraud is rarely susceptible of positive proof, a plaintiff may prove his or her case by circumstantial evidence," but a finding of fraud "must rest on something more than suspicion, surmise,

and speculation." *O'Gorman & Sandroni, P.C. v. Dodson*, 478 S.W.3d 539, 545-46 (Mo. Ct. App. 2015).

The Court concludes that there is no genuine dispute of material fact as to extensions of the 144-hour disengagement period because there was no false, material representation. Viewing the evidence in the light most favorable to ERB, Quintessa did not misrepresent its willingness to provide extensions. The contract provided that ERB had six full days to disengage a lead unless Quintessa otherwise agreed in writing. (Doc. 153-1 at 1.) Following a dispute regarding the qualification of a lead, Ms. Mingee reiterated that Quintessa would provide extensions for verifying insurance. (Doc. 153-6 at 2.) During the May 14, 2020, telephone conversation, Ms. Mingee reiterated that Quintessa wanted verification or disengagement completed in seven days, but if ERB needed to wait for a police report or insurance verification, Quintessa would extend the window. (Doc. 153-8 at 7:4-7, 8-9; 6:20-22.) Moreover, Mr. Mingee emphasized that Quintessa would not provide a blanket extension on every case. (*Id*. at 9:10-15.)

The statements made by Quintessa's representatives cannot be construed as an agreement to extend the disengagement window for all leads. Rather, they reaffirm the procedure laid out in the contract: ERB had 144 hours to disengage a lead for an approved reason, unless otherwise agreed upon in writing by Quintessa. ERB has not proffered any evidence nor pointed to any evidence in the record that it requested an extension on an individual lead that was denied by Quintessa. There is no genuine dispute of material fact as to extensions of the 144-hour disengagement period.

In addition to alleging a material misrepresentation of the extension policy, ERB alleged in its complaint that Quintessa "engaged 'plaintiffs' it expressly knew were unqualified and without any reasonable believe [sic] they could or would be qualified . . ." (Doc. 63 at ¶ 91.) The alleged false, material representation was that the leads provided by Quintessa were pre-qualified for representation by ERB. As discussed above, a genuine dispute of material fact remains as to the meaning of pre-qualification. Therefore, there is a genuine dispute of material fact as to the first element of fraudulent misrepresentation, i.e., whether Quintessa materially misrepresented the pre-qualification of leads.

In both its complaint and its summary judgment briefing, ERB contends that Quintessa's failure to use the updated retainer is evidence of fraud. (*Id*. at ¶ 85; Doc. 159 at 6.) ERB contends that it twice sent Quintessa an updated retainer contract, to be signed by leads, that contained the disengagement criteria, and Quintessa refused to use the retainer because it would have put leads on notice that they were unqualified for representation. The Court agrees that the evidence is relevant to the second element of fraudulent misrepresentation: Quintessa's knowledge of allegedly false, material representations.[3] The parties do not dispute the final four elements. Because genuine disputes of material fact remain as to at least the first two elements of fraudulent misrepresentation, the Court denies both motions for summary judgment.

Lastly, the Court turns to ERB's request for an adverse evidentiary inference due to the destruction of certain call recordings. Federal law applies to the imposition of sanctions for the spoliation of evidence. *Sherman v. Rinchem Co., Inc.*, 687 F.3d 996, 1006 (8th Cir. 2012). "The ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth, not the prospect of litigation." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007). "Intent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v. Union Pacific R.R.*, 373 F.3d 896, 901 (8th Cir. 2004). Once litigation has commenced and after a specific document request, a party cannot rely on its routine document retention policy as a shield. *Stevenson v. Union Pacific R. Co.*, 354 F.3d 739, 750 (8th Cir. 2004).

Quintessa uses TalkDesk, a cloud-based software service, for its call center operations. (Doc. 160-9 at ¶¶ 2, 4.) TalkDesk allows customers to record and store telephone calls. (*Id*. at ¶ 2.) Quintessa reconfigured the retention period for stored calls several times. From August 27, 2019, through April 27, 2020, the retention period was set

---

[3] To the extent that ERB asserts a claim for fraud based on the failure to use the updated contract, as asserted by Quintessa, it is barred from doing so for the reasons set forth as to Quintessa's pre-contract representations.

to 30 days; from April 27, 2020, to March 18, 2021, it was set to 180 days; and, since March 18, 2021, it has been set to 1095 days. (Doc. 160-9 at ¶ 4.)  As of July 17, 2020, all calls from April 1 to April 26, 2020, had already been deleted by TalkDesk, but calls from April 27, 2020, would have been available for preservation. (Doc. 160 at ¶ 153.)

ERB has not shown evidence of Quintessa's intent to destroy relevant evidence. While ERB worked with Quintessa, from April to mid-July 2020, Quintessa made its retention period longer, not shorter.  ERB relies on *Stevenson* for the proposition that Quintessa cannot use its document retention settings with TalkDesk as a shield for spoliation.  In *Stevenson*, though, the Eighth Circuit emphasized that the plaintiff sent a discovery request for documents while they were still available and could have been preserved.  354 F.3d at 749.  Because the defendant had specific knowledge of the litigation, it had actual knowledge of the document request, and the records were relevant, the district court did not abuse its discretion in giving an adverse inference. *Id*.  Here, ERB has not asserted that it requested the call recordings before they were scheduled for routine destruction.  The Court therefore denies ERB's request for an adverse inference without prejudice.

## **CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that ERB's motion for summary judgment on Quintessa's counterclaim for breach of contract **[Doc. 145] is denied.**

**IT IS FURTHER ORDERED** that ERB's motion for summary judgment on its own claims for breach of contract and conversion **[Doc. 154] is denied.**

**IT IS FURTHER ORDERED** that ERB's motion for summary judgment on its claim for fraud **[Doc. 158] is denied.**

**IT IS FURTHER ORDERED** that Quintessa's motion for summary judgment on ERB's claim for fraud **[Doc. 198] is granted as to extensions of the disengagement window, and is otherwise denied.**

                                              **/s/ David D. Noce**
                                     **UNITED STATES MAGISTRATE JUDGE**

Signed on December 22, 2022